No. 24-1939 (L)

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**ABBVIE, INC.,** *et al.*,

*Plaintiffs-Appellants,*

**v.**

**ANTHONY BROWN,** *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Maryland
(Matthew J. Maddox, District Judge)

# BRIEF OF APPELLEES

ANTHONY G. BROWN
Attorney General of Maryland

JOSHUA R. CHAZEN
HOWARD R. FELDMAN
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jchazen@oag.state.md.us
(410) 576-7058
(410) 576-6995 (facsimile)

February 21, 2025

Attorneys for Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1939 Caption: AbbVie, Inc., et al. v. Anthony G. Brown, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Anthony G. Brown, in his official capacity as Attorney General of the State of Maryland,
(name of party/amicus)

and all other Appellees

who is Appellees, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Joshua R. Chazen Date: 10/11/2024

Counsel for: Appellees



Print to PDF for Filing

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ........ 1

ISSUE PRESENTED FOR REVIEW ........ 2

STATEMENT OF THE CASE ........ 2

The Federal 340B Drug Pricing Program ........ 2

Statutory Background ........ 2

The Role of Covered Entities ........ 4

Covered Entities' Necessary Use of Contract Pharmacies ........ 6

Drug Manufacturers Restrict Covered Entities' Use of Multiple Contract Pharmacies ........ 10

Maryland Enacts House Bill 1056 ........ 13

Procedural Background ........ 15

SUMMARY OF ARGUMENT ........ 19

ARGUMENT ........ 21

I. THE COURT REVIEWS THE DECISION DENYING PRELIMINARY INJUNCTIVE RELIEF FOR LEGAL ERROR AND ABUSE OF DISCRETION. ........ 21

A. A Preliminary Injunction Is an Extraordinary Remedy, and a Plaintiff Must Establish Clear Entitlement to Relief. ........ 21

B. This Court Reviews Legal Conclusions De Novo and the Decision to Deny Preliminary Injunctive Relief for Abuse of Discretion. ........ 22

II. PLAINTIFFS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR PREEMPTION CLAIM. ........ 22

A. A Strong Presumption Against Preemption Applies to Public Health Legislation. ....23

B. Congress Has Not Indicated a Clear Intent to Preclude State Legislation Regarding the Field of Delivery of 340B Drugs. ....29

C. House Bill 1056 Is Consistent with—and Not an Obstacle to—the Objectives of the 340B Program. ....44

1. House Bill 1056 Helps to Fulfill the Objectives of the 340B Program. ....44

2. House Bill 1056 Is Not Otherwise an Obstacle to Fulfillment of the Objectives of the 340B Program. ....51

III. AbbVie Failed to Demonstrate a Likelihood of Success on the Merits of Its Takings Clause Claim. ....58

A. Federal Law Mandates the Sale and Transfer of AbbVie's Drugs at Discounted Prices. ....59

B. AbbVie's Voluntary Participation in the 340B Program Prevents Conferral of a Private Property Interest. ....60

C. AbbVie Does Not Meet Additional Requirements Necessary to Establish a Regulatory Taking. ....66

IV. Plaintiffs Failed to Demonstrate a Likelihood of Success on the Merits of Their Dormant Commerce Clause Challenge. ....69

A. House Bill 1056 Is Not an Extraterritorial Law. ....70

B. House Bill 1056 Is Not a Discriminatory Law. ....73

C. House Bill 1056 Does Not Excessively Burden Interstate Commerce. ....75

V. A Preliminary Injunction Would Not Serve the Public Interest and the Balance of the Equities Does Not Favor a Preliminary Injunction. ....77

VI. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM FROM ENFORCEMENT OF HOUSE BILL 1056 .......... 79

CONCLUSION .......... 81

REQUEST FOR ORAL ARGUMENT .......... 82

CERTIFICATE OF COMPLIANCE .......... 82

TEXT OF PERTINENT PROVISIONS .......... 83

# TABLE OF AUTHORITIES

Page

**Cases**

*AbbVie Inc. v. Fitch*, No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) .......... 23, 28, 68

*American Hosp. Ass'n v. Bacerra*, 596 U.S. 724 (2022) .......... 4

*Arizona v. United States*, 567 U.S. 387 (2012) .......... 35, 36, 45

*Association for Accessible Medicines v. Frosh*, 887 F.3d 664 (4th Cir. 2018) .......... 18, 70, 71, 72

*Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011) .......... 3, 33, 34, 35, 42, 60

*AstraZeneca Pharms. LP v. Fitch*, No. 1:24-cv-196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024) .......... 23, 33, 40

*Baker County Med. Servs., Inc. v. U.S. Att'y Gen.*, 763 F.3d 1274 (11th Cir. 2014) .......... 60, 61

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .......... 27, 28

*Burditt v. United States Dep't of Health & Hum. Servs.*, 934 F.2d 1362 (5th Cir. 1991) .......... 61

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) .......... 59

*Chairman of Bd. of Trs. of Emps.' Ret. Sys. v. Waldron*, 285 Md. 175 (1979) .......... 72

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) .......... 23

*Clayland Farm Enters., LLC v. Talbot County*, 987 F.3d 346 (4th Cir. 2021) .......... 66

*College Loan Corp. v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005) .......... 45

*Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Tr.*, 508 U.S. 602 (1993) .......... 66

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ..........................................79

*Eli Lilly & Co. v. United States Dep't of Health & Hum. Servs.*,
No. 1:21-cv-00081-SEB-MJD, 2021 WL 5039566
(S.D. Ind. Oct. 29, 2021)..................................................... 7, 12, 13, 50, 61, 62

*English v. General Elec. Co.*, 496 U.S. 72 (1990).................................................45

*Environmental Tech. Council v. Sierra Club*, 98 F.3d 774 (4th Cir. 1996) ...........69

*Fulton Corp. v. Faulkner*, 516 U.S. 325 (1996) ....................................................69

*Garelick v. Sullivan*, 987 F.2d 913 (2d Cir. 1993)................................................61

*Gibbons v. Ogden*, 22 U.S. 1 (1824)......................................................................76

*Granholm v. Heald*, 544 U.S. 460 (2005)...............................................................70

*Guthrie v. PPH Mortg. Corp.*, 79 F.4th 328 (4th Cir. 2023)..................................44

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ...........................................................53

*Healy v. Beer Inst.*, 491 U.S. 324 (1989)................................................................70

*Hillsborough County v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985)......................................................... 22, 24, 25, 28, 30, 37

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ...............................................................36

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691
(4th Cir. 1994)..........................................................................................................80

*Just Puppies, Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024) ........... 24, 29, 44, 45, 75

*Mahmoud v. McKnight*, 102 F.4th 191 (4th Cir. 2024) .........................................22

*Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356 (4th Cir. 2020) .......................68

*Maryland v. Louisiana*, 451 U.S. 725 (1981) .........................................................24

*McBurney v. Young*, 667 F.3d 454 (4th Cir. 2012)................................... 69, 70, 75

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .......................................... 24, 25, 37

*Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442 (8th Cir. 1984)....................................................................61

*National Pork Producers Council v. Ross*, 598 U.S. 356 (2023)......... 69, 74, 75, 76

*Newsom ex rel. Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003)...................................................................................................79

*Nken v. Holder*, 556 U.S. 418 (2009) ..............................................................77

*Northern Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472 (4th Cir. 2025)........................................... 19, 22, 23, 24, 29, 30, 44, 45, 51, 53

*Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024)........................................... 23, 27, 33, 35, 37, 38, 50, 51, 56

*Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024). 10, 12, 13, 28, 37, 38, 39

*Oregon Waste Sys., Inc. v. Department of Env't Qual.*, 511 U.S. 93 (1994) ..........74

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).................. 16, 66

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)..........................80

*Pharmaceutical Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir. 2001) ...........................................................................................71

*Pharmaceutical Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-cv-00160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024)...................................... 23, 36, 56

*Pharmaceutical Rsch. & Mfrs. of Am. v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) .......................................................................... 30, 34

*Pharmaceutical Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024)..3, 4, 7, 17, 23, 26, 28, 30, 31, 32, 33, 37, 42, 46, 47, 50, 51, 57

*Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*, Nos. 2:24-cv-00271, 2:24-cv-00272, 2:24-cv-00298, 2024 WL 5147643 (S.D. W. Va. Dec. 17, 2024)......................................................... 40, 41, 42, 57

*Pharmaceutical Rsch. & Mfrs. of Am. v. Murrill*, Nos. 6:23-CV-00997, 6:23-CV-01048, 6:23-CV-01307, 2024 WL 4361597 (W.D. La. Sept. 30, 2024)....................................................... 23, 33, 34, 48, 51

*Pharmaceutical Rsch. & Mfrs. of Am. v. Walsh*,
538 U.S. 644 (2003)........................................................ 25, 29, 45, 53, 71

*Pharmacist Political Action Comm. of Md. (PHARMPAC) v. Harris*,
502 F. Supp. 1235 (D. Md. 1980)................................................ 61, 63, 64

*Pierce v. North Carolina State Bd. of Elections*, 97 F.4th 194 (4th Cir. 2024) ......22

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ..................................................75

*Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005)...................... 23, 24, 25, 29, 37

*PPL Energyplus, LLC v. Nazarian*, 974 F. Supp. 2d 790 (D. Md. 2013) ...............76

*Pulte Home Corp. v. Montgomery County*, 909 F.3d 685 (4th Cir. 2018) .............66

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ..........................................24

*Roe v. Department of Def.*, 947 F.3d 207 (4th Cir. 2020) ............................... 22, 77

*Saint Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872 (7th Cir. 1983) ........................61

*Sanofi Aventis U.S. LLC v. United States Dep't Health & Hum. Servs.*,
58 F.4th 696 (3d Cir. 2023) ............................. 11, 12, 13, 28, 31, 37, 38, 39, 62

*Sanofi-Aventis U.S., LLC v. United States Dep't of Health & Hum. Servs.*,
570 F. Supp. 3d 129 (D.N.J. 2021)........................................... 61, 62, 65, 66, 67

*Sheetz v. County of El Dorado, Colorado*, 601 U.S. 267 (2024) ............................64

*Southeast Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448 (8th Cir. 2016) ..................62

*Southern Blasting Servs., Inc. v. Wilkes County*, 288 F.3d 584 (4th Cir. 2002) .....24

*Star Sci., Inc. v. Beales*, 278 F.3d 339 (4th Cir. 2002) .................................... 70, 72

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007) ............................................................... 70, 75, 77

*United States v. Clawson*, 650 F.3d 530 (4th Cir. 2011) ........................................40

*Virginia Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633
(E.D. Va. 2023)........................................................................................ 63, 65

*Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023) .....................................................22

*Whitney v. Heckler*, 780 F.2d 963 (11th Cir. 1986)....61

*Willowbrook Apartment Assocs., LLC v. City of Balt.*,
563 F. Supp. 3d 428 (D. Md. 2021)....68

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)....21, 80

*Wisconsin Dep't of Indus., Labor & Hum. Rels. v. Gould Inc.*,
475 U.S. 282 (1986)....33

**Constitutional Provisions**

U.S. Const. art. I, § 10, cl. 1....59

U.S. Const. art. I, § 8, cl. 3....69

U.S. Const. art. VI, cl. 2....22

**Statutes**

2024 Md. Laws ch. 962, § 1....1

28 U.S.C. § 1292(a)(1)....2

28 U.S.C. § 1331....1

38 U.S.C. § 8126(a)(2)....51

38 U.S.C. § 8126(h)(3)....52

41 U.S.C. § 256b(a)(5)(C)....5

42 U.S.C. § 1396r-8....3

42 U.S.C. § 256b....2

42 U.S.C. § 256b....40

42 U.S.C. § 256b(a)....3

42 U.S.C. § 256b(a)(4)....3

42 U.S.C. § 256b(a)(5)(A)....5

42 U.S.C. § 256b(a)(5)(B)....5

42 U.S.C. § 256b(a)(5)(D) ....................................................................5

42 U.S.C. § 256b(d)(2)(B)(v) ..............................................................41

42 U.S.C. § 256b(d)(2)(B)(v)(i)............................................................5

42 U.S.C. § 256b(d)(2)(B)(v)(ii)...........................................................5

42 U.S.C. § 256b(d)(3)...................................................................6, 41

Ark. Code Ann. § 23-92-604(c) (West 2021).........................................76

Health Occ. § 12-102(c)(2)(ii) ..............................................................47

La. Stat. Ann. §§ 40:2884-2885 (2023) .................................................76

Md. Code Ann., Elec. Law § 13-236.1 (LexisNexis 2022).....................................55

Md. Code Ann., Env't § 7-601 (LexisNexis 2013) .............................................55

Md. Code Ann., Fin. Inst. § 11-601 (LexisNexis 2020).........................................55

Md. Code Ann., Health Occ. § 12-6C-09.1 (LexisNexis Supp. 2024)......... 1, 13, 43

Md. Code Ann., Health Occ. § 12-6C-09.1(a) (LexisNexis Supp. 2024) ...............55

Md. Code Ann., Health Occ. § 12-6C-09.1(a)(1) (LexisNexis Supp. 2024)..........43

Md. Code Ann., Health Occ. § 12-6C-09.1(a)(2) (LexisNexis Supp. 2024)..........14

Md. Code Ann., Health Occ. § 12-6C-09.1(a)(4) (LexisNexis Supp. 2024).... 43, 54

Md. Code Ann., Health Occ. § 12-6C-09.1(a)(4)(i) (LexisNexis Supp. 2024).......14

Md. Code Ann., Health Occ. § 12-6C-09.1(a)(4)(ii) (LexisNexis Supp. 2024)......14

Md. Code Ann., Health Occ. § 12-6C-09.1(b) (LexisNexis Supp. 2024).. 14, 56, 79

Md. Code Ann., Health Occ. § 12-6C-09.1(c)(1) (LexisNexis Supp. 2024)... 14, 43, 57, 58, 60

Md. Code Ann., Health Occ. § 12-6C-09.1(c)(2) (LexisNexis Supp. 2024)..........14

Md. Code Ann., Health Occ. § 12-6C-09.1(d) (LexisNexis Supp. 2024)...............32

Md. Code Ann., Health-Gen. § 2-801 (LexisNexis 2023).....................................55

Minn. Stat. Ann. § 62J.96 (2024).....................................................................76

W. Va. Code Ann. § 60A-8-6a(c)(1)(A) (West 2024)...........................................77

**Regulations**

42 C.F.R. § 10.2 ....................................................................................3

42 C.F.R. § 10.20 ...............................................................................6, 41

42 C.F.R. § 10.21 ...............................................................................6, 41

42 C.F.R. § 10.22 ....................................................................................6

42 C.F.R. § 10.23 ....................................................................................6

42 C.F.R. § 10.24 ....................................................................................6

COMAR § 10.32.23.06.C ........................................................................47

**Miscellaneous**

2024 Miss. H.B. 728 ...............................................................................76

*340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation*, 82 Fed. Reg. 1210 (Jan. 5, 2017) ..................................67

H.R. Rep. No. 102-384 (1992)...............................................................4, 46

HRSA Office of Pharmacy Affairs Information System for 340B, available at https://340bopais.hrsa.gov/CoveredEntitySearch/000006177 ...........................56

Kan. 2024 H.B. 2551 ...............................................................................76

*Manufacturer Audit Guidelines and Dispute Resolution Process*, 61 Fed. Reg. 65406 (Dec. 12, 1996) .......................................................................6

*Memorandum Report: Contract Pharmacy Arrangements in the 340B Program, OEI-05-13*-00431, Department of Health and Human Services, Office of the Inspector General (Feb. 4, 2014) ....................................................................8

*Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services*, 75 Fed. Reg. 10272 (Mar. 5, 2010)................................................ 4, 8, 9, 10, 49

*Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43549 (Aug. 23, 1996). ............. 6, 7, 9, 26, 46

S. Rep. No. 102-259 § 2141(b) (1992) ..................................................................52

No. 24-1939 (L)

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**ABBVIE, INC., *et al.*,**

*Plaintiffs-Appellants,*

**v.**

**ANTHONY BROWN, *et al.*,**

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Maryland
(Matthew J. Maddox, District Judge)

**BRIEF OF APPELLEES**

## JURISDICTIONAL STATEMENT

In four consolidated civil actions challenging the constitutionality of 2024 Md. Laws ch. 962, § 1 ("H.B. 1056"), Md. Code Ann., Health Occ. § 12-6C-09.1 (LexisNexis Supp. 2024), the district court had jurisdiction under 28 U.S.C. § 1331 because the complaints raise federal claims.

After entering an order consolidating the actions, the district court held a hearing and denied plaintiffs' motions for preliminary injunction. (J.A. 19; J.A. 868-897; J.A. 921-922.) The plaintiffs timely appealed from the order denying

preliminary injunctive relief[1] (J.A. 923-933), and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's order.

## ISSUE PRESENTED FOR REVIEW

Did the district court correctly deny plaintiffs' motions for preliminary injunction because (1) plaintiffs did not demonstrate that they are likely to succeed on the merits of their claims; and (2) the balance of equities and public interest weighed against granting preliminary injunctive relief?

## STATEMENT OF THE CASE

### The Federal 340B Drug Pricing Program

#### Statutory Background

The Veterans Health Care Act of 1992 established the federal § 340B drug pricing program, codified at 42 U.S.C. § 256b and entitled "Limitation on Prices of Drugs Purchased by Covered Entities" (the "340B statute"). The 340B program is administered by the Health Resources and Services Administration ("HRSA"), an

[1] The plaintiffs in No. 24-1939 are pharmaceutical companies AbbVie, Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Aptalis Pharma US, Inc., Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "AbbVie"). The plaintiff in No. 24-1949 is pharmaceutical manufacturer Novartis Pharmaceuticals Corporation ("Novartis"). The plaintiff in No. 24-1978 is a pharmaceutical trade association, Pharmaceutical Research and Manufacturers of America ("PhRMA"). Some plaintiffs did not appeal.

agency of the United States Department of Health and Human Services ("HHS"). *See Astra USA, Inc. v. Santa Clara County, Cal.*, 563 U.S. 110, 113 (2011).

The 340B program requires drug manufacturers participating in Medicaid and Medicare Part B to provide price discounts on "covered outpatient drugs" to certain qualified health care providers ("covered entities").[2] 42 U.S.C. §§ 256b(a), 1396r-8. The 340B program imposes ceilings on the prices that manufacturers may charge on covered outpatient drugs and requires manufacturers to enter into pharmaceutical pricing agreements with the Secretary of Health and Human Services. 42 U.S.C. § 256b(a); *see also* 42 C.F.R. § 10.2. Under pharmaceutical pricing agreements, manufacturers agree to charge covered entities no more than the federally determined ceiling price and comply with certain reporting, record retention, confidentiality and other requirements.[3]

---

[2] Covered entities are health care providers that "'perform valuable services for low-income and rural communities but have to rely on limited federal funding for support.'" *Pharmaceutical Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1141 (8th Cir.), *cert. denied*, ____ S. Ct. ____, 2024 WL 5011712 (Dec. 9, 2024) (citations omitted); *see also Astra USA, Inc.*, 563 U.S. at 115. They include federally qualified health centers. 42 U.S.C. § 256b(a)(4). Covered entities are required to meet strict eligibility criteria. *Id.*

[3] The template pharmaceutical pricing agreement is available at https://www.hrsa.gov/sites/default/files/hrsa/opa/manufacturer-ppa.pdf (last visited Feb. 19, 2025).

**The Role of Covered Entities**

Congress intended that covered entities use the savings realized on purchases of 340B drugs "to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384 (Part 2), at 12 (1992); *see McClain*, 95 F.4th at 1141 (covered entities "'perform valuable services for low-income and rural communities but have to rely on limited federal funding for support,' and the 340B program was designed in part to support this work") (quoting *American Hosp. Ass'n v. Bacerra*, 596 U.S. 724, 738 (2022)). The 340B program does not mandate how covered entities must use the savings realized from the 340B program; the covered entities use the funds as they see fit, including to "pay contract pharmacies for their services or for extra services such as delivery." *Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services*, 75 Fed. Reg. 10272, 10277 (Mar. 5, 2010).

Covered entities often provide uncompensated care to uninsured or underinsured patients. (J.A. 310-337.) The discounts received through the 340B program help covered entities to make drugs more affordable and to fund critical health care programs and services. (J.A. 310-337.) With respect to insured patients, the difference between insurers' reimbursements and drug manufacturers'

discounted prices is used by covered entities to fund needed health care programs and services and to make drugs affordable to patients.[4] (J.A. 310-337.)

A covered entity may resell or transfer drugs purchased through the 340B program only to patients of that covered entity. 42 U.S.C. § 256b(a)(5)(B). Sale or transfer of drugs purchased through the 340B program to ineligible persons, known as "diversion," is prohibited. *Id.* Covered entities are prohibited from obtaining duplicate discounts by seeking a discount from manufacturers under the 340B program for a drug that is subject to a rebate payment under the Medicaid drug rebate program.[5] *Id.* § 256b(a)(5)(A).

To ensure compliance with these program requirements, covered entities must permit HHS and drug manufacturers to audit their records. *Id.* § 256b(a)(5)(C). A manufacturer may conduct an audit where a "reasonable person could believe that a covered entity may have violated" the 340B program's prohibitions on diversion and

---

[4] Congress intended that covered entities derive income from the savings they realize on purchases of covered outpatient drugs; the plaintiffs' characterization of such amounts as "arbitrage profits" misleadingly implies impropriety by covered entities. *See, e.g.*, Appellants' Br. 11, 20, 77. PhRMA's complaint acknowledged that "340B discounts are not required to be passed along to patients." (J.A. 89.)

[5] A covered entity that violates these requirements "shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug," plus interest for intentional violations 42 U.S.C. § 256b(a)(5)(D); *see also id*. § 256b(d)(2)(B)(v)(i). Violations can also result in removal of a covered entity from the 340B program. *Id.* § 256b(d)(2)(B)(v)(ii).

duplicate discounts. *Manufacturer Audit Guidelines and Dispute Resolution Process*, 61 Fed. Reg. 65406, 65409 (Dec. 12, 1996) (confirming that manufacturers must articulate "valid business concerns" in order to undertake audits of covered entities). Manufacturers may meet this modest standard in various ways, for example, by identifying "[s]ignificant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity." *Id*. at 65406.

The 340B program includes an administrative dispute resolution ("ADR") process that must be utilized after an audit to resolve claims by manufacturers against covered entities for violations of the 340B program's prohibitions on diversion and duplicate discounts. *See* 42 U.S.C. § 256b(d)(3); 42 C.F.R. §§ 10.20-10.24.

**Covered Entities' Necessary Use of Contract Pharmacies**

Covered entities may choose to contract with pharmacies, referred to as "contract pharmacies," to dispense discounted drugs purchased through the 340B program. Contract pharmacies serve as "agent[s]" to dispense prescription drugs on behalf of covered entities. *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43549, 43550 (Aug. 23, 1996). Covered entitles purchase drugs dispensed by contract pharmacies using a "ship to, bill to" procedure, whereby "the covered entity purchases the drug, the manufacturer bills the entity for the drug that it purchased, but ships the drug directly

to the contract pharmacy." *Id.* at 43555; *see also FAQs* ("What is a 'ship to bill to' arrangement?"), https://www.hrsa.gov/opa/faqs (last visited Feb. 19, 2025).

By permitting covered entities to use contract pharmacies, HRSA sought to "facilitate program participation" by covered entities that did not have in-house pharmacy services. 61 Fed. Reg. at 43555. Only "a very small number of covered entities used in-house pharmacies"; most relied on outside pharmacies to dispense drugs to patients. *Id.* at 43550. There would be detrimental impacts to covered entities if they were forced to devote resources to developing their own pharmacies or forgoing participation in the 340B program: "It would defeat the purpose of the 340B program if these covered entities could not use their affiliated [contract] pharmacies in order to participate in the 340B program." *Id.*

Consistent with HRSA's observations, Maryland covered entities rely on networks of multiple contract pharmacy locations to make 340B drugs available to patients who may not otherwise receive them (or not timely receive them) if they cannot obtain the drugs at affordable prices from contract pharmacies located conveniently to their homes or neighborhoods. (J.A. 312-313; J.A. 328-330.) *See McClain*, 95 F.4th at 1139 (observing that "building or maintaining a pharmacy is cost-prohibitive for many covered entities" and "outsourcing of pharmacy services has allowed for drug dispensation closer to where low-income patients reside"); *see also Eli Lilly & Co. v. United States Dep't of Health & Hum. Servs.*, No. 1:21-cv-

00081-SEB-MJD, 2021 WL 5039566, at *11 (S.D. Ind. Oct. 29, 2021) (observing that contract pharmacy arrangements were "a common practice at the time the 340B statute was enacted"), *appeal docketed*, No. 21-3128 (7th Cir. Nov. 15, 2021).

Guidance issued by HRSA in 2010 permitted covered entities to contract with one or more pharmacies. 75 Fed. Reg. at 10272, 10277. Multiple contract pharmacy arrangements allow covered entities "to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients served." *Id.* at 10273. Under such contracts, the covered entities must "purchase the drug, maintain title to the drug and assume responsibility for establishing its price." *Id.* at 10277. Manufacturers or, as applicable, their wholesalers, "must bill the covered entity for the drug . . . purchased, but ship[] the drug directly to the contract pharmacy."[6] *Id.*

[6] In addition to the "replenishment" inventory model, covered entities and contract pharmacies also utilize a "pre-purchased" inventory model, where pharmacies fill prescriptions from covered entities' stocks of 340B drugs with contract pharmacies. *See Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, *OEI-05-13*-00431, Department of Health and Human Services, Office of the Inspector General, at 5 (Feb. 4, 2014), available online at https://oig.hhs.gov/documents/evaluation/2914/OEI-05-13-00431-Complete%20Report.pdf (last visited Feb. 19, 2025). Under the replenishment model, a covered entity orders and pays for the 340B drugs. (J.A. 35; J.A. 217) (explaining that replenishment orders are placed on a "340B account . . . in the covered entity's name" and "reflect[] its financial payment information")).

Covered entities' use of contract pharmacies, provides "*only* . . . those covered entities [with] a process for accessing 340B pricing," 61 Fed. Reg. at 43550 (emphasis in original), and "does not in any way extend [340B program drug] pricing to entities which do not meet program eligibility." *Id.*

The 340B program's prohibitions of diversion and duplicate discounts are applicable to covered entities who choose to contract with pharmacies. Covered entities using contract pharmacies are "responsible for ensuring that the system of distribution chosen fully meets statutory obligations of ensuring against diversion to non-patients or creating a situation that results in a State Medicaid program seeking a rebate on a [340B program] discounted drug." 75 Fed. Reg. at 10278. A covered entity's use of a contract pharmacy arrangement "does not lessen [its] duty to ensure that the 340B program is being administered in compliance with the statute and HRSA guidelines." *Id.* at 10273. Thus, a covered entity still "has, and continues to bear, full responsibility and accountability" for preventing diversion and duplication. *Id.*; *see also id*. at 10275 ("It is expected [by HRSA] that all covered entities will have written policies and procedures for preventing diversion and duplicate discounts as part of their obligations to prevent diversion and duplicate discounts. They are also required to maintain auditable records.").

To facilitate HHS's and manufacturers' statutory audit rights, covered entities and contract pharmacies must maintain "[a]uditable records" demonstrating

compliance with the statutory prohibitions against diversion and duplication of drug discounts. *Id.* at 10273. "Drug diversion and duplicate discounts are a significant concern of HRSA and all efforts to avoid these problems should be well documented." *Id*. at 10278; *see id*. at 10274 ("To the extent a manufacturer believes there is a reasonable basis to conclude that a covered entity is in breach of program requirements, it may audit a covered entity . . . .").

**Drug Manufacturers Restrict Covered Entities' Use of Multiple Contract Pharmacies**

In 2020, drug manufacturers placed limits "on the number of outside pharmacies with which a covered entity may contract to receive 340B-priced drugs." (J.A. 73.) Plaintiff Novartis limited covered entities' ability to use contract pharmacies, first by limiting dispensation of drugs to contract pharmacies located within 40 miles of certain covered entities and then requiring hospital covered entities "lacking an in-house pharmacy to select a single contract pharmacy location." (J.A. 39; J.A. 41.) Plaintiff AbbVie likewise placed limits on covered entities' use of contract pharmacies. (J.A. 388.) After imposing these restrictions, AbbVie "experienced a significant reduction in the volume of drugs for which 340B pricing was requested." (J.A. 178.) Other drug manufacturers have employed similar and, in some cases, more restrictive tactics to limit sales of discounted drugs under the 340B program. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 458 (D.C. Cir. 2024) (describing efforts by Novartis and United Therapeutics

Corporation); *Sanofi Aventis U.S. LLC v. United States Dep't Health & Hum. Servs.*, 58 F.4th 696, 700-01 (3d Cir. 2023) (describing efforts by Sanofi Aventis and Novo Nordisk).

Manufacturers' restrictions on the use of contract pharmacies cause economic harm to covered entities and impair their ability to provide much needed health care services and 340B drugs to patients. Substantial declines in 340B revenues have impaired Maryland covered entities' financial ability to provide health care services and provide affordable drugs to patients. (J.A. 313-314; J.A. 317-318; J.A. 323; J.A. 328-332.) For example, one Baltimore-based health care provider discontinued certain health care services and then closed, in large part due to the adverse financial impact of these manufacturers' tactics. (J.A. 335-336.)

Drug manufacturers challenged HRSA's regulatory authority to require that drug makers recognize covered entities' relationships with an unlimited number of contract pharmacies. For example, in *Sanofi*, drug manufacturers brought actions challenging (1) a December 2020 HHS advisory opinion stating that manufacturers were required to deliver drugs purchased under the 340B program to an unlimited number of contract pharmacies and (2) violation letters issued by HHS asserting that the manufacturers' policies and efforts to restrict covered entities' use of contract pharmacies was unlawful. *Sanofi*, 58 F.4th at 701.

In assessing whether HRSA and HHS are authorized to require manufacturers to deliver 340B drugs to an unlimited number of contract pharmacies, and ultimately determining that they are not, the Third Circuit first observed that the statutory "text is silent about delivery" of drugs. *Id*. at 703. "Nowhere does Section 340B mention contract pharmacies." *Id*.

Based on the text, the Third Circuit concluded that the 340B statute does not prohibit manufacturers' ability to adopt policies restricting covered entities' ability to use an unlimited number of contract pharmacies, like those at issue in *Sanofi*.[7] *Id*. at 704. That is, the "drug makers' restrictions of delivery to contract pharmacies do not violate Section 340B." *Id*. at 706. And in a case brought by manufacturers under circumstances like those involved in *Sanofi*, the District of Columbia Circuit concluded that the 340B program's statutory silence about delivery conditions permits "sellers to impose at least some delivery conditions." *Johnson*, 102 F.4th at 460; *see also id.* ("Statutory silence implies that manufacturers *may* impose distribution conditions by contract, not that they are prohibited from doing so." (emphasis in original)).

*Eli Lilly* involved circumstances like those at issue in *Sanofi* and *Johnson*. There too, the court observed that "[t]he 340B statute is silent as to contract

---

[7] The Third Circuit avoided the question of whether a manufacturer's policy could lawfully preclude all use of contract pharmacies. *Sanofi*, 58 F.4th at 703-04.

pharmacy arrangements and drug manufacturers' *delivery* obligations." 2021 WL 5039566, at *17 (emphasis in original). But in contrast with *Sanofi* and *Johnson*, the court held that the 340B statute "does not leave room for drug manufacturers to unilaterally condition or control the availability of 340B pricing to a particular delivery location" because the effect of such restrictions would render 340B program drug prices inaccessible to covered entities which do not operate an in-house pharmacy or fail to designate just a single contract pharmacy. *Id*. at *18-*20.

Based on this analysis, the 340B statute does not limit the number of pharmacies with which a covered entity may contract or require a covered entity to contract with any number of pharmacies.

**Maryland Enacts House Bill 1056**

Against the backdrop of drug manufacturers' efforts to limit covered entities' use of contract pharmacies to dispense 340B drugs and, therefore, limit the extent of covered entities' participation in the 340B program, Maryland enacted H.B. 1056 (J.A. 339-343), which took effect on July 1, 2024 (J.A. 343). Health Occ. § 12-6C-09.1. The law is intended to prevent 340B drug manufacturers from taking actions "to limit or restrict the acquisition or delivery of a 340B drug" (J.A. 339):

> [A] 340B manufacturer may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity unless the receipt of 340B

> drugs is prohibited by the U.S. Department of Health and Human Services.

Health Occ. § 12-6C-09.1(c)(1). A 340B manufacturer, however, is permitted to limit "the distribution of a 340B drug if the limitation is required under" federal law.[8] *Id.* § 12-6C-09.1(c)(2). Under Maryland's law, "covered entity" is defined by the 340B statute. *Id.* § 12-6C-09.1(a)(2). A "340B drug" is a drug that (1) is a covered outpatient drug under the 340B program, (2) has been subject to an offer for reduced pricing under the 340B program, and (3) "is purchased by a covered entity." *Id.* § 12-6C-09.1(a)(4)(i). H.B. 1056 also applies to purchases of 340B drugs covered entities would have made but for manufacturers' delivery restrictions. *Id.* § 12-6C-09.1(a)(4)(ii).

Whether a covered entity purchases 340B drugs to replenish or establish inventory at its contract pharmacy, federal law dictates the price of the 340B drugs. H.B. 1056 requires only that manufacturers comply with covered entities' instructions to deliver 340B drugs to the covered entities' contract pharmacies of choice. H.B. 1056 regulates delivery of drugs purchased, or to be purchased, by covered entities at prices determined and mandated by federal law. And because

[8] The statute shall not be construed to be "in conflict with applicable federal" law. Health Occ. § 12-6C-09.1(b).

pharmacies are not covered entities under the 340B program, H.B. 1056 does not require that manufacturers make discounted sales to pharmacies.

**Procedural Background**

The plaintiffs filed separate lawsuits challenging the constitutionality of H.B. 1056, respectively, on May 29, 2024 (Novartis), June 5, 2024 (PhRMA), and June 21, 2024 (AbbVie). (J.A. 6; J.A. 18; J.A. 27.)[9] On August 20, 2024, the district court entered an order consolidating the four lawsuits. (J.A. 19.) Collectively, the complaints sought injunctive and declaratory relief for alleged violations of the Supremacy Clause, the dormant Commerce Clause, the Takings Clause, the Due Process Clause, and the Excessive Fines Clause (J.A. 56-58; J.A. 99-109; J.A. 397-410.)

The plaintiffs' motions for preliminary injunction, respectively, were filed on May 29, 2024 (Novartis), June 18, 2024 (PhRMA), and June 22, 2024 (AbbVie). (J.A. 7; J.A. 18; J.A. 28.) Following a hearing on September 4, 2024, the district court delivered an oral ruling denying the plaintiffs' motions for preliminary injunction. (J.A. 868-897.) A written order followed on September 5, 2024. (J.A. 921-922.) In its ruling, the district court observed that covered entities'

[9] AstraZeneca Pharmaceuticals LP ("AstraZeneca"), which is not a party to this appeal, also filed a lawsuit challenging the constitutionality of H.B. 1056, and the district court denied AstraZeneca's motion for preliminary injunction.

arrangements with pharmacies to dispense 340B drugs "have proven necessary because covered entities often lack the resources to operate their own pharmacies, and . . . to make the prescribed medications more accessible to the covered entities' under-resourced patients." (J.A. 871.)

In denying preliminary injunctive relief, the district court determined that AbbVie is not likely to succeed on its takings claim because "HB 1056 does not compel manufacturers to transfer their products either to the government or to a private party.[10] The statute applies only to drug manufacturers who voluntarily participate in the [federal] Medicaid and Medicare programs." (J.A. 876.) Applying the factors from *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), the district court also concluded that H.B. 1056 does not constitute a regulatory taking. (J.A. 876-878.) In this regard, the court determined that (1) the economic impact of H.B. 1056 on AbbVie was not "so severe as to render that statute a taking"; (2) H.B. 1056 did not interfere with AbbVie's distinct investment-backed expectations; and (3) the "public purpose" of H.B. 1056 "to protect the continued operation" of covered entities, was not in the nature of a taking. (J.A. 877-878.)

---

[10] The district court also concluded that AbbVie was not likely to succeed on its claim under the Excessive Fines Clause. AbbVie does not challenge that ruling on appeal. (J.A. 878-881.)

Second, the district court concluded that the plaintiffs are not likely to succeed on their claims of field and conflict preemption. (J.A. 881-889.) In so concluding, the district court observed that the 340B program is not "so pervasive as to occupy a field that HB1056 has invaded," notwithstanding the complexity of the 340B program in its regulation of the price manufacturers may charge on the sale of 340B drugs to covered entities, including "mechanisms to ensure compliance, penalties for noncompliance, reporting requirements imposed on participating manufacturers, and authorization for HHS and manufacturers to audit covered entities." (J.A. 881-882.)

Citing to the Eighth Circuit's decision in *McClain*, the district court explained that the "340B [program] does not speak to or regulate delivery or distribution of drugs to patients or the acquisition of drugs by contract pharmacies as agents of covered entities. H.B. 1056, on the other hand, regulates delivery to and acquisition by contract pharmacies." (J.A. 882.) In determining that the plaintiffs "have failed to show or persuade the Court that the 340B program leaves no room for states to supplement it as to the matter of drug delivery," the court highlighted that state law has traditionally complemented federal law in the areas of drug regulation and consumer protection and noted the presumption that health and safety regulation by states is not preempted. (J.A. 882-883.)

In determining that the plaintiffs are not likely to succeed on their claim of field preemption, the district court concluded that "Congress' silence in the 340B

statute on the matter of delivery to contract pharmacies leaves room for the states to exercise their traditional police power through legislation." (J.A. 885.) The district court similarly rejected the plaintiffs' assertions that H.B. 1056 conflicts with the 340B program, including its mechanism for enforcing the federally mandated price ceilings and prohibitions on diversion and duplicate discounts, and that H.B. 1056 creates an obstacle to accomplishing the objectives of the 340B program. (J.A. 885-887.)[11]

Third, the district court determined that Novartis and PhRMA are not likely to succeed on their claims that H.B. 1056 violates the dormant Commerce Clause. (J.A. 889-896.) The district court found that H.B. 1056 does not target out-of-state transactions, nor does it target manufacturers' transactions with out-of-state wholesalers or distributors. (J.A. 889-890.) The district court further found that Novartis and PhRMA did not make a clear showing that H.B. 1056 exhibits any of the factors found in *Association for Accessible Medicines v. Frosh*, 887 F.3d 664 (4th Cir. 2018). (J.A. 890-896.)

Finally, the district court concluded that the public interest would not be served by enjoining enforcement of H.B. 1056 because its implementation "would

[11] The district court also rejected a theory that H.B. 1056 is preempted by federal patent laws. (J.A. 887-889.)

tend to increase accessibility of 340B drugs to disadvantaged patients served by 340B covered entities." (J.A. 896.) This appeal followed.

## SUMMARY OF ARGUMENT

For several reasons, the district court did not err in denying the plaintiffs' motions for preliminary injunction. First, the district court properly determined that the plaintiffs failed to demonstrate that they are likely to succeed on their challenges to the constitutionality of H.B. 1056 under the Supremacy Clause, the Takings Clause, and the dormant Commerce Clause.

Field preemption applies only when Congress has expressed an intention to altogether displace state law, for example, through pervasive federal legislation. *See Northern Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025). The 340B statute's silence regarding delivery of 340B drugs means that Congress did not intend displace state law in that field. As such, the plaintiffs cannot overcome the strong presumption that state law, such as H.B. 1056, in a field traditionally regulated by the States—health and safety—is not preempted by federal law. The presumption against preemption is particularly strong here because H.B. 1056 and the 340B program share a common purpose of enabling covered entities to acquire 340B drugs at the discounted prices set by federal law. The plaintiffs cannot establish obstacle preemption because H.B. 1056 supports the 340B program's objectives of financially supporting covered entities and increasing the accessibility

of 340B drugs to patients of covered entities. Absent any actual conflict between H.B 1056 and the 340B program, the plaintiffs' obstacle preemption claim fails.

AbbVie is unlikely to succeed on its takings claim because it voluntarily participates in the 340B program and that program, not H.B. 1056, mandates that it sell drugs at discount process to covered entities. Moreover, AbbVie cannot establish a regulatory taking because (1) it has not shown the economic impact on AbbVie of any taking, (2) it does not have a reasonable, investment-backed expectation that it would be free from regulation regarding the delivery of 340B drugs, and (3) the public purpose of H.B. 1056 is not in the nature of a taking.

Novartis and PhRMA are unlikely to succeed on their respective claims under the dormant Commerce Clause because H.B. 1056 does not discriminate against interstate commerce or impede Congress's power to regulate interstate commerce. H.B. 1056 does not regulate the price of any out-of-state transaction, nor does it treat Maryland manufacturers different from manufacturers located outside of Maryland. The law seeks to regulate only conduct that impacts Maryland 340B covered entities and does not provide differential treatment between in-state and out-of-state economic interests. And Novartis and PhRMA are unable to show that H.B. 1056 creates any burden on interstate commerce, let alone one that is clearly excessive.

Second, the district court correctly concluded that the public interest would not be served by enjoining enforcement of H.B. 1056. Implementation of H.B. 1056

is in the public interest because it will preclude drug manufacturers from limiting covered entities' ability to participate in the 340B program and will increase the accessibility of 340B drugs.

Finally, the plaintiffs failed to establish that they would be irreparably harmed from enforcement of H.B. 1056. A stay in enforcement of H.B. 1056 would, however, cause irreparable financial harm to Maryland cash-strapped covered entities and disrupt their patients' access to discounted 340B drugs.

## ARGUMENT

### I. THE COURT REVIEWS THE DECISION DENYING PRELIMINARY INJUNCTIVE RELIEF FOR LEGAL ERROR AND ABUSE OF DISCRETION.

#### A. A Preliminary Injunction Is an Extraordinary Remedy, and a Plaintiff Must Establish Clear Entitlement to Relief.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

### B. This Court Reviews Legal Conclusions De Novo and the Decision to Deny Preliminary Injunctive Relief for Abuse of Discretion.

This Court reviews a decision to deny a preliminary injunction for abuse of discretion, *Roe v. Department of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) and, as part of that review, assesses the lower court's legal conclusions de novo. *Northern Va. Hemp*, 125 F.4th at 492. "[A] district court abuses its discretion 'when it misapprehends the law with respect to the underlying issues in litigation.'" *Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024), *cert. granted sub nom. Mahmoud v. Taylor*, No. 24-297 (U.S. Jan. 17, 2025) (quoting *Vitkus v. Blinken*, 79 F.4th 352, 362 (4th Cir. 2023)). "'[M]ere disagreement with the district court,'" however, does not warrant reversal. *Mahmoud*, 102 F.4th at 203 (quoting *Pierce v. North Carolina State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024)).

## II. PLAINTIFFS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR PREEMPTION CLAIM.

The United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. State law may be preempted under the Supremacy Clause in three circumstances: (1) when Congress has expressed an intention to preempt state law ("express preemption"); (2) when Congress has indicated its clear intent, through comprehensive legislation, to occupy an entire field ("field preemption"); and (3) when a federal law conflicts with state law ("conflict preemption"). *See Hillsborough County v. Automated Med.*

*Labs., Inc.*, 471 U.S. 707, 712-13 (1985); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992); *Northern Va. Hemp*, 125 F.4th at 492-93. H.B. 1056's regulation of delivery of 340B drugs is not preempted by the federal 340B statute.

The plaintiffs assert that the 340B program preempts H.B. 1056 based on field preemption and conflict preemption. Appellants' Br. 26-54. The Eighth Circuit's decision in *McClain*, along with several district court decisions that have analyzed and upheld other States' drug delivery statutes,[12] serve as a roadmap for evaluating and rejecting the plaintiffs' arguments that Maryland's delivery statute is preempted by the 340B program.

### A. A Strong Presumption Against Preemption Applies to Public Health Legislation.

Any assessment of whether a state law is preempted by federal law "'starts with the basic assumption that Congress did not intend to displace state law.'" *Pinney v. Nokia, Inc.*, 402 F.3d 430, 453-54 (4th Cir. 2005) (quoting *Maryland v.*

[12] *See AstraZeneca Pharms. LP v. Fitch*, No. 1:24-cv-196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024) ("*AstraZeneca-Fitch*"); *Pharmaceutical Rsch. & Mfrs. of Am. v. Murrill*, Nos. 6:23-CV-00997, 6:23-CV-01048, 6:23-CV-01307, 2024 WL 4361597 (W.D. La. Sept. 30, 2024), *appeal docketed*, No. 24-30673 (5th Cir. Oct. 21, 2024); *AbbVie Inc. v. Fitch*, No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) ("*AbbVie-Fitch*"), *appeal docketed*, No. 24-60375 (5th Cir. July 24, 2024); *Pharmaceutical Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-cv-00160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024) ("*PhRMA-Fitch*"), *appeal docketed*, No. 24-60340 (5th Cir. July 5, 2024); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) ("*Novartis-Fitch*"), *appeal docketed*, No. 24-60342 (5th Cir. July 9, 2024).

*Louisiana*, 451 U.S. 725, 746 (1981)); *accord Northern Va. Hemp*, 125 F.4th at 492 ("[A] federal statute is presumed not to preempt a state provision."). The assumption disfavoring preemption is particularly strong when, as here, Congress legislates in a field that the States, as "independent sovereigns," have "'traditionally occupied.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Southern Blasting Servs., Inc. v. Wilkes County*, 288 F.3d 584, 590-91 (4th Cir. 2002) (holding that "the comprehensiveness of federal law in the explosives area" did not require preemption of county ordinances); *Pinney*, 402 F.3d at 454.

States, as "independent sovereigns in our federal system . . . do not need Congress's permission to exercise their historic police powers." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 664 (4th Cir. 2024) (rejecting claims that law prohibiting the sale of dogs by retailers was preempted by federal Animal Welfare Act and affirming district court's dismissal); *see also Northern Va. Hemp*, 125 F.4th at 492 ("[U]nder the federalism principles baked into the Constitution, states are separate sovereigns. So, we apply the Supremacy Clause with 'the basic assumption that Congress did not intend to displace state law.'" (citation omitted)).

The area of health and safety is one such field that is "primarily" and "historically" a matter of local concern. *Hillsborough County*, 471 U.S. at 719 (holding that federal regulations governing collection of blood plasma did not

preempt local regulations governing blood plasma centers); *see also Medtronic*, 518 U.S. at 475 (explaining that "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" and holding that state law was not preempted by federal law regulating medical devices) (internal quotation marks omitted). Therefore, courts "seldom infer, solely from the comprehensiveness of federal regulations, an intent to pre-empt in its entirety a field related to health and safety." *Hillsborough County*, 471 U.S. at 718; *see also Pinney*, 402 F.3d at 457 ("[T]here is a strong presumption against preemption when the federal government regulates in areas traditionally left to the states, such as health and safety."). Further, the presumption against preemption "of a state statute designed to foster public health . . . has special force" when, as here, it appears that the federal and state "governments are pursuing 'common purposes.'" *Pharmaceutical Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (citations omitted).

As explained above, the discounts covered entities receive through the 340B program help them to make drugs more affordable to their patients and help covered entities to fund critical health care programs and services. Because covered entities have limited resources and often lack the expertise to open and operate a pharmacy, "[i]t would defeat the purpose of the 340B program if these covered entities could not use their affiliated [contract] pharmacies in order to participate in the 340B

program." 61 Fed. Reg. at 43550. And, as discussed, HRSA's observations about the public health benefits of covered entities' use of contract pharmacies are confirmed by the experience of Maryland covered entities. (J.A. 312-313; J.A. 328-330.)

The adverse impact of manufacturer restrictions on covered entities' use of contract pharmacies has been substantial. As discussed, substantial declines in 340B revenues experienced by covered entities since the imposition of manufacturers' restrictions have impaired Maryland covered entities' financial ability to provide health care services and provide affordable drugs to patients. (J.A. 313-314; J.A. 317-318; J.A. 323; J.A. 328-332.) And the adverse financial impact of manufacturers' restrictions caused the discontinuation of certain health care services by one Baltimore based health care provider and, ultimately, contributed to the closure of that provider. (J.A. 335-336.)

H.B. 1056 is directed at the very manufacturer restrictions that have adversely impacted Maryland covered entities and, derivatively, at bettering the public health of Maryland citizens by facilitating the availability of heath care services and 340B drugs. When seen in this light, the plaintiffs' assertion that H.B. 1056 "does not implicate states' traditional police powers" is meritless. Appellants' Br. 55. Accordingly, courts assessing other States' 340B drug delivery laws apply the presumption against preemption. *See, e.g.*, *McClain*, 95 F.4th at 1140; *Novartis-*

*Fitch*, 738 F. Supp. 3d at 748 ("House Bill 728 plainly falls under the umbrella of a health and safety regulation. It prohibits manufacturers from refusing to deliver Section 340B drugs to contract pharmacies, presumably to maximize covered-entity patients' access to drugs for which the manufacturers have already agreed to provide a discount."). As such, the district court properly applied a presumption against preemption in its assessment of H.B. 1056. (*See* J.A. 883.)

The Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), does not support the plaintiffs' argument that the district court erred in applying the presumption against preemption, because, unlike here, *Buckman* did not involve a field that the States have traditionally occupied. Appellants' Br. 54-55. In *Buckman*, individuals brought state-law tort claims based on injuries sustained from medical devices manufactured by the defendant. 531 U.S. at 346-47. The plaintiffs premised their state tort claims on a theory that the manufacturer made "fraudulent representations to the FDA as to the intended use" of its devices and, as a result, the devices were "given market clearance [by the FDA] and were subsequently used to the plaintiffs' detriment." *Id*. at 347.

In assessing whether the plaintiffs' "fraud-on-the-FDA" claims were preempted by federal law, the Supreme Court observed that "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied' . . . such as to warrant a presumption against finding federal pre-emption of a state-law

cause of action." *Id*. (citation omitted). Thus, the Court held that the tort claims conflicted with, and were therefore preempted by, federal law because the "federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration."

In contrast with the statutory scheme at issue in *Buckman*, the 340B statute is silent regarding the subject matter of H.B. 1056, which is delivery of drugs; as decisions by the District of Columbia and Third Circuits confirm, federal regulators cannot enforce matters of delivery. *See Johnson*, 102 F.4th 452; *Sanofi*, 58 F.4th 696. Unlike the field of policing fraud against federal agencies, States have traditionally occupied the field of health and safety. Thus, in *McClain*, "[n]otwithstanding the supremacy of federal law," the Eighth Circuit appropriately applied the "'presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause.'" 95 F.4th at 1140 (quoting *Hillsborough County*, 471 U.S. at 715). Indeed, one district court observed that drug manufacturers should have "foreseen that states might enact policies favoring dispensation at contract pharmacies." *AbbVie-Fitch*, 2024 WL 3503965, at *20; *see also id*. at *7 ("'[D]eference to our federalism counsels a presumption that areas of law traditionally reserved to the states . . . are not to be disturbed absent the clear and manifest purpose of Congress.'" (citation omitted; ellipses in *AbbVie-Fitch*).

As these cases highlight, in assessing whether federal law preempts H.B. 1056, a court must apply the "strong presumption against preemption when the federal government regulates in areas traditionally left to the states, such as health and safety." *Pinney*, 402 F.3d at 457. Here, the presumption against federal preemption has "special force" because the 340B program and H.B. 1056 have the common purpose of better enabling covered entities to acquire drugs at discounted prices and use the savings to provide needed health care services to underserved communities and to make drugs more accessible to patients. *See Walsh*, 538 U.S. at 666.

### B. Congress Has Not Indicated a Clear Intent to Preclude State Legislation Regarding the Field of Delivery of 340B Drugs.

Whether Congress intended a federal law to displace state law in a particular field does not, as the plaintiffs assert, turn on whether the federal law "expressly invites" state legislation in the field. Appellants' Br. 27. Rather, field preemption "reflects an intent to displace state law altogether." *Northern Va. Hemp*, 125 F.4th at 493. Such an intent can be inferred from federal legislation that is "'so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id*. (citation omitted).

In *Just Puppies*, this Court observed that field preemption occurs only in the "*rare case* in which Congress intends for federal law to exclusively govern a

particular subject." 123 F.4th at 661 (emphasis supplied; internal quotation marks and brackets omitted). "Importantly, though, *rarely does Congress legislate so comprehensively* in a particular field that there is no room for 'supplementary state legislation.'" *Northern Va. Hemp*, 125 F.4th at 493 (emphasis supplied; citation omitted). At least insofar as delivery of 340B drugs is concerned, the 340B program is not one of those rare cases.

Again, *McClain* provides the appropriate roadmap for the Court. *McClain* involved a challenge by PhRMA to an Arkansas statute which, like H.B. 1056, "prohibits manufacturers from limiting covered entities' ability to contract with outside pharmacies." *McClain*, 95 F.4th at 1139, 1142-43 (describing the Arkansas statute). Rejecting PhRMA's claims, the district court granted a motion for summary judgment filed by intervening covered entities. *See Pharmaceutical Rsch. & Mfrs. of Am. v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022).

In affirming the lower court's decision, the Eighth Circuit properly recognized the "'presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause.'" *McClain*, 95 F.4th at 1140 (quoting *Hillsborough County*, 471 U.S. at 715). In that regard, the court observed that "'the practice of pharmacy is an area traditionally left to state regulation.'" *McClain*, 95 F.4th at 1143 (citation omitted). As the court explained, "the federal government has traditionally regarded state law as a complementary form of drug regulation and

has long maintained that state law offers an additional, and important, layer of consumer protection that complements federal regulation." *Id.* (internal quotation marks and citations omitted).

History repeats itself, for in *McClain*, PhRMA argued that the Arkansas delivery statute was unconstitutional because the 340B program preempts the field; that is, the federal law is so pervasive in nature, that no room was left for supplementary state regulation. *See id.* The Eighth Circuit was unpersuaded. In rejecting the applicability of field preemption, the court observed that the 340B program statute "'is silent about delivery' of drugs to patients" and that such "silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field." *Id.* at 1143-44 (quoting *Sanofi*, 58 F.4th at 703).

Indeed, because it was narrowly focused on the price of 340B drugs offered for sale to and sold to covered entities, in enacting the 340B program, Congress also did not legislate with respect the multitude of other contract terms (*e.g.*, delivery, distribution, time and method of payment, representations and warranties, limitation of liability, governing law, dispute resolution, insurance) that might be incorporated into a drug purchase agreement entered into between a covered entity and manufacturer. The omission of legislation regarding any such contract terms indicates that the 340B statute was not intended to be "so pervasive" as to preclude supplementary state legislation, including with respect to drug delivery and

distribution. As such, the 340B program does not, as the plaintiffs assert, constitute a "comprehensive federal scheme." Appellants' Br. 26.

On the question of field preemption, the Eighth Circuit also rejected as "conflat[ing] the [federal and state] statutes," *McClain*, 95 F.4th at 1144, PhRMA's assertion that the mechanisms to enforce the Arkansas law's drug delivery requirements improperly intrude on the mechanisms to enforce the 340B program. On the one hand, the Arkansas statute, like H.B. 1056, "ensures that covered entities can utilize contract pharmacies for their distribution needs and authorizes the Arkansas Insurance Division to exact penalties and equitable relief if manufacturers deny 340B drugs to covered entities' contract pharmacies." *Id.*; *cf.* Health Occ. § 12-6C-09.1(d) (authorizing the conduct of investigations by the Maryland Office of the Attorney General and the Board of Pharmacy and the assessment of fines and penalties for violations). The 340B program, on the other hand, does not provide HHS with jurisdiction over disputes regarding distribution of drugs. Rather, through its ADR process, HRSA has jurisdiction over disputes "between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs." *McClain*, 95 F.4th at 1144. Thus, contrary to the plaintiffs' assertion, Appellants' Br. 32, H.B. 1056 does not provide

a state-law penalty for conduct proscribed by federal law or otherwise interfere with HRSA's enforcement of the 340B program.[13]

To summarize, on the question of field preemption, the Eighth Circuit explained the traditional role of States in the regulation of the practice of pharmacy:

> Pharmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted. . . . For these reasons, we conclude that in enacting Section 340B, Congress did not intend to preempt the field.

*McClain*, 95 F.4th at 1144.[14]

The Supreme Court's decision in *Astra USA* does not support a contrary conclusion. Appellants' Br. 29-30, 33. In *Astra USA*, covered entities filed a lawsuit

---

[13] *Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc.*, 475 U.S. 282 (1986) does not apply. Appellants' Br. 32. *Gould* involved a state law that debarred parties from doing business with the State if they violated the National Labor Relations Act ("NLRA") three times within a five-year period. 475 U.S. at 284. Unlike the areas of health care and drug distribution, which are at issue here, the NLRA "largely displaced state regulation of industrial relations." *Id*. at 286. Because the point of the NLRA "is to deter labor law violations and to reward 'fidelity to the law,'" the preempted state law at issue in *Gould* diminished the National Labor Relations Board's "control over enforcement of the NLRA." *Id*. at 288 (citation omitted). In contrast, H.B. 1056 regulates an area about which the 340B program is silent and does not sanction any conduct that violates the 340B statute.

[14] District courts interpreting Louisiana and Mississippi's delivery statutes have likewise rejected manufacturers' similar arguments that Congress intended to preempt the field of delivery of 340B drugs. *See, e.g.*, *AstraZeneca-Fitch*, 2024 WL 5345507, at *6; *Murrill*, 2024 WL 4361597, at *4-8; *Novartis-Fitch*, 738 F. Supp. 3d at 751-52.

against drug makers alleging they were overcharged for drugs that should have been discounted under the 340B program. 563 U.S. at 116. Because the 340B statute does not authorize a private cause of action for covered entities, the plaintiffs sued as intended third party beneficiaries of the pharmaceutical pricing agreements drug manufacturers must enter into with HHS in connection with the 340B program. *Id.* at 113, 116. In holding that covered entities' private lawsuits against manufacturers, regardless of legal theory, on matters of pricing were incompatible with the 340B program's price enforcement mechanism, the Supreme Court pointed to the ADR process mandated by the 340B statute, *id.* at 121 (citing 42 U.S.C. § 256b(d)), and explained that this requirement, along with the statute's penalty and audit provisions, were enacted by Congress after receiving reports that HRSA lacked oversight mechanisms and authority. *Astra USA*, 563 U.S. at 121-22.

In disregarding preemption arguments, like those raised here, pertaining to matters of drug distribution, the district court in *McClain* aptly concluded that the Supreme Court's "narrow holding" in *Astra USA* regarding HRSA's authority over enforcement of the 340B program's pricing requirements does not make the 340B program "immune from any type of state regulation." *McClain*, 645 F. Supp. 2d at 899; *accord Murrill*, 2024 WL 4361597, at *7 ("The Court [in *Astra USA*] did not . . . address the role of contract pharmacies—its ruling pertains solely to participating pharmaceutical companies, covered entities, and their compliance with the pricing

requirements of the Section 340B program."); *Novartis-Fitch*, 738 F. Supp. 3d at 752 ("The Supreme Court's rejection [in *Astra USA*] of a right of action for covered entities under [pharmaceutical pricing agreements] has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs."). Because the 340B statute is silent regarding drug distribution, the district court likewise properly rejected the plaintiffs' assertions regarding the relevance of *Astra USA*. (J.A. 883-884.)

Nor does *Arizona v. United States*, 567 U.S. 387 (2012) support plaintiffs' preemption arguments. *See* Appellants' Br. 32-33. In that case, based on preemption, the federal government challenged an Arizona law which (1) made it a state misdemeanor for a person to fail to comply with federal alien registration requirements, (2) made it a state misdemeanor for an unauthorized alien to seek or engage in work in Arizona, and (3) authorized state and local law enforcement to arrest without a warrant any person believed to have committed an offense which would make them removable from the United States. *Arizona*, 567 U.S. at 393-94. The federal government's "broad, undoubted power over the subject of immigration and the status of aliens" was central to the Supreme Court's decision that these three provisions[15] were preempted by federal immigration law. *Id.* at 394.

[15] The Supreme Court rejected the federal government's challenge to a fourth provision of the Arizona law. *See* 567 U.S. at 411-15.

The Supreme Court explained that "federal power to determine immigration policy is well settled" because such policy can "affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country." *Id*. at 395. Further, "[i]t is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id*.; *see also Hines v. Davidowitz*, 312 U.S. 52, 64 (1941) ("One of the most important and delicate of all international relationships, recognized immemorially as a responsibility of government, has to do with the protection of the just rights of a country's own nationals when those nationals are in another country."). Accordingly, "[f]ederal governance of immigration and alien status is extensive and complex." *Arizona*, 567 U.S. at 395. Based on these precepts, which are unique to the subject matters of immigration and foreign relations, the Supreme Court held that the three provisions of Arizona law were preempted by federal law. *Id*. at 400-10.

The subject matters of immigration, to which the Arizona law pertained, and health and safety, to which H.B. 1056 pertains, are incomparable. *See PhRMA-Fitch*, 2024 WL 3277365, at *11 (explaining that the Mississippi delivery statute "implicates a traditional area of state regulation, triggering the presumption against preemption . . . and rendering inapplicable *Arizona*'s discussion of dominant federal

interests."). In contrast with the field of immigration, the States, in accordance with their police powers, have traditionally occupied the field of health and safety. *See, e.g.*, *Medtronic*, 518 U.S. at 475; *Hillsborough County*, 471 U.S. at 719. Indeed, as this Court has explained, state laws in the field of public safety are presumptively *not* subject to federal preemption. *See, e.g.*, *Pinney*, 402 F.3d at 457. Given the presumption against preemption, congressional silence regarding distribution of drugs purchased by covered entities through the 340B program is "a strong showing that Congress" did not intend for preemption of state laws such as H.B. 1056. *See McClain*, 95 F.4th at 1144.

Further, the decisions by the Third and District of Columbia Circuits, in *Sanofi* and *Johnson*, respectively, compel here the same result reached by the Eighth Circuit in *McClain*. As discussed above, in agreement with *McClain*, both decisions confirm that the 340B program statute is silent regarding drug delivery and distribution. *Compare McClain*, 95 F.4th at 1143, *with Johnson*, 102 F.4th at 459-60 and *Sanofi*, 58 F.4th at 703; *see also, e.g.*, *Novartis-Fitch*, 738 F. Supp. 3d at 745 ("Both the Third Circuit and D.C. Circuit concluded . . . that Section 340B is silent about delivery, and that the federal statute's requirement that manufacturers offer discounts did not implicitly permit HHS to mandate that they comply with any delivery practice the covered entities desire.").

Those decisions, however, do not address the issue raised here, that is, whether a State has the authority to regulate drug delivery. H.B. 1056 regulates the delivery of 340B drugs. There is no federal statutory prohibition on covered entities' use of contract pharmacies to dispense 340B drugs purchased by covered entities; nor is there any federal limitation on the number of pharmacies with which covered entities may contract. The holdings in *Sanofi* and *Johnson*, that HRSA lacks statutory authority to compel drug manufacturers to deliver 340B drugs to an unlimited number of contract pharmacies, have no bearing on whether States, as independent sovereigns, can regulate in a field in which Congress has determined to remain silent. The very congressional silence that, in *Sanofi* and *Johnson*, left HRSA without authority to mandate that manufacturers recognize an unlimited number of contract pharmacies enables the states to regulate in the area of 340B drug delivery. *See, e.g.*, *Novartis-Fitch*, 738 F. Supp. 3d at 749 ("But the same statutory silence . . . that does not *implicitly mandate* that manufacturers deliver to any contract pharmacy does not, on the other hand, show that Congress clearly intended to *preclude states* from enacting their own public health regulations aimed at maximizing the availability of low-cost drugs for covered-entity patients." (brackets and internal quotation marks omitted; emphasis in original)).

When, as here, the field in question involves health and safety—a field traditionally occupied by the States—an argument for preemption cannot overcome

the applicable presumption against preemption absent a clear expression by Congress to the contrary. Thus, the district court properly rejected the plaintiffs' argument that "Congress' silence as to the delivery of 340B drugs to contract pharmacies is somehow evidence of its intent to preempt state regulation of delivery to contract pharmacies." (J.A. 884-885.) "For their part," the district court correctly observed, "neither the Third Circuit in *Sanofi*, [nor] the D.C. Circuit in [*Johnson*] said anything of that sort. . . . Plaintiffs' argument fails as a matter of logic and a matter of law." (J.A. 884.)

The plaintiffs nevertheless argue that "Congress intended the 340B program to be a harmonious whole," thereby excluding any state regulation. Appellants' Br. 33. In doing so, the plaintiffs take great pains to identify various aspects of the 340B program, including the drugs covered by the program and their prices, the prohibitions on diversion and duplicate discounts, the obligation of covered entities to permit audits, the offer requirement, and the mechanisms to enforce compliance. Appellants' Br. 27-28. Yet the plaintiffs ignore the limited context in which each of the cited provisions apply—that is, to the regulation of the price covered entities must pay for 340B drugs. The plaintiffs also ignore that, in addition to delivery, the 340B statute does not regulate the many other contract terms that might be included in a drug purchase agreement between a covered entity and a manufacturer.

The title of the 340B statute, "Limitation on *Prices of Drugs* Purchased by Covered Entities," highlights and confirms the narrow scope of the statute and resolves any ambiguity with respect to whether Congress, by enacting the 340B program, intended to legislate in a field other than drug pricing. 42 U.S.C. § 256b (emphasis added); s*ee also, e.g.*, *United States v. Clawson*, 650 F.3d 530, 536 (4th Cir. 2011) ("Although the title of a statute and the heading of a section cannot limit the plain meaning of the text, they are useful when they shed light on some ambiguous word or phrase.") (internal quotation marks and brackets omitted).

The plaintiffs repeatedly, and erroneously, cite to the Southern District of West Virginia's decision in *Pharmaceutical Research & Manufacturers of America v. Morrisey*, Nos. 2:24-cv-00271, 2:24-cv-00272, 2:24-cv-00298, 2024 WL 5147643 (S.D. W. Va. Dec. 17, 2024), *appeal docketed*, Nos. 24-1054, 25-1055, 25-1056 (4th Cir. Jan. 16, 2025), for the proposition that H.B. 1056 regulates price, and not delivery of 340B drugs purchased by covered entities. *E.g.*, Appellants' Br. 34, 35, 37-38, 53, 57-58. To the extent it reached such a conclusion with respect to the West Virgina statute at issue in that case, *Morrisey* was wrongly decided and stands as an anomaly. Indeed, the district court's analysis there, and its determination to preliminarily enjoin the West Virgina law, has already been rejected by one court. *See AstraZeneca-Fitch*, 2024 WL 5345507, at *8-*9.

The Southern District of West Virginia based its analysis, in part, on a provision in the West Virginia law that prohibits manufacturers from requiring claims data as a condition of providing the 340B discount. *See* 2024 WL 5147643, at *5-*7. There is no such provision in H.B. 1056.

The *Morrisey* decision was also based on the district court's flawed understanding of the 340B statute and flawed interpretation of the West Virginia law as a pricing statute, as opposed to a delivery statute. First, the district court thought that the West Virginia law would require state actors to determine questions of federal law if a drug manufacturer refuses delivery of a 340B drug to a contract pharmacy when it believes that drug is being diverted within the meaning of the federal 340B statute. *See* 2024 WL 5147643, at *7-*8. But that reasoning relies on a fundamental misunderstanding of the 340B statute. Under the statute, 340B's anti-diversion provisions are enforced either by HRSA directly or in the post hoc ADR process provided for by federal law. 42 U.S.C. §§ 256b(d)(2)(B)(v), (d)(3); 42 C.F.R. §§ 10.20, 10.21.

The federal statute does not permit a manufacturer to take the law into its own hands and refuse delivery if it suspects diversion by a covered entity. Instead, as the district court below observed, the 340B statute "provides an ADR process to resolve disputes between manufacturers and covered entities." (J.A. 870.) In fact, this is true for delivery of 340B drugs to covered entity-operated pharmacies or contract

pharmacies. As such, H.B. 1056 and other state statutes that require drug companies to comply with covered entities' requests for delivery to contract pharmacies will never raise questions of diversion since, under federal law, those issues must be addressed in the federal processes after 340B drugs have been purchased by covered entities and delivered.

Second, in contrast with every other district court and the Eighth Circuit, the district court concluded in *Morrisey* that the West Virgina law regulates price "[b]ecause the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy." 2024 WL 5147643, at *8.[16] The court based this conclusion on its apparent understanding of the replenishment inventory model as the only[17] means utilized to account for and track inventories of 340B drugs.

Regardless, the plaintiffs concede that, under the replenishment model, covered entities order and pay for 340B drugs delivered to contract pharmacies. (J.A. 217) ("[T]he replenishment order will be placed on a covered entity's account with the relevant wholesaler. The 340B account is in the covered entity's name and

[16] Based on its incorrect characterization of the West Virginia law as regulating price, the court misapplied the Supreme Court's decision in *Astra USA* and gave short shrift to *McClain* and decisions by the Southern District of Mississippi rejecting motions to enjoin state delivery statutes. *See* 2024 WL 5147643, at *9-*11.

[17] In addition to the replenishment model, covered entities and contract pharmacies also utilize a pre-purchased inventory model. *See* footnote 6.

reflects its financial payment information."); (J.A. 35.) Thus, regardless of which methodology is used to account for and track inventory of 340B drugs, H.B. 1056 regulates delivery of purchases of drugs by covered entities at the federally mandated 340B price. H.B. 1056 does not regulate purchases (at any price) by pharmacies on their own account.[18]

Whether 340B drugs purchased by a covered entity are used to replenish or establish inventory at a contract pharmacy, federal law dictates the price of the 340B drugs. In both cases, H.B. 1056 requires only that manufacturers comply with instructions to deliver to covered entities' pharmacies of choice. Any questions about alleged diversion or compliance with federal pricing requirements are solely matters for federal enforcement unrelated to the Maryland law at issue here.

---

[18] Because the purpose of H.B. 1056 is clear, *see* Health Occ. § 12-6C-09.1, the plaintiffs' hypothetical about manufacturers' direct sales to pharmacies does not illustrate any point that is relevant to H.B. 1056 and the preemption questions raised here. *See* Appellants' Br. 35-36. In short, Maryland law does not regulate any aspect, including price, of manufacturers' direct sales to pharmacies.

In addition, the plaintiffs' focus on the word "acquisition" in Health Occupations § 12-6C-09.1(c)(1) to support their suggestion that H.B. 1056 regulates manufacturers' direct sales to pharmacies ignores the entire context of H.B. 1056 and its limited application to drugs purchased by covered entities and drugs that would have been purchased by covered entities but for manufacturers' delivery restrictions regarding pharmacies that are "under contract with or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity." Health Occ. §§ 12-6C-09.1(a)(1), (a)(4), (c)(1). Stated simply, H.B. 1056 applies only to transactions involving 340B drugs and, under federal law, only covered entities may purchase 340B drugs; as such, H.B. 1056 does not regulate transactions involving drug purchases by pharmacies.

Here, the district court correctly concluded that "Congress' silence in the 340B statute on the matter of delivery to contract pharmacies leaves room for states to exercise their traditional police power through legislation." (J.A. 885.) As such, this is not the rare case where Congress has legislated so comprehensively as to foreclose supplementary state legislation regarding the delivery of 340B drugs. Accordingly, the district court properly determined that the plaintiffs are not likely to succeed on their claims of field preemption.

### C. House Bill 1056 Is Consistent with—and Not an Obstacle to—the Objectives of the 340B Program.

#### 1. House Bill 1056 Helps to Fulfill the Objectives of the 340B Program.

Within conflict preemption, "direct conflict" or "impossibility" preemption may exist when it is impossible to comply with both federal and state law and "obstacle" preemption may exist when state law stands "'as an obstacle to the accomplishment and execution of the full purposes and objectives of'" federal law. *Guthrie v. PPH Mortg. Corp.*, 79 F.4th 328, 336-37 (4th Cir. 2023) (citation omitted); *see also Northern Va. Hemp*, 125 F.4th at 493. The plaintiffs appear to advocate only for obstacle preemption. Appellants' Br. 41-54.

This Court engages in a two-step process to analyze claims of obstacle preemption. First, the Court determines "Congress's significant objectives in passing the federal law." *Just Puppies*, 123 F.4th at 662 (internal quotation marks

and citation omitted). Second, the Court determines whether "the state law stands as an obstacle to the accomplishment of those significant federal objectives." *Id.* (internal quotation marks and citation omitted); *see also Walsh*, 538 U.S. at 679 (Thomas, J., concurring) ("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law.").

"'[P]re-emption is ordinarily not to be implied absent an actual conflict.'" *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595, 598 (4th Cir. 2005) (quoting *English v. General Elec. Co.*, 496 U.S. 72, 90 (1990) (internal quotation marks omitted)). Thus, "a court should not find conflict preemption unless preemption was 'the clear and manifest purpose of Congress.'" *Northern Va. Hemp*, 125 F.4th at 493 (quoting *Arizona*, 567 U.S. at 400). Likewise, courts must not "seek out conflicts between state and federal regulation where none clearly exists." *College Loan Corp.*, 396 F.3d at 598 (citations, brackets, and internal quotation marks omitted); *accord Northern Va. Hemp*, 125 F.4th at 493. Accordingly, "[i]f a federal statute is ambiguous with respect to whether it pre-empts state law, then the presumption against pre-emption should ordinarily prevent a court from concluding that the state law is pre-empted." *Walsh*, 538 U.S. at 680 n.4 (Thomas, J., concurring).

As discussed above, the 340B program was adopted with the overriding, significant objective of providing cash-strapped, underfunded covered entities with

additional funds, realized from the savings on purchases of 340B drugs, to enable them to "reach[] more eligible patients and provid[e] more comprehensive services." H.R. Rep. No. 102-384 (Part 2), at 12 (1992); *see also McClain*, 95 F.4th at 1141. Consistent with that objective, covered entities realize greater savings, and thereby derive higher revenues to allocate to patient care and services, the greater the volume of their 340B drug purchases. HRSA has observed the important role that contract pharmacies play in facilitating covered entities' participation in the 340B program, noting that "[i]t would defeat the purpose of the 340B program if . . . covered entities could not use their affiliated [contract] pharmacies in order to participate in the 340B program." 61 Fed. Reg. at 43550.

Conversely, manufacturer restrictions[19] that minimize covered entities' participation in the 340B program by reducing the volume of their purchases have drastic, adverse consequences on the financial ability of covered entities to provide much needed services to underserved communities and provide affordable drugs to patients. (J.A. 313-314; J.A. 317-318; J.A. 323; J.A. 328-332.) The adverse financial impact of manufacturers' restrictions has resulted in the discontinuation of

[19] As for-profit businesses, manufacturers are motivated to limit the volume of drugs they sell at 340B program mandated discounts. Whether by design or otherwise, the restrictions manufacturers impose on the volume of covered entities' purchases at federally mandated discounted prices advance their economic interest in achieving higher revenues.

certain health care services by one Baltimore-based health care provider and, ultimately, contributed to the closure of that provider. (J.A. 335-336.) Manufacturer restrictions also limit patients' ability to conveniently access medications in their neighborhoods, thereby delaying or precluding them from obtaining such medications. (J.A. 329-330.) And, because Maryland physicians may not dispense refill prescriptions or prescriptions by mail order, Health Occ. § 12-102(c)(2)(ii) and COMAR § 10.32.23.06.C, manufacturers' restrictions on covered entities' use of pharmacies may leave covered entities without a means of dispensing 340B drugs to patients, particularly to those who are homebound or who lack adequate transportation. *See McClain*, 95 F.4th at 1142 (observing that "pharmacies are essential, and legally required, as part of the drug distribution chain").

By precluding manufacturers from imposing delivery restrictions upon covered entities and thereby minimize their participation in the 340B program, H.B. 1056 unquestionably fosters the 340B program's objectives of financially supporting covered entities and increasing the accessibility of 340B drugs. Thus, the district court was spot-on in its observation that H.B. 1056 "assists in fulfilling the purpose of" the 340B program. (J.A. 886.). In rejecting claims of obstacle preemption, other courts have similarly observed that States' delivery statutes assist in fulfilling the purpose of the 340B program. *See, e.g.*, *McClain*, 95 F.4th at 1145 (noting that the Arkansas law "assists in fulfilling the purpose of 340B" by "simply deterring

pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements."); *Murrill*, 2024 WL 4361597, at *9 (observing that the Louisiana law "arguably advances" the objectives of the 340B program by allowing covered entities, through the use of contract pharmacies, "to increase their revenues from insured patients who use those pharmacies" and to "provide wider coverage for patients."). The plaintiffs do not dispute that an effect of H.B. 1056 is to increase the volume of covered entities' purchases of 340B drugs and that such increased volume is consistent with the 340B program's objective of providing covered entities with additional funds.

Nonetheless, in their effort to create an obstacle where none exists, ignoring the verbiage and narrow scope of H.B. 1056, the plaintiffs insist that H.B. 1056 compels them to sell drugs to pharmacies at the federally mandated 340B prices and they risk sanctions if they fail to provide 340B pricing on sales to pharmacies. Appellants' Br. 42, 48-50, 57-58.

But only the 340B statute enumerates the health care providers who may qualify as covered entities, requires sales of discounted drugs only to those enumerated covered entities, and dictates the prices of the 340B drugs. H.B. 1056 does not change that. The 340B statute does not mandate drug sales to any parties, including pharmacies, other than covered entities. Again, H.B. 1056 does not change that. The 340B statute prohibits covered entities from engaging in diversion

(that is, reselling or transferring 340B discounted drugs to parties other than their patients)[20] and obtaining duplicate discounts, and provides manufacturers a remedy if a covered entity engages in such prohibited conduct. Again, H.B. 1056 does not change that.

Rather, in connection with purchases or contemplated purchases of 340B drugs *by covered entities*, H.B. 1056 simply requires that manufacturers comply with covered entities' instructions to deliver 340B drugs to their contract pharmacies. H.B. 1056 does not regulate drug purchases *by pharmacies* on their own account and does not compel manufactures to sell drugs to pharmacies. Thus, a manufacturer cannot be sanctioned under H.B. 1056 for refusing to sell drugs to a pharmacy, at 340B prices or otherwise. Because H.B. 1056 does not require any sales that are not permitted by the 340B program and regulates drug distribution, not drug pricing, it does not "inevitably conflict" with federal enforcement of the 340B program. *See* Appellants' Br. 48.

Implying wrongdoing, the plaintiffs complain that covered entities' use of the replenishment model promotes diversion because covered entities do not retain title to 340B drugs. Appellants' Br. 13, 58-59. To the extent a manufacturer asserts that

---

[20] As noted above, HRSA's published guidance confirms that covered entities who choose to dispense drugs through covered entities remain "responsible for ensuring that the system of distribution chosen fully meets statutory obligations." 75 Fed. Reg. at 10278.

a covered entity, *after* a completed purchase of 340B drugs, is improperly diverting 340B discounted drugs, via the replenishment model or otherwise, the manufacturer's recourse is to avail itself of its audit rights and to assert a claim against any such covered entity through HRSA's mandatory ADR process, and H.B. 1056 does not change or interfere with those rights.

Changes of title that constitute diversion after completed purchases of 340B drugs, put simply, are exclusively a matter of federal enforcement and are outside the scope of H.B. 1056. *See Novartis-Fitch*, 738 F. Supp. 3d at 750 ("To the extent that delivering discounted drugs to contract pharmacies raises the risk of diversion, Section 340B prohibits diversion and provides for comprehensive enforcement mechanisms. . . . If Section 340B healthcare providers are conspiring with pharmacies to divert discounted drugs, HHS can require the provider to compensate the manufacturer for its losses . . . and remove the provider from the [340B] program."); *Eli Lilly*, 2021 WL 5039566, at *20 n.14 ("[T]here can be no dispute that Congress mandated that any concerns regarding diversion be addressed first through ADR procedures, not in federal litigation."). Because it narrowly regulates delivery of 340B drugs, about which the 340B statute is silent, H.B. 1056 does not interfere with HRSA's enforcement of the 340B program.

Like the Arkansas statute assessed in *McClain*, H.B. 1056 "does not set or enforce discount pricing. As such, the delivery of a covered entity's 340B drugs to

contract pharmacies for dispensing creates no obstacle." *McClain*, 95 F.4th at 1145. Also like the Arkansas statute, H.B. 1056 simply deters drug manufacturers from interfering with covered entities' chosen means of dispensing and distributing drugs to their patients, and the penalties for noncompliance with H.B. 1056 "are aimed at activity [(drug delivery and distribution)] that falls outside the purview of" the 340B program. *Id.* Thus, like other States' delivery statutes, H.B. 1056 does not create an obstacle for manufacturers to comply with both H.B. 1056 and the 340B program. *See id.* at 1144-45; *see also Murrill*, 2024 WL 4361597, at *9 (rejecting claim of obstacle preemption); *Novartis-Fitch*, 738 F. Supp. 3d at 747-51 (same).

**2. House Bill 1056 Is Not Otherwise an Obstacle to Fulfillment of the Objectives of the 340B Program.**

The plaintiffs' other arguments fail to establish that it was the "clear and manifest purpose of Congress" to preempt state law. *See Northern Va. Hemp*, 125 F.4th at 493. First, the plaintiffs point to 38 U.S.C. § 8126 in arguing that Congress, in adopting the 340B program, intentionally omitted delivery obligations to protect "overburdened manufacturers." Appellants' Br. 43-44. That section pertains to the acquisition of discounted drugs by the Department of Veterans Affairs and other agencies and, in relevant part, requires manufacturers to enter into agreements to sell discounted "covered drugs" that are "purchased under depot contracting systems or listed on the Federal Supply Schedule." 38 U.S.C. § 8126(a)(2). Section 8126 defines "depot" as

> a centralized commodity management system through which covered drugs procured by an agency of the Federal Government are (A) received, stored, and delivered through (i) a federally owned and operated warehouse system, or (ii) a commercial entity operating under contract with such agency; or (B) delivered directly from the commercial source to the entity using such covered drugs.

*Id*. § 8126(h)(3).

The plaintiffs argue that the reference in that definition to "a commercial entity operating under contract" and the omission of any reference to contract pharmacies in the 340B statute somehow evidence Congress's intent to preempt States from legislating with respect to delivery of 340B drugs. Section 8126, however, has nothing to do with pharmacies generally or with pharmacies in the context of the 340B program, which pertains to the acquisition of discounted drugs by private entities, as opposed to government agencies.

Still focused on inaction by Congress, the plaintiffs also point to Congress's rejection of a bill that would have restricted delivery of 340B drugs to covered entities' on-site pharmacies. Appellants' Br. 44 (citing S. Rep. No. 102-259 § 2141(b) (1992)). The plaintiffs' point, however, supports the State's position. That is because, to the extent any meaning can be derived from Congress's failure to enact the cited legislation, its rejection of that provision must mean that Congress did not intend to restrict, but rather permit, delivery of 340B drugs to off-site contract pharmacies. The 340B statute cannot logically be read to include, by implication, a restriction on covered entities' use of off-site contract pharmacies that Congress

decided to omit. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result [urged] here weighs heavily against [the plaintiffs'] interpretation."). As the district court explained, "Congress's omission to address delivery to contract pharmacies cannot be interpreted as a prohibition or restriction against it, nor as an entitlement conferred to drug manufacturers to place their own restrictions upon it." (J.A. 886.) Ultimately, insofar as the preemption analysis is concerned, Congress's silence does not constitute an expression of a "clear and manifest purpose" to preempt state law. *Northern Va. Hemp*, 125 F.4th at 493.

Regardless, the plaintiffs' focus on congressional inaction is misdirected because it is focused on the burden that H.B. 1056 may impose on manufacturers. That burden, however, is not relevant to the preemption analysis, because protecting manufacturers from the burden of higher volumes of sales of discounted drugs to covered entities was not Congress's objective in enacting the 340B program. *See Walsh*, 538 U.S. at 668 (observing that the "impact on manufacturers" of a Maine prescription drug law "is not relevant because any transfer of business to less expensive products will produce savings for the Medicaid program" and holding that the Maine law was not preempted). Just the opposite, Congress's objective in enacting the 340B program was to promote higher sales volumes of 340B drugs in order to provide funds to covered entities.

Second, the plaintiffs complain that "Maryland has now stepped in and explicitly required the federal price even where no purchase [of 340B drugs] has occurred." Appellants' Br. 45. The plaintiffs make this assertion because H.B. 1056 applies to 340B drugs "purchased by a covered entity" and to 340B drugs "that would have been purchased but for" a manufacturer's delivery restriction. Health Occ. § 12-6C-09.1(a)(4). The latter circumstance would occur when a covered entity rejects as unacceptable a manufacturer's offer to sell 340B drugs to the covered entity because the offer was conditioned on delivery only to the location of the covered entity itself.

H.B. 1056 does not interfere with manufacturers' ability to make offers to sell drugs to covered entities at the prices dictated by the 340B program and, except for delivery restrictions, their ability to include in offers any one or more of the many contract terms about which the 340B statute is silent. H.B. 1056 only precludes profit-driven manufacturers from including delivery restrictions in offers to covered entities for the sale of 340B drugs. By precluding the inclusion of delivery restrictions in offers, H.B. 1056 promotes the objective of the 340B program by eliminating a roadblock to the completion of drug sales to covered entities at federally mandated discounted prices. H.B. 1056 does not, as the plaintiffs suggest, require 340B pricing when no purchase has occurred. Obviously, no price is paid by a covered entity if no purchase has occurred. By precluding manufacturers'

delivery restrictions, consistent with the 340B program's objective of providing financial support to covered entities, H.B. 1056 promotes the completion of purchases that would not have occurred but for such restrictions.

Third, presumably because H.B. 1056 adopts the 340B program's definitions of "covered entity" and "covered outpatient drug" among other terms (Health Occ. § 12-6C-09.1(a)),[21] the plaintiffs argue that state decisionmakers' "need to resolve multiple complex questions of federal law" will create a conflict with federal enforcement of the 340B program. Appellants' Br. 50. The plaintiffs' argument has no support in the statutory text of either federal or Maryland law.

Specifically, the plaintiffs assert that, in an enforcement action, state decisionmakers will be required to determine whether a health care provider is (and remains) a covered entity, either because it never enrolled in the 340B program or because it was removed from the program for diverting 340B drugs in violation of the 340B statute. In either case, there is no decision to be made by the State. That

---

[21] The Maryland General Assembly did nothing novel in adopting definitions from federal law into H.B. 1056. The practice is common in many different contexts. *See, e.g.*, Md. Code Ann., Health-Gen. § 2-801 (LexisNexis 2023) (adopting federal definition of "wholesale acquisition cost"); Md. Code Ann., Env't § 7-601 (LexisNexis 2013) (adopting federal definitions of "extremely hazardous substance," "facility," "hazardous chemical," and "local emergency planning committee"); Md. Code Ann., Elec. Law § 13-236.1 (LexisNexis 2022) (adopting federal definition of "foreign principal"); Md. Code Ann., Fin. Inst. § 11-601 (LexisNexis 2020) (adopting federal definition of "depository institution").

is because state officials may simply refer to HRSA's online database of approved covered entities. *See* https://340bopais.hrsa.gov/CoveredEntitySearch/000006177 (last visited Feb. 19, 2025). If a manufacturer believes that a covered entity has engaged in conduct that would render it ineligible for the 340B program, it must address that concern through HRSA. State officials also may easily determine whether a pharmacy is approved to receive delivery of a covered entity's 340B drugs. That is because HRSA's online database also lists the contract pharmacies for each covered entity. Moreover, HRSA can presumably provide a list of the drugs eligible for 340B pricing. Regardless, because H.B. 1056, like the Mississippi law, "addresses delivery and Section 340B does not, . . . adjudications under [H.B. 1056] will not interfere with federal enforcement of Section 340B's compliance mechanisms." *Novartis-Fitch*, 738 F. Supp. 3d at 751.

Fourth, the plaintiffs argue that H.B. 1056 creates an obstacle to their ability to gather data from covered entities. Appellants' Br. 51-54, 60. H.B. 1056 does not prohibit manufacturers from obtaining any data. Indeed, because H.B. 1056 provides that it shall not be construed to conflict with applicable federal law, Health Occ. § 12-6C-09.1(b), it could not be construed to deny a manufacturer any information it is entitled to under federal law. *See PhRMA-Fitch*, 2024 WL 3277365, at *10 (noting that the Mississippi delivery statute, like H.B. 1056, states that it should not be construed to conflict with federal law and, because the "obvious

point" of the law "is to prevent manufacturers from refusing to deliver 340B drugs . . . to contract pharmacies," rejecting argument that the Mississippi statute limits manufacturers' access to data). The plaintiffs' reliance, Appellants' Br. 53, on *Morrisey* to support their assertion that H.B. 1056 creates an obstacle is misplaced because the West Virgina law, unlike H.B. 1056, contains a provision (dubbed in *Morrisey* as the "no-audits provision") that expressly "restricts a drug manufacturer's ability to acquire claims and utilization data." *Morrisey*, 2024 WL 5147643, at *3, *5-*7.

Fifth, the plaintiffs criticize *McClain* and the district court for assuming that contract pharmacies act as agents of covered entities. Appellants' Br. 59-60. The plaintiffs' critique makes little sense. Similar to other States' laws, H.B. 1056 applies only to transactions involving pharmacies that have entered into contracts with pharmacies, or which are authorized by covered entities to take delivery of their 340B drugs. Health Occ. § 12-6C-09.1(c)(1). If a covered entity has entered into a contract with a pharmacy or authorized a pharmacy to take delivery of its 340B drugs then, presumably, the pharmacy is acting as its agent. For purposes of the plaintiffs' facial challenge, it is irrelevant whether, as the plaintiffs seem to assert, certain pharmacies may not be agents of particular covered entities in some circumstances. That said, if a covered entity instructs a manufacturer in writing to deliver its 340B drugs to a particular pharmacy, that instruction would be authorization.

The objective of Congress in enacting the 340B program was to provide covered entities with funds that would further their missions of providing health care to underserved communities; conversely, it was not Congress's objective to unburden drug manufacturers from having to make discounted sales. H.B. 1056 furthers the goal of the federal program by ensuring Maryland covered entities participation in the 340B program is not limited by manufacturers' restrictions on delivery and, by promoting covered entities' unrestricted use of pharmacies, ensures that 340B drugs are widely and readily accessible to covered entities' patients. While the plaintiffs' raise many arguments, individually and collectively, their arguments fail to establish that H.B. 1056 stands as an obstacle to accomplishment of the objective of the 340B program or that it was the clear and manifest purpose of Congress to preempt state delivery laws. Accordingly, the plaintiffs' claim of obstacle preemption fails.

## III. AbbVie Failed to Demonstrate a Likelihood of Success on the Merits of Its Takings Clause Claim.

AbbVie's takings claim is built on the legally unsupportable foundation that H.B. 1056 compels it to sell discounted drugs to pharmacies. H.B. 1056 regulates only the acquisition or delivery of 340B drugs to Maryland pharmacies on behalf of a covered entity that purchases 340B drugs. Health Occ. § 12-6C-09.1(c)(1). H.B. 1056 does not authorize Maryland to purchase, acquire title to, or dictate the price of pharmaceuticals manufactured by the plaintiffs. H.B. 1056 also does not require

manufacturers to sell drugs to pharmacies. Thus, there is no transfer of AbbVie's property to private parties other than covered entities. Appellants' Br. 60. Because there is no government-authorized invasion in this case, the district court correctly concluded that AbbVie is unlikely to succeed on the merits of its Takings Clause claim. Stripped of its foundation, AbbVie's argument must fail.

### A. Federal Law Mandates the Sale and Transfer of AbbVie's Drugs at Discounted Prices.

The Takings Clause provides, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. art. I, § 10, cl. 1. H.B. 1056 does not compel manufacturers to offer 340B drugs for sale to pharmacies and does not entitle pharmacies to purchase drugs at the discounted prices set by the 340B program. Rather, H.B. 1056 requires that manufacturers comply with covered entities' instructions to deliver the drugs that covered entities purchased under the 340B program. Thus, it is federal law, not state law, that causes AbbVie to be dispossessed of its drugs at discounted prices.

AbbVie's argument that H.B. 1056 effectuates a physical taking thus fails at the start. A physical, or per se, taking, occurs "[w]hen the government physically acquires private property for a public use," including "when the government physically takes possession of property without acquiring title to it." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). The failure of AbbVie's argument both below and in this Court is that H.B. 1056 does not compel direct, confiscatory

sales to private pharmacies. As the law makes clear, 340B drugs are not sold to pharmacies. Health Occ. § 12-6C-09.1(c)(1). Rather, the drugs are sold to covered entities. *Id.* AbbVie is wrong in stating that pharmacies may purchase discounted drugs. Appellants' Br. 65, 67.

AbbVie cannot make a valid Takings Clause claim based on an incorrect statement that H.B. 1056 requires sales to private pharmacies. H.B. 1056 does not compel drug manufacturers to transfer 340B drugs to a private party. And H.B. 1056 does not compel drug manufacturers to transfer 340B drugs to the government. Because H.B. 1056 does not compel AbbVie to directly sell 340B drugs to pharmacies, it is not a taking for purposes of the Takings Clause.

### B. AbbVie's Voluntary Participation in the 340B Program Prevents Conferral of a Private Property Interest.

Even if AbbVie could show it is likely to succeed on the merits that a taking occurred through the enactment of H.B. 1056, its voluntary participation in the 340B program further precludes its ability to bring a claim under the Takings Clause. AbbVie's decision to participate in the 340B program is voluntary as is its decision to participate in the Medicaid and Medicare Part B programs. *See Astra USA, Inc.*, 563 U.S. at 113 (explaining that manufacturers "opt into" the 340B program). Because participation in the regulated activity is voluntary, there is no conferral of private property interests. *See Baker County Med. Servs., Inc. v. U.S. Att'y Gen.*,

763 F.3d 1274, 1276 (11th Cir. 2014) (collecting cases); *Pharmacist Political Action Comm. of Md. (PHARMPAC) v. Harris*, 502 F. Supp. 1235, 1243 (D. Md. 1980).

The voluntary nature of AbbVie's participation in these programs forecloses any claim under the Takings Clause. In every case of which the defendants are aware, the court held that no unconstitutional taking occurred because the pharmaceutical company or other challenger had a choice as to whether to participate in the government program. *See Baker County*, 763 F.3d at 1276; *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984); *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993), *cert. denied*, 510 U.S. 821 (1993); *Burditt v. United States Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991); *Whitney v. Heckler*, 780 F.2d 963, 972-74 (11th Cir. 1986); *Saint Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 875 (7th Cir. 1983); *Eli Lilly*, 2021 WL 5039566, at *21; *Sanofi-Aventis U.S., LLC v. United States Dep't of Health & Hum. Servs.*, 570 F. Supp. 3d 129, 207-10 (D.N.J. 2021), *rev'd on other grounds*, 58 F.4th 696 (3d Cir. 2023).

In *Eli Lilly*, the pharmaceutical manufacturer contended that the federal government's interpretation of the 340B program, which did not allow drug manufacturers to condition access to discount drugs based on a covered entities' operation of an in-house pharmacy, represented an unconstitutional taking. *Eli Lilly*, 2021 WL 5039566 at *5, *21. Specifically, the manufacturer asserted that HHS

requirements represented "an unconstitutional condition on a valuable government benefit." *Id*. at *21. The district court disagreed, emphasizing the importance of the voluntary nature of participation in the government program and holding that the manufacturer's voluntary participation in the 340B program foreclosed "the possibility that the statute could result in an imposed taking of private property." *Id*. (quoting *Southeast Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016) (internal quotation marks omitted)).

And, in *Sanofi-Aventis*, Novo Nordisk made the same takings argument, asserting HHS "effect[ed] a taking of private property . . . and impose[d] an unconstitutional condition on a valuable government benefit: access to Medicaid/Medicare." 570 F. Supp. 3d at 207. The district court disagreed because Novo Nordisk "voluntarily joined the 340B Program with full knowledge of the discount drug scheme it effected," and plaintiff's unconstitutional takings claim failed, even when there were significant financial implications for the company. *Id.* at 210.[22]

The avenue to pursue an unconstitutional takings claim is similarly foreclosed in the case at bar, where AbbVie asserts that compliance with H.B. 1056 drug distribution requirements is an unconstitutional taking of property. Because

[22] Although this decision was appealed, the Third Circuit did not address the district court's Takings Clause analysis. *Sanofi*, 58 F.4th at 696.

participation in the 340B program is voluntary, Maryland's actions do not constitute a taking. *See Virginia Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 666-67 (E.D. Va. 2023) (holding that because hospitals were "opting into receiving that [Medicare] benefit" their voluntary participation defeated plaintiff's takings claims).[23]

In addition, numerous courts have held that there is no unconstitutional taking based on an entity's ability to choose whether to participate in a government program. For example, in *PHARMPAC*, an association of Maryland pharmacists challenged the validity of the Maximum Allowable Cost regulations and program, which determined limitations on reimbursements for drugs under the Medicaid and Medicare programs. *PHARMPAC*, 502 F. Supp. at 1238. Under the program, which primarily impacted outpatient medications covered by Medicaid, pharmacists were not required to sell drugs at a set price. *Id*. at 1242. Rather, pharmacists could charge whatever price they wanted; but if prices were higher than competitors, pharmacists could lose Medicaid customers. *Id*. The district court held that the voluntary

[23] AbbVie wrongly relies on *Roberts*. Appellants' Br. 67-68. *Roberts* stands for the proposition that, but for Eleventh Amendment immunity, a party's participation in a federal program compelled by state law may give rise to a takings claim by that party against the State. 671 F. Supp. 3d at 667. AbbVie, however, does not contend that H.B. 1056 compels it to participate in the 340B program. And, of course, H.B. 1056 does not do that. Thus, AbbVie incorrectly argues that H.B. 1056, on its own, mandates it to sell discounted drugs to pharmacies.

participation by pharmacists in the State Medicaid program, and the "lack of compulsion to participate in the program," barred a claim of unconstitutional taking of property without just compensation. *Id.* at 1243. Similarly, in the case at bar, AbbVie's involvement in the 340B program via participation in Medicaid or Medicare Part B is also voluntary.

AbbVie also argues that H.B. 1056 does not satisfy the voluntary participation doctrine because "there is no nexus or rough proportionality between forced sales to pharmacies and AbbVie's decision to participate in federal programs." Appellants' Br. 69. As stated above, there are no forced sales to pharmacies under H.B. 1056. Thus, *Sheetz v. County of El Dorado, Colorado*, 601 U.S. 267 (2024), does not change the outcome, even if not stretched far beyond the unanimous Supreme Court's holding that the Takings Clause does not distinguish between legislative and administrative land-use permit conditions. AbbVie transfers their products at issue here through 340B program mandated sales to covered entities, not through confiscation by the State. (*See* J.A. 876).

H.B. 1056 allows for the economically viable sale of AbbVie's drugs, thus obviating a per se takings claims. In a similar case, the Eastern District of Virginia considered whether the Emergency Medical Treatment and Active Labor Act ("EMTALA") requirements that Medicare-participating hospitals provide services to all patients with emergency medical conditions independent of their ability to pay

constituted a per se taking. *Roberts*, 671 F. Supp. 3d at 641. Although plaintiffs argued that they were virtually compelled to provide emergency services without just compensation, they received financial benefits via income derived from Medicare participation. *Id.* at 667. Thus, the district court held that because hospitals were "opting into receiving that [Medicare] benefit," financial implications that resulted from complying with the EMTALA program did not constitute "per se" takings. *Id.*

AbbVie similarly receives financial benefits from the Medicare Part B and Medicaid programs in exchange for voluntary participation in the 340B program. AbbVie also receives discounted prices for the drugs that manufacturers are mandated to sell under the 340B program. The discounted prices AbbVie receives for 340B drugs, in combination with the financial benefits AbbVie enjoys through participation in the Medicare Part B and Medicaid programs, by no stretch, can be construed to equate to the required destruction of all economic benefit required to prevail on a "per se" regulatory taking claim. *See Sanofi-Aventis*, 570 F. Supp. 3d at 208 (rejecting argument that 340B program constitutes a "per se" regulatory taking because "[c]overed entities pay for what they buy to the tune of billions of dollars per year" and lack of profit is not a basis for a regulatory takings claim). As such, AbbVie's participation in the 340B program does not constitute a "per se" taking.

### C. AbbVie Does Not Meet Additional Requirements Necessary to Establish a Regulatory Taking.

A regulatory taking represents a significant restriction on an owner's use of property. In addition to failing to satisfy the requirements for a preliminary injunction as to a per se taking, AbbVie failed to show that H.B. 1056 constituted a taking based on (1) the economic impact of the regulation, (2) whether the government action interferes with reasonable investment-backed expectations, and (3) the action's character. *Penn Central Transp. Co.*, 438 U.S. at 124.

AbbVie's regulatory takings claim fails under the three prongs of the *Penn Central* regulatory takings standard. *See Sanofi-Aventis*, 570 F. Supp. 3d at 208-09 (takings claim failed all three prongs of *Penn Central*). First, the economic impact of the regulation does not weigh in favor of an unconstitutional takings claim. "'[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking.'" *Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 696 (4th Cir. 2018) (holding that an 83 percent diminution in value was insufficient to show a regulatory taking (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Tr.*, 508 U.S. 602, 645 (1993))); *see also Clayland Farm Enters., LLC v. Talbot County*, 987 F.3d 346, 354 (4th Cir. 2021) (holding that a 40 percent diminution in value was insufficient to show a regulatory taking and noting that "other circuits have found no regulatory taking when presented with diminutions in value of 75 percent and 92.5 percent").

Here, AbbVie's amended complaint offers no specificity about H.B. 1056's economic impact on AbbVie. Rather, AbbVie merely generally alleges that it has been injured by H.B. 1056. (*E.g.*, J.A. 394.) An affidavit submitted in support of AbbVie's motion for preliminary injunction asserts that H.B. 1056 will threaten AbbVie with "millions of dollars in forced unnecessary discounts," (J.A. 178), a point that AbbVie reiterates on appeal. Appellants' Br. 81. Such broad-brush assertions of injury, however, lack any context from which the economic impact of H.B. 1056 on AbbVie can be discerned (for example, as a percentage of the value of the "taken" property).

Moreover, 340B sales constituted only five percent of the prescription drug market and 14 percent of the branded drug market, and, cumulatively, the 340B program has a small economic impact when considering the entire prescription drug marketplace. *Sanofi-Aventis*, 570 F. Supp. 3d at 208. Further, HHS assumes that covered entities pay 50 to 75 percent of the non-340B drug price when using the 340B program, thus demonstrating that pharmaceutical manufacturers still generate substantial revenues from the sales of 340B drugs. *See 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation*, 82 Fed. Reg. 1210, 1227 n.1 (Jan. 5, 2017).

Second, AbbVie does not have a reasonable, investment-backed expectation based on Maryland's history of enacting health and safety regulations in the public-

interest, making it unrealistic for AbbVie to assume it would be free from regulation under the 340B program. *See Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 367 (4th Cir. 2020) (holding Maryland statutes banning possession of bump stocks for semiautomatic rifles were not takings under the Fifth Amendment); *Willowbrook Apartment Assocs., LLC v. City of Balt.*, 563 F. Supp. 3d 428, 441-44 (D. Md. 2021) (holding that legislation restricting landlords from increasing rent during governor's declared COVID-19 pandemic state of emergency was not an unconstitutional taking of property).[24]

Third, the character of the governmental action demonstrates connections with myriad public interests including providing financial support to covered entities, providing healthcare services to socioeconomically disadvantaged Marylanders, and making 340B more accessible. This weighs against a "takings" determination.

AbbVie has not suffered an unconstitutional taking. AbbVie's desire to participate in Medicare and Medicaid does not leave it with no choice but to participate in the 340B program, even if a significant portion of its business may

[24] As noted above, at least one district court observed that drug manufacturers specifically should have "foreseen that states might enact policies favoring dispensation at contract pharmacies." *AbbVie-Fitch*, 2024 WL 3503965, at *20.

come from these federal programs. AbbVie can opt out at any time. Thus, AbbVie failed to show a likelihood of success on their claim under the Takings Clause.

## IV. PLAINTIFFS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR DORMANT COMMERCE CLAUSE CHALLENGE.

The district court did not abuse its discretion when determining that Novartis and PhRMA were unlikely to succeed on the merits of their respective claims under the dormant Commerce Clause. The Commerce Clause provides that "[t]he Congress shall have the Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "Dormant Commerce Clause jurisprudence arises as a 'negative implication'" of the Commerce Clause, *McBurney v. Young*, 667 F.3d 454, 468 (4th Cir. 2012), *aff'd*, 569 U.S. 221 (2013), preventing States from adopting certain measures that restrict interstate commerce or encroach upon Congress's power to regulate interstate commerce, *see National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330-31 (1996).

Thus, a dormant Commerce Clause challenge requires careful review of a state law that "discriminates facially, in its practical effect, or in its purpose" against interstate commerce. *McBurney*, 667 F.3d at 468 (quoting *Environmental Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996)). This form of discrimination means "differential treatment of in-state and out-of-state economic

interests that benefits the former and burdens the latter." *McBurney*, 667 F.3d at 468 (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007)); *see also Granholm v. Heald*, 544 U.S. 460, 472 (2005) (explaining that a state "may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses")

**A. House Bill 1056 Is Not an Extraterritorial Law.**

Novartis and PhRMA contend that H.B. 1056 will have an impermissible and extraterritorial effect on prices involved in drug manufacturers' out-of-state transactions with wholesalers and distributors. Appellants' Br. 85-91. The principle against extraterritoriality underlies the dormant Commerce Clause because "a State may not regulate commerce occurring wholly outside of its border." *Star Sci., Inc. v. Beales*, 278 F.3d 339, 355 (4th Cir. 2002) (citing *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989)). "A state law violates the extraterritoriality principle if it either expressly applies to out-of-state commerce . . . or has that 'practical effect,' regardless of the legislature's intent." *Association for Accessible Medicines*, 887 F.3d at 668 (internal citations omitted).

Novartis and PhRMA argue that the district court sidestepped *Association for Accessible Medicines*. Appellants' Br. 87. In that case, this Court held that Maryland's statute prohibiting price gouging in the sale of prescription drugs violated the dormant Commerce Clause "because it directly regulates the price of

transactions that occur outside Maryland." *Association for Accessible Medicines*, 887 F.3d at 666. But H.B. 1056 regulates drug distribution, not drug pricing. Thus, the instant matter does not relate to the holdings in *Association for Accessible Medicines*.

Rather, H.B. 1056 is more akin to the law challenged in *Walsh*, where PhRMA challenged the constitutionality of a Maine law that established the Maine Rx Program and enabled "individuals to buy drugs from retail pharmacies at a discount roughly equal to the rebate on Medicaid purchases." 538 U.S. at 653-54 (citations omitted). The district court granted PhRMA's motion for a preliminary injunction, *id.* at 658, but the First Circuit vacated the injunction in part because there was no violation of the dormant Commerce Clause. *Id.* at 660. The Supreme Court, affirming the First Circuit's denial of preliminary injunctive relief, found that Maine "does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain price. Similarly, Maine is not tying the price of its in-state products to out-of-state prices." *Id.* at 669 (quoting *Pharmaceutical Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 81-82 (1st Cir. 2001)). Furthermore, the Court found that the Maine Rx Program would not impose a disparate burden on competitors because Maine manufacturers would receive no additional benefits compared to their out-of-state peers. *Walsh*, 538 U.S. at 670.

H.B. 1056 applies to all manufacturers, regardless of their state of incorporation. It does not except in-state manufacturers from the requirements imposed on manufacturers located outside of Maryland. Thus, there is no differential treatment of in-state and out-of-state economic interests. H.B. 1056 is triggered only when a Maryland 340B covered entity seeks to purchase 340B drugs for its patients. Stated differently, the relevant conduct penalized by H.B. 1056 is discrimination against a Maryland 340B covered entity seeking to purchase discounted drugs for its patients. *See Association for Accessible Medicines*, 887 F.3d at 670-71 (citing *Star Sci.*, 278 F.3d at 346).

Novartis and PhRMA rely on the false premise that, because H.B. 1056 contains no territorial limitations, it must then be interpreted to reach conduct beyond Maryland's border. *See* Appellants' Br. 88. But it is the exact opposite presumption that governs the interpretation of Maryland law. Indeed, Maryland law is clear: "[U]nless an intent to the contrary is expressly stated, acts of the legislature will be presumed not to have any extraterritorial effect." *Chairman of Bd. of Trs. of Emps.' Ret. Sys. v. Waldron*, 285 Md. 175, 183-84 (1979). Accordingly, H.B. 1056 must be construed to apply only to conduct that is occurring within Maryland.

In plain terms, the law seeks only to regulate conduct that impacts Maryland 340B covered entities. There is no attempt to dictate controls over the purchase of 340B drugs by covered entities outside of Maryland and there is no attempt to

regulate conduct without a nexus to Maryland. As a result, H.B. 1056 is inapplicable to the specific circumstances advanced by the plaintiffs. Appellants' Br. 89-90.

H.B. 1056 covers drug distribution, not drug pricing. The law seeks to regulate only conduct that impacts Maryland 340B covered entities. There is no attempt to dictate controls over the purchase of 340B drugs by covered entities outside of Maryland and there is no attempt to regulate conduct without a nexus to Maryland. Therefore, H.B. 1056 is not an extraterritorial law.

**B. House Bill 1056 Is Not a Discriminatory Law.**

The 340B program, not H.B. 1056, establishes the price ceiling for eligible pharmaceuticals. The State does not bar any out-of-state manufacturers from competing in the marketplace. H.B. 1056 attempts to reinforce the tenets of the 340B program and prevent distribution and delivery manipulation by the manufacturers themselves to the detriment of the covered entities who provide health care services to the most vulnerable of Marylanders and, ultimately, to Maryland consumers of health care services.

Contrary to the congressional intent of the 340B program to financially support covered entities, Novartis and other members of PhRMA seek to maximize their profits by limiting Maryland covered entities' ability to utilize contract pharmacies and, thereby, minimize their purchases of discounted 340B drugs. Maryland is simply deterring pharmaceutical manufacturers from interfering with

covered entities' contract pharmacy arrangements. There is no differential treatment being provided between in-state and out-of-state economic interests, and certainly no treatment that benefits in-state economic interests while burdening out-of-state economic interests. *See Oregon Waste Sys., Inc. v. Department of Env't Qual.*, 511 U.S. 93, 99 (1994). Much like the Supreme Court affirmed in 2023, this Court should dismiss the plaintiffs' attempt to prevent "state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause," as there is no clear infraction here. *National Pork Producers Council*, 598 U.S. at 390-91.

In *National Pork Producers Council*, the Supreme Court affirmed the dismissal of a complaint challenging California's Proposition 12, a 2018 ballot measure passed by California voters that amended the California Health and Safety Code to prohibit the sale of pork from animals confined in a manner inconsistent with California standards. *Id.* at 365-66. The plaintiffs argued that Proposition 12 placed an undue burden on interstate commerce and that it caused an impermissible "extraterritorial effect" because it effectively forces all or most hog farmers, regardless of their location, to comply with the California requirements even though 87% of the pork produced in the United States is consumed outside of California. *Id.* at 371-76.

Despite their efforts, Novartis and PhRMA cannot circumvent the truth: the purpose of H.B. 1056, preventing limits or restrictions on the acquisition or delivery of 340B drugs, is non-discriminatory.

### C. House Bill 1056 Does Not Excessively Burden Interstate Commerce.

Under *Pike v. Bruce Church, Inc*., 397 U.S. 137 (1970), a non-discriminatory state law may nonetheless violate the dormant Commerce Clause if it unjustifiably burdens the interstate flow of commerce. *See McBurney*, 667 F.3d at 468. Here, H.B. 1056 withstands *Pike* scrutiny because the plaintiffs cannot show that the statutory scheme creates any burden on interstate commerce, let alone one that is clearly excessive. This is for essentially the same reasons that H.B. 1056 does not have a discriminatory effect. Indeed, because H.B. 1056 does not regulate based on state lines, and thus places no limit on the free flow of goods into Maryland from other states, interstate commerce is not subject to any burdens that are constitutionally cognizable. *See United Haulers*, 550 U.S. at 334; *Just Puppies*, 123 F.4th at 670.

As stated above, in *National Pork Producers Council*, a majority of the Court concluded that under the balancing test established in *Pike*, Proposition 12 did not violate the dormant Commerce Clause. *National Pork Producers Council*, 598 U.S. at 377-80 (section IV-A of the Court's opinion, highlighting that the presence or absence of discrimination in practice proved decisive). Justice Gorsuch, with two

justices joining and two justices concurring, accepted that states do have an interest in protecting the public health and welfare, and that this may extend to behavior occurring outside of the state. *Id.* at 381-82. The plaintiffs' argument is identical to the one advanced by petitioners in *National Pork Producers Council* and rejected by the Supreme Court. *See id.* at 390 ("[T]his Court has recognized since *Gibbons* [*v. Ogden*, 22 U.S. 1 (1824)] that virtually all state laws create ripple effects beyond their borders."). Thus, the district court was correct in denying the motions for preliminary injunction despite the plaintiffs' "incautious invitations." *Id.* at 391.

The plaintiffs also claim that they must contend with a patchwork of state laws. But this is not a burden for purposes of *Pike* balancing. *See PPL Energyplus, LLC v. Nazarian*, 974 F. Supp. 2d 790, 853-55 (D. Md. 2013) (holding that there was not a significant burden on interstate commerce because a locational requirement did not affect the ability of other market participants to sell energy in the region). And somehow the plaintiffs are the only ones who cannot see all the putative benefits of H.B. 1056. The law ensures that manufacturers do not interfere with Maryland 340B qualified health centers' use of contract pharmacies to dispense 340B-discounted drugs and limit discriminatory practices in Maryland. Furthermore, the fact that Arkansas (Ark. Code Ann. § 23-92-604(c) (West 2021)), Kansas (2024 H.B. 2551), Louisiana (La. Stat. Ann. §§ 40:2884-2885 (2023)), Minnesota (Minn. Stat. Ann. § 62J.96 (2024)), Mississippi (2024 Miss. H.B. 728),

and West Virginia (W. Va. Code Ann. § 60A-8-6a(c)(1)(A) (West 2024)) passed similar, but not identical, laws shows that Maryland is not shifting the cost of regulation to other states. *See United Haulers*, 550 U.S. at 345. Because these are plainly legitimate interests, for they place no or *de minimis* burden on interstate commerce, the district court correctly concluded that Novartis and PhRMA failed to show a likelihood of success on the merits of their respective claims that H.B. 1056 is invalid under the dormant Commerce Clause.

## V. A PRELIMINARY INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES DOES NOT FAVOR A PRELIMINARY INJUNCTION.

When the government opposes a preliminary injunction, the traditional factors of assessing the harm to the opposing party—balance of the equities—and weighing the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Roe*, 947 F.3d at 230. The district court found that this factor favored the defendants. (J.A. 896.) The district court explained its opinion that "implementation of HB1056 would tend to increase the accessibility of 340B drugs to disadvantaged patients served by 340B covered entities, who may otherwise lack access to these drugs." (J.A. 896.) Acknowledging the purpose of the statute, the district court correctly concluded that the plaintiffs did not make a clear showing that the public interest would be better served by an injunction. (J.A. 896.)

Covered entities in Maryland have suffered and, without H.B. 1056, will continue to suffer financial harm, which will adversely affect the availability of health care and affordable medications to the population they serve, many of whom live on incomes well below the poverty line. (J.A. 310-337.) The inability to provide services to Maryland's indigent population creates catastrophic results. (J.A. 310-337.) For example, the financial impact of manufacturer restrictions on the use of contract pharmacies prevented the Family Health Centers of Baltimore from providing dental and behavioral health services to the Brooklyn and Cherry Hill neighborhoods of Baltimore in 2023. (J.A. 334-336.) In 2023, that entity closed for financial reasons due to reduced revenues that it generated from the 340B program. (J.A. 334-336.)

This is an evaluation that the district court undertook and one that the plaintiffs ignore. *See* Appellants' Br. 100. In fact, the plaintiffs seem more concerned with their financial bottom line and view this as a fight with supposedly greedy pharmacies who are not a party to this case. *See* Appellants' Br. 100-101. In making a correct determination, the district court realized that the Marylanders would suffer if the district court granted the preliminary injunction relief sought by the plaintiffs. In today's health care system, patients rely on pharmacies to provide them with necessary pharmaceuticals. In seeking to put more money into their coffers, drug manufacturers seek to severely limit covered entities' ability to benefit from the

340B program. This harms the public. The imposition of an injunction would allow manufacturers to impose restrictions on covered entities, which would cause them to lose funding that covered entities can ill afford to lose. (*See* J.A. 310-337.)

## VI. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM FROM ENFORCEMENT OF HOUSE BILL 1056.

The district court did not evaluate the irreparable harm factor when ruling on the motions for preliminary injunction. *See* Appellants' Br. 97. But this Court only evaluates and resolves this factor if this Court finds that the district court erroneously denied the preliminary injunction on either the likelihood-of-success factor or the merged public interest-equities factor. *See Newsom ex rel. Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). And for the reasons above, the district court correctly denied the motions for preliminary injunction.

But even assuming the district court erred on both of those factors, the plaintiffs still cannot show irreparable harm from enforcement of H.B. 1056. The text and purpose of H.B. 1056, which must be construed to be consistent with applicable federal law, Health Occ. § 12-6C-09.1(b), does not require drug manufacturers to sell drugs at 340B discounted prices to any party that is not entitled to receive such discounts under the 340B statute. The 340B program requires sales only to covered entities. H.B. 1056 does not change that.

The mere possibility of irreparable harm is insufficient to permit the issuance of a preliminary injunction. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir.

2017) (quoting *Winter*, 555 U.S. at 22). The plaintiffs do not argue that they are currently subject to an enforcement action in Maryland; nor do they argue that they have received notice of an investigation into their business practices and conduct in Maryland. Thus, any harm that the plaintiffs would suffer is purely speculative.

Further, there is a mechanism that exists for the plaintiffs to recover the costs incurred if the district court later concludes that H.B. 1056 is unconstitutional. To the extent any harm is calculable, the plaintiffs, which are or represent the largest biomedical companies by revenue in the world, would be able to provide data on lost sales and revenue for the duration of the underlying litigation. The plaintiffs, with good reason, do not argue that they will suffer insolvency. *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). Rather, they speculatively assert that they will spend millions of dollars and that they will be unable to recover damages against Maryland.[25] That is not enough to satisfy their high burden to satisfy irreparable harm.

A stay of H.B. 1056 would wreak havoc on Maryland's qualified health centers, some of which have already closed because of the adverse financial impact of restrictions imposed by drug manufacturers on covered entities' use of contract

[25] The defendants agree that an action to recover costs in federal court would be foreclosed by sovereign immunity. Appellants' Br. 99; *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). But the plaintiffs do not state whether they could bring a claim in any Maryland court.

pharmacies to dispense drugs they purchased through the 340B program. (*See* J.A. 334-336.) These organizations provide meaningful and necessary medical and social resources to Maryland citizens who need the most support. (*See* J.A. 310-337.) The plaintiffs cannot satisfy the irreparable harm requirement on any of the causes of action under which they seek a preliminary injunction.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Joshua R. Chazen
JOSHUA R. CHAZEN
HOWARD R. FELDMAN
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jchazen@oag.state.md.us
(410) 576-7058
(410) 576-6995 (facsimile)

Attorneys for Appellees

## REQUEST FOR ORAL ARGUMENT

The Appellee respectfully requests that the Court hear oral argument in this appeal. The Appellee submits that oral argument would aid the Court in its disposition of this appeal, in which the plaintiffs seek to ignore decisions by numerous appellate and district courts and attempt to dismantle a constitutional Maryland law.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32(b), with the exception that this brief contains 19,022 words as allowed this Court's order granting the joint motion to exceed length limitations, excluding the parts of the brief exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Joshua R. Chazen
Joshua R. Chazen

# TEXT OF PERTINENT PROVISIONS

**Constitutional Provisions**
**Constitution of the United States**
**Article I, § 8, cl. 3**

The Congress shall have the Power

* * *

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]

**Article I, cl. 2**

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

**Amendment V**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**Statutes**
**42 U.S.C. § 256b - Limitation on prices of drugs purchased by covered entities**

(a) Requirements for agreement with Secretary

(1) In general

The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs (other than drugs described in paragraph (3)) purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992, does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act in the preceding calendar quarter, reduced by the rebate percentage described in paragraph (2). Each such agreement shall require that the manufacturer furnish the Secretary with reports, on a quarterly basis, of the price for each covered outpatient drug subject to the agreement that, according to the manufacturer, represents the maximum price that covered entities may permissibly be required to pay for the drug (referred to in this section as the "ceiling price"), and shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price.

(2) "Rebate percentage" defined

(A) In general

For a covered outpatient drug purchased in a calendar quarter, the "rebate percentage" is the amount (expressed as a percentage) equal to-

(i) the average total rebate required under section 1927(c) of the Social Security Act with respect to the drug (for a unit of the dosage form and strength involved) during the preceding calendar quarter; divided by

(ii) the average manufacturer price for such a unit of the drug during such quarter.

(B) Over the counter drugs

(i) In general

For purposes of subparagraph (A), in the case of over the counter drugs, the "rebate percentage" shall be determined as if the rebate required under section 1927(c) of the Social Security Act is based on the applicable percentage provided under section 1927(c)(3) of such Act.

(ii) "Over the counter drug" defined

> The term "over the counter drug" means a drug that may be sold without a prescription and which is prescribed by a physician (or other persons authorized to prescribe such drug under State law).

(3) Drugs provided under State Medicaid plans

Drugs described in this paragraph are drugs purchased by the entity for which payment is made by the State under the State plan for medical assistance under title XIX of the Social Security Act.

(4) "Covered entity" defined

In this section, the term "covered entity" means an entity that meets the requirements described in paragraph (5) and is one of the following:

(A) A Federally-qualified health center (as defined in section 1905(l)(2)(B) of the Social Security Act).

(B) An entity receiving a grant under section 256a of this title.

(C) A family planning project receiving a grant or contract under section 300 of this title.

(D) An entity receiving a grant under subpart II of part C of subchapter XXIV (relating to categorical grants for outpatient early intervention services for HIV disease).

(E) A State-operated AIDS drug purchasing assistance program receiving financial assistance under subchapter XXIV.

(F) A black lung clinic receiving funds under section 937(a) of title 30.

(G) A comprehensive hemophilia diagnostic treatment center receiving a grant under section 501(a)(2) of the Social Security Act.

(H) A Native Hawaiian Health Center receiving funds under the Native Hawaiian Health Care Act of 1988.

(I) An urban Indian organization receiving funds under title V of the Indian Health Care Improvement Act.

(J) Any entity receiving assistance under subchapter XXIV (other than a State or unit of local government or an entity described in subparagraph (D)), but only if the entity is certified by the Secretary pursuant to paragraph (7).

(K) An entity receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) or section 247b(j)(2) of this title (relating to treatment of tuberculosis) through a State or unit of local government, but only if the entity is certified by the Secretary pursuant to paragraph (7).

(L) A subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act) that-

> (i) is owned or operated by a unit of State or local government, is a public or private non-profit corporation which is formally granted governmental powers by a unit of State or local government, or is a private non-profit hospital which has a contract with a State or local government to provide health care services to low income individuals who are not entitled to benefits under title XVIII of the Social Security Act or eligible for assistance under the State plan under this subchapter;
>
> (ii) for the most recent cost reporting period that ended before the calendar quarter involved, had a disproportionate share adjustment percentage (as determined under section 1886(d)(5)(F) of the Social Security Act) greater than 11.75 percent or was described in section 1886(d)(5)(F)(i)(II) of such Act; and
>
> (iii) does not obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement.

(M) A children's hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(iii) of the Social Security Act, or a free-standing cancer hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(v) of the Social Security Act, that would meet the requirements of subparagraph (L), including the disproportionate share adjustment percentage requirement under clause (ii) of such subparagraph, if the hospital were a subsection (d) hospital as defined by section 1886(d)(1)(B) of the Social Security Act.

(N) An entity that is a critical access hospital (as determined under section 1820(c)(2) of the Social Security Act), and that meets the requirements of subparagraph (L)(i).

(O) An entity that is a rural referral center, as defined by section 1886(d)(5)(C)(i) of the Social Security Act, or a sole community hospital, as defined by section 1886(d)(5)(C)(iii) of such Act, and that both meets the requirements of subparagraph (L)(i) and has a disproportionate share adjustment percentage equal to or greater than 8 percent.

(5) Requirements for covered entities

(A) Prohibiting duplicate discounts or rebates

(i) In general

A covered entity shall not request payment under title XIX of the Social Security Act for medical assistance described in section 1905(a)(12) of such Act with respect to a drug that is subject to an agreement under this section if the drug is subject to the payment of a rebate to the State under section 1927 of such Act.

(ii) Establishment of mechanism

The Secretary shall establish a mechanism to ensure that covered entities comply with clause (i). If the Secretary does not establish a mechanism within 12 months under the previous sentence, the requirements of section 1927(a)(5)(C) of the Social Security Act shall apply.

(B) Prohibiting resale of drugs

With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.

(C) Auditing

A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs (A) or (B) with respect to drugs of the manufacturer.

(D) Additional sanction for noncompliance

If the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing, that a covered entity is in violation of a requirement described in subparagraphs (A) or (B), the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug (as described in subparagraph (A)) provided under the agreement between the entity and the manufacturer under this paragraph.

(6) Treatment of distinct units of hospitals

In the case of a covered entity that is a distinct part of a hospital, the hospital shall not be considered a covered entity under this paragraph unless the hospital is otherwise a covered entity under this subsection.

(7) Certification of certain covered entities

(A) Development of process

Not later than 60 days after November 4, 1992, the Secretary shall develop and implement a process for the certification of entities described in subparagraphs (J) and (K) of paragraph (4).

(B) Inclusion of purchase information

The process developed under subparagraph (A) shall include a requirement that an entity applying for certification under this paragraph submit information to the Secretary concerning the amount such entity expended for covered outpatient drugs in the preceding year so as to assist the Secretary in evaluating the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices.

(C) Criteria

The Secretary shall make available to all manufacturers of covered outpatient drugs a description of the criteria for certification under this paragraph.

(D) List of purchasers and dispensers

The certification process developed by the Secretary under subparagraph (A) shall include procedures under which each State shall, not later than 30 days after the submission of the descriptions under subparagraph (C), prepare and submit a report to the Secretary that contains a list of entities described in subparagraphs (J) and (K) of paragraph (4) that are located in the State.

(E) Recertification

The Secretary shall require the recertification of entities certified pursuant to this paragraph on a not more frequent than annual basis, and shall require that such entities submit information to the Secretary to permit the Secretary to evaluate the validity of subsequent purchases by such entities in the same manner as that required under subparagraph (B).

(8) Development of prime vendor program

The Secretary shall establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs. If a covered entity obtains drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution.

(9) Notice to manufacturers

The Secretary shall notify manufacturers of covered outpatient drugs and single State agencies under section 1902(a)(5) of the Social Security Act of the identities of covered entities under this paragraph, and of entities that no longer meet the requirements of paragraph (5) or that are no longer certified pursuant to paragraph (7).

(10) No prohibition on larger discount

Nothing in this subsection shall prohibit a manufacturer from charging a price for a drug that is lower than the maximum price that may be charged under paragraph (1).

(b) Other definitions

(1) In general

In this section, the terms "average manufacturer price", "covered outpatient drug", and "manufacturer" have the meaning given such terms in section 1927(k) of the Social Security Act.

(2) Covered drug

In this section, the term “covered drug”—

(A) means a covered outpatient drug (as defined in section 1927(k)(2) of the Social Security Act; and

(B)includes, notwithstanding paragraph (3)(A) of section 1927(k) of such Act, a drug used in connection with an inpatient or outpatient service provided by a hospital described in subparagraph (L), (M), (N), or (O) of subsection (a)(4) that is enrolled to participate in the drug discount program under this section.

(c) Repealed

(d) Improvements to program integrity

(1) Manufacturer compliance

(A) In general

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by manufacturers with the requirements of this section in order to prevent overcharges and other violations of the discounted pricing requirements specified in this section.

(B) Improvements

The improvements described in subparagraph (A) shall include the following:

(i) The development of a system to enable the Secretary to verify the accuracy of ceiling prices calculated by manufacturers under subsection (a)(1) and charged to covered entities, which shall include the following:

(I) Developing and publishing through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices under such subsection.

(II) Comparing regularly the ceiling prices calculated by the Secretary with the quarterly pricing data that is reported by manufacturers to the Secretary.

(III) Performing spot checks of sales transactions by covered entities.

(IV) Inquiring into the cause of any pricing discrepancies that may be identified and either taking, or requiring manufacturers to take, such corrective action as is appropriate in response to such price discrepancies.

(ii) The establishment of procedures for manufacturers to issue refunds to covered entities in the event that there is an overcharge by the manufacturers, including the following:

(I) Providing the Secretary with an explanation of why and how the overcharge occurred, how the refunds will be calculated, and to whom the refunds will be issued.

(II) Oversight by the Secretary to ensure that the refunds are issued accurately and within a reasonable period of time, both in routine instances of retroactive adjustment to relevant pricing data and exceptional circumstances such as erroneous or intentional overcharging for covered outpatient drugs.

(iii) The provision of access through the Internet website of the Department of Health and Human Services to the applicable ceiling prices for covered outpatient drugs as calculated and verified by the Secretary in accordance with this section, in a manner (such as through the use of password protection) that limits such access to covered entities and adequately assures security and protection of privileged pricing data from unauthorized re-disclosure.

(iv) The development of a mechanism by which—

(I) rebates and other discounts provided by manufacturers to other purchasers subsequent to the sale of covered outpatient drugs to covered entities are reported to the Secretary; and

(II) appropriate credits and refunds are issued to covered entities if such discounts or rebates have the effect of lowering the applicable ceiling price for the relevant quarter for the drugs involved.

(v) Selective auditing of manufacturers and wholesalers to ensure the integrity of the drug discount program under this section.

(vi) The imposition of sanctions in the form of civil monetary penalties, which—

(I) shall be assessed according to standards established in regulations to be promulgated by the Secretary not later than 180 days after March 23, 2010;

(II) shall not exceed $5,000 for each instance of overcharging a covered entity that may have occurred; and

(III) shall apply to any manufacturer with an agreement under this section that knowingly and intentionally charges a covered entity a price for purchase of a drug that exceeds the maximum applicable price under subsection (a)(1).

(2) Covered entity compliance

(A) In general

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by covered entities with the requirements of this section in order to prevent diversion and violations of the duplicate discount provision and other requirements specified under subsection (a)(5).

(B) Improvements

The improvements described in subparagraph (A) shall include the following:

(i) The development of procedures to enable and require covered entities to regularly update (at least annually) the information on the Internet website of the Department of Health and Human Services relating to this section.

(ii) The development of a system for the Secretary to verify the accuracy of information regarding covered entities that is listed on the website described in clause (i).

(iii) The development of more detailed guidance describing methodologies and options available to covered entities for billing covered outpatient drugs to State Medicaid agencies in a manner that avoids duplicate discounts pursuant to subsection (a)(5)(A).

(iv) The establishment of a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering, purchasing, and delivery of covered outpatient drugs under this section, including the processing of chargebacks for such drugs.

(v) The imposition of sanctions, in appropriate cases as determined by the Secretary, additional to those to which covered entities are subject under subsection (a)(5)(D), through one or more of the following actions:

(I) Where a covered entity knowingly and intentionally violates subsection (a)(5)(B), the covered entity shall be required to pay a monetary penalty to a manufacturer or manufacturers in the form of interest on sums for which the covered entity is found liable under subsection (a)(5)(D), such interest to be compounded monthly and equal to the current short term interest rate as determined by the Federal Reserve for the time period for which the covered entity is liable.

(II) Where the Secretary determines a violation of subsection (a)(5)(B) was systematic and egregious as well as knowing and intentional, removing the covered entity from the drug discount program under this section and disqualifying the entity from re-entry into such program for a reasonable period of time to be determined by the Secretary.

(III) Referring matters to appropriate Federal authorities within the Food and Drug Administration, the Office of Inspector General of Department of Health and Human Services, or other Federal agencies for consideration of appropriate action under other Federal statutes, such as the Prescription Drug Marketing Act (21 U.S.C. 353).

(3) Administrative dispute resolution process

(A) In general

Not later than 180 days after March 23, 2010, the Secretary shall promulgate regulations to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for drugs purchased under this section, and claims by manufacturers, after the conduct of audits as authorized by subsection (a)(5)(C), of violations of subsections (a)(5)(A) or (a)(5)(B), including appropriate procedures for the provision of remedies and enforcement of determinations made pursuant to such process through mechanisms and sanctions described in paragraphs (1)(B) and (2)(B).

(B) Deadlines and procedures

Regulations promulgated by the Secretary under subparagraph (A) shall—

(i) designate or establish a decision-making official or decision-making body within the Department of Health and Human Services to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices for covered outpatient drugs in excess of the ceiling price described in subsection (a)(1), and claims by manufacturers that violations of subsection (a)(5)(A) or (a)(5)(B) have occurred;

(ii) establish such deadlines and procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously;

(iii) establish procedures by which a covered entity may discover and obtain such information and documents from manufacturers and third parties as may be relevant to demonstrate the merits of a claim that charges for a manufacturer's product have exceeded the applicable ceiling price under this section, and may submit such documents and information to the administrative official or body responsible for adjudicating such claim;

(iv) require that a manufacturer conduct an audit of a covered entity pursuant to subsection (a)(5)(C) as a prerequisite to initiating administrative dispute resolution proceedings against a covered entity;

(v) permit the official or body designated under clause (i), at the request of a manufacturer or manufacturers, to consolidate claims brought by more than one manufacturer against the same covered entity where, in the judgment of such official or body, consolidation is appropriate and consistent with the goals of fairness and economy of resources; and

(vi) include provisions and procedures to permit multiple covered entities to jointly assert claims of overcharges by the same manufacturer for the same drug or drugs in one administrative proceeding, and permit such claims to be asserted on behalf of covered entities by associations or organizations representing the interests of such covered entities and of which the covered entities are members.

(C) Finality of administrative resolution

The administrative resolution of a claim or claims under the regulations promulgated under subparagraph (A) shall be a final agency decision and shall

be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction.

(4) Authorization of appropriations

There are authorized to be appropriated to carry out this subsection, such sums as may be necessary for fiscal year 2010 and each succeeding fiscal year.

(e) Exclusion of orphan drugs for certain covered entities

For covered entities described in subparagraph (M) (other than a children's hospital described in subparagraph (M)), (N), or (O) of subsection (a)(4), the term "covered outpatient drug" shall not include a drug designated by the Secretary under section 360bb of title 21 for a rare disease or condition.

**Annotated Code of Maryland, Health Occupations Article (LexisNexis Supp. 2024)**
**§ 12-6C-09.1. Acquisition of a 340B drug.**

(a)(1) In this section the following words have the meanings indicated.

(2) "Covered entity" has the meaning stated in 42 U.S.C. § 256b(a)(4).

(3) "Package" has the meaning stated in 21 U.S.C. § 360eee(11).

(4)(i) "340B drug" means a drug that:

1. Is a covered outpatient drug under 42 U.S.C. § 256b;

2. Has been subject to an offer for reduced prices by a 340B manufacturer under 42 U.S.C. § 256b(a)(1); and

3. Is purchased by a covered entity.

(ii) "340B drug" includes a drug that would have been purchased but for the limitation under subsection (c) of this section.

(5) "340B manufacturer" means a manufacturer, as defined in 42 U.S.C. § 1396r-8(k)(5), of covered outpatient drugs that has signed a pharmaceutical pricing agreement under 42 U.S.C. § 256b(a)(1).

(b) This section may not be construed to be:

(1) Less restrictive than any federal law that is applicable to a person regulated by this section; or

(2) In conflict with applicable federal and State laws and regulations.

(c)(1) Except as provided in paragraph (2) of this subsection, a 340B manufacturer may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity unless the receipt of 340B drugs is prohibited by the U.S. Department of Health and Human Services.

(2) A 340B manufacturer may limit the distribution of a 340B drug if the limitation is required under 21 U.S.C. § 355-1.

(d)(1)(i) A violation of subsection (c) of this section:

1. Subject to paragraph (2) of this subsection, is an unfair, abusive, or deceptive trade practice within the meaning of Title 13 of the Commercial Law Article and is subject to the enforcement and penalty provisions contained in Title 13 of the Commercial Law Article; and

2. A. If the alleged violation was committed by a person that is licensed or permitted by the Board, shall be investigated by the Board or the Consumer Protection Division of the Office of the Attorney General; or

B. If the alleged violation was committed by a person that is not licensed or permitted by the Board, shall be investigated by the Consumer Protection Division of the Office of the Attorney General.

(ii) As part of an investigation conducted under subparagraph (1)(i)2 of this paragraph, the Board or the Consumer Protection Division of the Office of the Attorney General may investigate an affiliate or a contractor of the 340B manufacturer, including a wholesaler or third-party logistics provider.

(2)(i) In addition to the penalties under Title 13 of the Commercial Law Article, a civil fine may be assessed in the amount of $5,000 per violation of subsection (c) of this section.

(ii) A violation of this section does not create a private right of action under § 13-408 of the Commercial Law Article.

(3) If a violation of subsection (c) of this section is committed by a person licensed or permitted by the Board, the Board may impose discipline, suspension, or revocation of the person's license or permit.

(4) Each package of 340B drugs subject to a violation of subsection (c) of this section shall constitute a separate violation.

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

| | | |
|---|---|---|
| ABBVIE, INC., *et al.*, | * | |
| *Plaintiff-Appellants*, | * | |
| v. | * | No. 24-1939 (L) |
| ANTHONY BROWN, *et al.*, | * | |
| *Defendants-Appellees*. | * | |

* * * * * * * * * * * * * *

## CERTIFICATE OF SERVICE

I certify that, on this 21st day of February, 2025, the Brief of Appellees was filed electronically and served on counsel of record who are registered CM/ECF users.

/s/ Joshua R. Chazen
Joshua R. Chazen