No. 24-1939 (L)

# United States Court of Appeals
# for the Fourth Circuit

_____

ABBVIE, INC., (a Delaware corporation); ALLERGAN, INC., (a
Delaware corporation); DURATA THERAPEUTICS, INC., (a Delaware
corporation); ABBVIE PRODUCTS LLC, (a Georgia limited liability
company); APTALIS PHARMA US, INC., (a Delaware corporation);
PHARMACYCLICS LLC, (a Delaware limited liability company);
ALLERGAN SALES, LLC, (a Delaware limited liability company),

*Plaintiffs - Appellants*,

and

NOVARTIS PHARMACEUTICALS CORPORATION;
PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF
AMERICA; ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiffs,*

v.

ANTHONY G. BROWN, in his official capacity as Attorney General of
the State of Maryland; KRISTOPHER RUSINKO, in his official
capacity as Board President of the Maryland Board of Pharmacy;
DAPHANIE ROBINSON, in her official capacity as a member of the
Maryland Board of Pharmacy; ADETORO ORIAIFO, in his official
capacity as a member of the Maryland Board of Pharmacy; KRISTEN
FINK, in her official capacity as a member of the Maryland Board of
Pharmacy; KAREN SLAGLE, in her official capacity as a member of
the Maryland Board of Pharmacy; BRENDA OLIVER, in her official
capacity as a member of the Maryland Board of Pharmacy; KARLA
EVANS, in her official capacity as a member of the Maryland Board of
Pharmacy; JAVIER VAZQUEZ, in his official capacity as a member of
the Maryland Board of Pharmacy; AKESH PATEL, in his official
capacity as a member of the Maryland Board of Pharmacy; KEVIN
MORGAN, in his official capacity as a member of the Maryland Board
of Pharmacy; JENNIFER HARDESTY, in her official capacity as a
member of the Maryland Board of Pharmacy; PEGGY GLASCOE

GEIGHER, in her official capacity as a member of the Maryland Board of Pharmacy; NEIL LEIKACH, in his official capacity as a member of the Maryland Board of Pharmacy; MARYLAND BOARD OF PHARMACY/PRESIDENT,

*Defendants - Appellees.*

## No. 24-1949

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff - Appellant,*

and

ABBVIE, INC., (a Delaware corporation); ALLERGAN, INC., (a Delaware corporation); DURATA THERAPEUTICS, INC., (a Delaware corporation); ABBVIE PRODUCTS LLC, (a Georgia limited liability company); APTALIS PHARMA US, INC., (a Delaware corporation); PHARMACYCLICS LLC, (a Delaware limited liability company); ALLERGAN SALES, LLC, (a Delaware limited liability company); PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA; ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiffs,*

v.

ANTHONY G. BROWN, in his official capacity as Attorney General of the State of Maryland; KRISTOPHER RUSINKO, in his official capacity as Board President of the Maryland Board of Pharmacy; DAPHANIE ROBINSON, in her official capacity as a member of the Maryland Board of Pharmacy; ADETORO ORIAIFO, in his official capacity as a member of the Maryland Board of Pharmacy; KRISTEN FINK, in her official capacity as a member of the Maryland Board of Pharmacy; KAREN SLAGLE, in her official capacity as a member of the Maryland Board of Pharmacy; BRENDA OLIVER, in her official capacity as a member of the Maryland Board of Pharmacy; KARLA EVANS, in her official capacity as a member of the Maryland Board of Pharmacy; JAVIER VAZQUEZ, in his official capacity as a member of the Maryland Board of Pharmacy; AKESH PATEL, in his official capacity as a member of the Maryland Board of Pharmacy; KEVIN MORGAN, in his official capacity as a member of the Maryland Board

of Pharmacy; JENNIFER HARDESTY, in her official capacity as a
member of the Maryland Board of Pharmacy; PEGGY GLASCOE
GEIGHER, in her official capacity as a member of the Maryland Board
of Pharmacy; NEIL LEIKACH, in his official capacity as a member of
the Maryland Board of Pharmacy; MARYLAND BOARD OF
PHARMACY/PRESIDENT,

*Defendants - Appellees.*

## No. 24-1978

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF
AMERICA,

*Plaintiff - Appellant*,

and

ABBVIE, INC., (a Delaware corporation); ALLERGAN, INC., (a
Delaware corporation); DURATA THERAPEUTICS, INC., (a Delaware
corporation); ABBVIE PRODUCTS LLC, (a Georgia limited liability
company); APTALIS PHARMA US, INC., (a Delaware corporation);
PHARMACYCLICS LLC, (a Delaware limited liability company);
ALLERGAN SALES, LLC, (a Delaware limited liability company);
NOVARTIS PHARMACEUTICALS CORPORATION; ASTRAZENECA
PHARMACEUTICALS LP,

*Plaintiffs,*

v.

ANTHONY G. BROWN, in his official capacity as Attorney General of
the State of Maryland; KRISTOPHER RUSINKO, in his official
capacity as Board President of the Maryland Board of Pharmacy;
DAPHANIE ROBINSON, in her official capacity as a member of the
Maryland Board of Pharmacy; ADETORO ORIAIFO, in his official
capacity as a member of the Maryland Board of Pharmacy; KRISTEN
FINK, in her official capacity as a member of the Maryland Board of
Pharmacy; KAREN SLAGLE, in her official capacity as a member of
the Maryland Board of Pharmacy; BRENDA OLIVER, in her official
capacity as a member of the Maryland Board of Pharmacy; KARLA
EVANS, in her official capacity as a member of the Maryland Board of
Pharmacy; JAVIER VAZQUEZ, in his official capacity as a member of
the Maryland Board of Pharmacy; AKESH PATEL, in his official

capacity as a member of the Maryland Board of Pharmacy; KEVIN
MORGAN, in his official capacity as a member of the Maryland Board
of Pharmacy; JENNIFER HARDESTY, in her official capacity as a
member of the Maryland Board of Pharmacy; PEGGY GLASCOE
GEIGHER, in her official capacity as a member of the Maryland Board
of Pharmacy; NEIL LEIKACH, in his official capacity as a member of
the Maryland Board of Pharmacy; MARYLAND BOARD OF
PHARMACY/PRESIDENT,

*Defendants - Appellees.*

─────────────────

On Appeal from the United States District Court
for the District of Maryland,
No. 1:24-cv-01557-MJM
Judge Matthew J. Maddox

─────────────────

## APPELLANTS' REPLY BRIEF
─────────────────

Ashley C. Parrish
John D. Shakow
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Suite 900
Washington, D.C. 20006
(202) 626-2627
aparrish@kslaw.com
jshakow@kslaw.com

Nicole Bronnimann
KING & SPALDING LLP
1100 Louisiana, Suite 4100
Houston, TX 77002
(713) 276-7402
nbronnimann@kslaw.com

Matthew S. Owen, P.C.
Meredith M. Pohl
Lucas H. Funk
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com

Timothy Maloney
JOSEPH GREENWALD LAAKE
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(240) 553-1206
tmaloney@jgllaw.com

*Counsel for Plaintiffs – Appellants AbbVie, Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.; Pharmacyclics LLC; Allergan Sales, LLC*

Catherine E. Stetson
Susan M. Cook
Marlan Golden
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com
susan.cook@hoganlovells.com

*Counsel for Plaintiff – Appellant Novartis Pharmaceuticals Corporation*

Philip J. Perry
Andrew D. Prins
Abid R. Qureshi
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.
(202) 637-2200
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

*Counsel for Plaintiff – Appellant Pharmaceutical Research and Manufacturers of America*

March 28, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES ......................................................... iii

INTRODUCTION ...................................................................... 1

ARGUMENT ............................................................................ 6

I.  APPELLANTS' PREEMPTION CLAIMS ARE LIKELY TO SUCCEED
    ON THE MERITS............................................................... 6

    A.  H.B. 1056 Is Field Preempted. ................................... 6

        1.  H.B. 1056 Regulates 340B Drug Pricing. ...................... 7

        2.  H.B. 1056 Invades The Field By Attempting To
            Redefine Manufacturers' 340B Offers. ........................ 12

        3.  Section 340B Preempts State-Law Efforts To
            Regulate 340B-Specific Conduct. ............................. 13

    B.  H.B. 1056 Conflicts With The Federal 340B Program. ......... 20

        1.  H.B. 1056 Upends The Bargain Congress Struck
            in 340B. ................................................... 21

        2.  H.B. 1056 Clashes With The Federal 340B
            Enforcement Scheme. ......................................... 25

II. ABBVIE'S TAKINGS CLAIM IS LIKELY TO SUCCEED ON THE
    MERITS.................................................................... 29

    A.  H.B. 1056 Effects A Physical Taking....................... 30

    B.  H.B. 1056 Is Not Voluntary. ................................ 32

    C.  *Penn Central* Does Not Apply, But H.B. 1056 Fails If It
        Does........................................................ 36

III. PHRMA AND NOVARTIS ARE LIKELY TO SUCCEED ON THEIR
     CLAIMS    THAT    H.B.    1056    VIOLATES    THE

EXTRATERRITORIALITY PRINCIPLES IN THE UNITED STATES CONSTITUTION. .................................................................. 38

    A.    H.B. 1056 Impermissibly Regulates Conduct Outside Maryland. ............................................................... 39

    B.    H.B. 1056 Is Discriminatory. ................................... 44

    C.    H.B. 1056 Excessively Burdens Interstate Commerce. ........ 46

IV.   APPELLANTS HAVE SATISFIED THE REMAINING INJUNCTION FACTORS. ...................................................................... 48

CONCLUSION .............................................................................. 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. McVey,*
   37 F.4th 89 (4th Cir. 2022) ................................................. 50

*Alden v. Maine,*
   527 U.S. 706 (1999) ........................................................ 50

*Am. Petroleum Inst. v. Cooper,*
   718 F.3d 347 (4th Cir. 2013) ............................................ 15

*Arizona v. United States,*
   567 U.S. 387 (2012) ............................................... 6, 14, 20

*Ass'n for Accessible Meds. v. Frosh,*
   887 F.3d 664 (4th Cir. 2018) ................ 38, 39, 40, 41, 42, 43

*Astra USA, Inc. v. Santa Clara Cnty.,*
   563 U.S. 110 (2011) ........................... 1, 16, 18, 20, 26, 27

*Baker Cnty. Med. Servs., Inc. v. U.S. Atty. Gen.,*
   763 F.3d 1274 (11th Cir. 2014) ........................................ 32

*Brown-Forman Distillers Corp. v. New York State Liquor
Auth.,*
   476 U.S. 573 (1986) ............................................. 40, 45, 46

*Buckman Co. v. Plaintiffs' Legal Comm.,*
   531 U.S. 341 (2001) ........................................................ 14

*Burditt v. HHS,*
   934 F.2d 1362 (5th Cir. 1991) ......................................... 32

*C & A Carbone, Inc. v. Town of Clarkstown,
N.Y.,* 511 U.S. 383 (1994) .................................................. 45

*Cedar Point Nursery v. Hassid,*
   594 U.S. 139 (2021) .................................................. 30, 32

*Cienega Gardens v. United States,*
  331 F.3d 1319 (Fed. Cir. 2003) .......................................... 37

*Edgar v. MITE Corp.,*
  457 U.S. 624 (1982) ........................................................ 40

*Eli Lilly & Co. v. HHS,*
  2021 WL 5039566 (S.D. Ind. Oct. 29, 2021) ...................... 32

*Garelick v. Sullivan,*
  987 F.2d 913 (2d Cir. 1993) .............................................. 33

*Healy v. Beer Inst., Inc.,*
  491 U.S. 324 (1989) ...................................... 38, 40, 44, 48

*Horne v. Dep't of Agric.,*
  576 U.S. 350 (2015) .............................................. 35, 36

*Kelo v. City of New London,*
  545 U.S. 469 (2005) ........................................................ 31

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
  2 F.4th 330 (4th Cir. 2021) .............................................. 49

*Lee v. Cline,*
  384 Md. 245 (2004) ........................................................ 51

*Loretto v. Teleprompter Manhattan CATV Corp.,*
  458 U.S. 419 (1982) ........................................................ 38

*McCulloch v. Maryland,*
  17 U.S. 316 (1819) ........................................................ 13

*Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota
Dep't of Pub. Welfare,*
  742 F.2d 442 (8th Cir. 1984) .................................... 33, 35

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023) ............................... 39, 40, 42, 44, 47, 48

iv

*Novartis Pharmaceuticals Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024)
      ................................................... 1, 2, 12, 15, 16, 20, 21, 24, 31, 32, 38

*Novartis Pharms. Corp. v. Espinosa*,
    2021 WL 5161783 (D.D.C. Nov. 5, 2021) ........................................... 24

*Pharmacist Pol. Action Comm. of Md. (PHARMPAC) v.
    Harris*,
    502 F. Supp. 1235 (D. Md. 1980) .................................................. 33, 34

*PhRMA v. McClain*,
    95 F.4th 1136 (8th Cir. 2024) ....................................................... 6, 10

*PhRMA v. Morrisey*,
    2024 WL 5147643 (S.D. W. Va. Dec. 17, 2024)
      ............................................................... 8, 10, 23, 27, 28, 29

*PhRMA v. Walsh*,
    538 U.S. 644 (2003) ................................................................... 23, 40, 42

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ...................................................................... 46, 47

*Rapanos v. United States*,
    547 U.S. 715 (2006) ............................................................................ 23

*Sanofi Aventis U.S. LLC v. HHS*,
    58 F.4th 696 (3d Cir. 2023) ................................... 12, 16, 20, 21, 31, 38

*Sanofi-Aventis U.S., LLC v. HHS*,
    570 F. Supp. 3d 129 (D.N.J. 2021) ...................................................... 33

*St. Francis Hosp. Ctr. v. Heckler*,
    714 F.2d 872 (7th Cir. 1983) ............................................................... 33

*Star Sci. Inc. v. Beales*,
    278 F.3d 339 (4th Cir. 2002) .............................................................. 46

*Stokes v. Stirling*,
    64 F.4th 131 (4th Cir. 2023) .............................................................. 36

*Teltech Sys., Inc. v. Bryant,*
  702 F.3d 232 (5th Cir. 2012)........................................................15, 16

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
  588 U.S. 504 (2019)............................................................................45

*U.S. Fid. & Guar. Co. v. McKeithen,*
  226 F.3d 412 (5th Cir. 2000)............................................................37

*Valancourt Books, LLC v. Garland,*
  82 F.4th 1222 (D.C. Cir. 2023) .......................................................36

*Virginia Hosp. & Healthcare Ass'n v. Roberts,*
  671 F. Supp. 3d 633 (E.D. Va. 2023) ..............................................34

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods.
  Liab. Litig.,*
  959 F.3d 1201 (9th Cir. 2020).........................................................15

*Whitney v. Heckler,*
  780 F.2d 963 (11th Cir. 1986)..........................................................33

*Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.,*
  401 F.3d 560 (4th Cir. 2005)............................................................46

*Ex parte Young,*
  209 U.S. 123 (1908) ...........................................................................50

**Statutes**

42 U.S.C. §256b.....................................................1, 12, 17, 21, 26

Md. Code, Com. Law §13-411..................................................................19

Md. Code, Health Occ. §12-6C-09.1 ...............................7, 13, 19, 29, 41

Md. Code, State Gov't §12-104(a)(2)(i)................................................51

**Regulations**

42 C.F.R. §10.21(a)(1) ...........................................................................19

61 Fed. Reg. 43549 (Aug. 23, 1996) ......................................................37

89 Fed. Reg. 28643 (Apr. 19, 2024) ........................................................... 19

## INTRODUCTION

The 340B statute sets out an exclusively federal scheme that determines when the 340B price must be offered and to whom. The statute also further mandates an enforcement regime meant to be enforced by the federal government—and the federal government alone, as the Supreme Court has held. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 120-21 (2011). The State's response brief sidesteps the governing text of the 340B statute and disregards key undisputed facts in an attempt to save its constitutionally defective statute.

Most fundamentally, the State ignores the principal provision of the federal statute creating drug manufacturer obligations to sell at 340B prices. Congress provided in 42 U.S.C. §256b that, in exchange for participating in Medicaid and Medicare Part B, drug manufacturers must "offer" to sell certain drugs at steeply reduced 340B prices. The scope of that required "offer"—and what terms it must include—*is solely a question of federal law*.

The D.C. Circuit settled that question in *Novartis Pharmaceuticals Corp. v. Johnson*, explaining that a federal offer must be *bona fide* and can include reasonable conditions, including as to delivery. 102 F.4th

452, 462-64 (D.C. Cir. 2024). The decision further established that the same conditions at issue here—a one contract-pharmacy condition and a claims data condition—are both permissible. *Id.* at 463. If a covered entity does not accept the manufacturer offer with these permissible conditions, *there is no 340B purchase under federal law* and no manufacturer obligation to provide 340B pricing arises. The scope of the federal offer thus defines the scope of manufacturers' 340B obligations.

This is important because it reveals exactly what H.B. 1056 attempts to do: circumvent the D.C. Circuit's holding about permissible conditions on a federal 340B offer. By requiring manufacturers to make offers broader than those required under federal law, Maryland forces manufacturers to enter a wide range of 340B-priced transactions not mandated by 340B. Opp. 48 (conceding that H.B. 1056 increases the volume of covered entities' purchases of 340B-priced drugs). H.B. 1056 thus directly interferes with and vastly expands the scope of the detailed statutory program Congress created and radically changes the careful balance Congress struck. This fundamental point makes clear why Appellants' claims are likely to succeed.

Start with field preemption.  Despite H.B. 1056's plain text, which regulates the "acquisition" of 340B drugs, the State contends that H.B. 1056 regulates only "delivery" and thus is outside the broad scope of Section 340B.  The reality is that H.B. 1056 is not about delivery at all, but price.  The drugs are already being delivered to pharmacies; what the Maryland law mandates is that they be delivered to those commercial pharmacies *at the 340B price*.  If a manufacturer denies the 340B-reduced pricing to one of these commercial pharmacies for reasons federal law permits—diversion, for example—the manufacturer still faces Maryland penalties, and Maryland would need to make determinations of uniquely federal law issues to proceed.  Maryland's law thereby demands that manufacturers make much more than the federally mandated "bona fide" offer—or face a state enforcement scheme and overlaid penalties that Congress did not contemplate.  That trespasses into the exclusive territory of Section 340B.

On conflict preemption, the State fares no better.  In 340B, Congress struck a careful balance between burdening manufacturers, thereby discouraging innovation, and providing access to reduced-price drugs.  Though Maryland claims to be pursuing the same end, it cannot

intrude on Congress's scheme.  H.B. 1056 greatly increases the costs of participation in 340B.  It distorts Congress's careful balance by forcing manufacturers to offer their drugs for little-to-no cost to a vastly increased number of entities and transactions, and on any terms that covered entities might prefer.  Maryland's law also throws a wrench in Section 340B's comprehensive enforcement scheme, which Congress placed in the exclusive care of the federal government.

On AbbVie's takings claim, the State has no convincing answer.  It avoids the reality that H.B. 1056 compels a physical transfer of property by arguing that Section 340B is the real culprit and by pointing out that H.B. 1056 does not compel *direct sales* to contract pharmacies.  None of these points camouflage H.B. 1056's unquestioned effect: the law directly undermines AbbVie's authority to dictate reasonable, non-price terms to its federally mandated offer and thereby *forces* AbbVie to transfer low-cost drugs to contract pharmacies without limit.  The State likewise tries to frame its confiscatory law as "voluntary" because AbbVie participates in the federal 340B program.  That logic would appear to provide states carte blanche to leverage away the constitutional rights of all

4

participants in federal programs. This Court should not endorse such a sweeping and unprecedented claim of state power.

Finally, Maryland's response highlights the two separate ways H.B. 1056 violates the dormant Commerce Clause. First, Maryland does not dispute the record showing that manufacturers make 340B pricing available through a series of out-of-state intermediaries. By seeking to dictate when and how manufacturers must provide those price reductions, Maryland has necessarily sought to improperly regulate commerce occurring outside the State. Second, Maryland itself admits that H.B. 1056 was designed to protect the economic interests of in-state 340B entities and their business partners. This intention erects a type of economic protectionism that, as the Supreme Court has emphasized, runs counter to the very core of the dormant Commerce Clause.

Because the State has no legitimate interest in enforcing its unconstitutional regime, which will inflict substantial irreparable harms on Appellants while doing nothing for patients in Maryland, this Court should reverse the district court and preliminarily enjoin H.B. 1056.

# ARGUMENT

## I. APPELLANTS' PREEMPTION CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS.

Appellants are likely to succeed on their preemption claims.  The State offers no persuasive responses to the contrary.[1]

### A. H.B. 1056 Is Field Preempted.

Maryland's law improperly regulates conduct in a field that Congress "has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012).

The State does not dispute that Section 340B preempts—at a minimum—the "field" of 340B drug pricing.  Opp. 30.  Instead, the State argues that H.B. 1056 survives because federal law does not preempt the "field of delivery of 340B drugs."  Opp. 29, 33 n.14.  That framing has two flaws.  ***First***, it fails on its own terms; H.B. 1056 regulates the *price* at which 340B manufacturers must provide their drugs.  ***Second***, it

---

[1] The State relies extensively on the Eighth Circuit's noncontrolling decision in *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024), including quoting *McClain*'s conclusions as fact, *e.g.*, Opp. 7, and embarking on multi-page descriptions that far exceed *McClain*'s own scant reasoning, *e.g.*, Opp. 30-33.  But as Appellants' opening brief explained, *McClain* relied on key assumptions that render its analysis unhelpful here.  *See* Br. §I.D., 56-60.

artificially narrows the "field" that Congress's comprehensive 340B Program preempts.

### 1. H.B. 1056 Regulates 340B Drug Pricing.

The State's argument hinges on the fiction that H.B. 1056 regulates only "delivery" of 340B drugs. But Maryland's law *in fact* regulates 340B *pricing*. That should end the case: No one disputes that federal law preempts state 340B pricing regulations.

Under H.B. 1056, drug manufacturers cannot "deny, restrict, prohibit … or otherwise limit" contract pharmacies from either "acqui[ring]" *or* receiving "delivery" of "340B drugs"—drugs that the statute defines by reference to their discounted *price*. Md. Code, Health Occ. §12-6C-09.1(a)(4), (c)(1). So, as a textual matter, the statute regulates "acquisition" *or* "delivery" of drugs at a particular *price*.

H.B. 1056's real-world application confirms this: Maryland does not dispute that even now manufacturers *deliver* their drugs to contract pharmacies whenever asked. The sole question the statute addresses is at what price those deliveries are made. Manufacturers face liability under H.B. 1056 unless they provide the 340B *price* for those same deliveries.

The Southern District of West Virginia reached that same conclusion when preliminarily enjoining a virtually identical state law. *PhRMA v. Morrisey*, 2024 WL 5147643, at *8-9 (S.D. W. Va. Dec. 17, 2024). *Morrisey* noted that, like here, manufacturers "already deliver" their "drug products to contract pharmacies" throughout the state. *Id.* at *9. So, a manufacturer risks violating the challenged law "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering its drugs to those pharmacies." *Id.* Thus, the law necessarily "regulates price, not delivery." *Id.* at *8.

The State dismisses *Morrisey*'s logic as an "anomaly." Opp. 40-42. But earlier in this litigation, Maryland *itself* used the same logic to concede that H.B. 1056 regulates price. JA252. Only later, after realizing that such an admission destroyed its case, did the State backtrack. *See* JA841. Now, the State defends its "delivery, not pricing" position by stressing that H.B. 1056 regulates only 340B transactions—i.e., purchases made by (or in the name of) a covered entity. Opp. 42-43 & n.18, 49. In Maryland's telling, H.B. 1056 "does not regulate purchases (at any price) by pharmacies on their own account." *Id.* at 43.

8

This is a non sequitur.  The problem with H.B. 1056 is not that it regulates pharmacies unconnected to the 340B Program—the problem is that Maryland seeks to dictate when and how manufacturers must give effect to the federally prescribed price.  And, on that point, Maryland's distinction means nothing in practice.  Contract pharmacies do not differentiate between drugs that they purchase directly and 340B drugs that are nominally purchased through a covered entity.  Pharmacies order and receive regular shipments of *all* drugs, take title to them, stock them on unsegregated shelves, then dispense them to patients at commercial prices—regardless of whether the patient's provider is a covered entity.  JA174-176.  Only later, on the back end, do contract pharmacies (aided, of course, by third-party administrators who also have their thumbs in the pie) estimate how many previously dispensed drugs may have been eligible for 340B pricing (a contention impossible to question or rebut, without access to claims data).  *Id.*  Then the *pharmacy*—not the covered entity—typically orders "replenishment"

drugs at 340B prices using the covered entity's account details.[2] *Id.* Covered entities play little to no role in this process; sometimes, they do not even know contract pharmacies ordered drugs on their behalf. JA176-177.[3]

Perhaps recognizing that its case rests on an untenable distinction, the State tries a different tack: It suggests that if the above-described practice violates Section 340B's federal prohibition on diversion, manufacturers should just comply with H.B. 1056 and *then* deal with diversion at the federal dispute resolution process. Opp. 43, 49-50. But that argument only confirms H.B. 1056 is preempted, both as a practical

---

[2] The State asserts (without support) that contract pharmacies and covered entities sometimes use a "pre-purchased" inventory model. Opp. 8 n.6, 42 n.17. Even if that were sometimes true, it does not change the fact—which no party disputes—that the above-described "product replenishment model" dominates the 340B landscape.

[3] Contract pharmacies often do *not* act as "agents" of covered entities, as both the district court and *McClain* wrongly assumed. JA177. The State argues this is "irrelevant" to Appellants' "facial challenge" so long as *some* pharmacies *do* act as agents. Opp. 57. But that line of reasoning "makes little sense" in the preemption context—it "would reject a conflict preemption claim in a facial challenge whenever a defendant can conjure up just one hypothetical factual scenario in which implementation of the state law would not directly interfere with federal law." *Morrisey*, 2024 WL 5147643, at *13 (citation omitted).

matter and as a legal matter. As a practical matter, the State makes no attempt to explain how this could possibly work on the ground; will it pause state enforcement proceedings while the necessary federal questions underlying those proceedings are litigated? And as a legal matter, States cannot pass laws that directly facilitate federal violations, leaving a bigger mess for federal authorities to clean up.

Finally, the State's characterization of H.B. 1056 as a mere delivery regulation is impossible to square with the law's dramatic financial impact. As the State emphasizes, its so-called "delivery" law significantly increases the *revenue* covered entities and contract pharmacies obtain at manufacturers' expense. *See* Opp. 10, 46 n.19. Indeed, that is the whole point. *Id.* at 47. That financial impact does not derive from manufacturers' obligation to *deliver* drugs to a different location: it derives from the delta between *340B* pricing and *commercial* pricing when manufacturers are forced to deliver more discounted drugs to entities that are not entitled to receive them.

H.B. 1056 is no "delivery" regulation. It regulates 340B pricing and enables contract pharmacies—that are not authorized by the Program—

to benefit from that pricing—topics even the State agrees lie in solely federal hands.

### 2. H.B. 1056 Invades The Field By Attempting To Redefine Manufacturers' 340B Offers.

The question of what reasonable conditions a drug manufacturer may impose under federal law also defines the scope of a manufacturer's obligation to provide 340B pricing, an arena H.B. 1056 invades. 42 U.S.C. §256b(a)(1). Under federal law, manufacturers may place reasonable conditions on their 340B offers, including claims data and contract pharmacy conditions. *Novartis*, 102 F.4th at 463-64; *see also Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704 (3d Cir. 2023).

A covered entity that receives an "offer" can either "assent to the same terms" and "purchase" the drugs at the federal 340B price, or it can reject the 340B offer and purchase drugs at a commercial price. *Novartis*, 102 F.4th at 460; *see also Sanofi*, 58 F.4th at 703 (same). The Congressional mandate does not "require the offeror to accede to any distribution terms demanded by the offeree." *Novartis*, 102 F.4th at 461; *Sanofi*, 58 F.4th at 703.

H.B. 1056 wades into that federal offer regime, imposing Maryland's own desired terms. Although H.B. 1056 adopts the text of

the federal statute's "shall offer" provision in its definition of "340B drug," Maryland then substitutes its own view of what that provision actually means. Md. Code, Health Occ. §12-6C-09.1(a)(4)(i). That reworking of the federal offer falls within the heartland of the federal field.

### 3. Section 340B Preempts State-Law Efforts To Regulate 340B-Specific Conduct.

Regardless, the State would lose even if H.B. 1056 solely regulated conditions (like delivery) that manufacturers may attach to their 340B offers. Section 340B establishes a comprehensive program with a finite set of obligations, eligibility criteria, and enforcement mechanisms. Any state regulation that expressly targets the 340B Program—such as by imposing new 340B-specific obligations—encroaches upon the federally preempted field. So contrary to the State's claims, 340B clearly *does* preempt the field of *340B* drug delivery, *340B* pricing, and anything else specific to 340B.

**I.** States cannot regulate Congress's creations. *McCulloch v. Maryland*, 17 U.S. 316 (1819). But that is precisely what Maryland is doing here. Its brief ignores the fact that H.B. 1056 targets conduct that exists *solely* because of 340B and could not exist without the federal program. It does not involve Maryland's general police power to regulate

13

the fields of pharmacy, drug delivery, or even affordable drug pricing. By the State's own framing, its own law exclusively regulates a federally created category of conduct: the terms of a 340B offer.[4] Opp. 38-39.

Put simply, Maryland is bootstrapping a federal program. In the State's view, 340B—which imposes no contract-pharmacy obligations or claims data restrictions—did not go far enough. *See* Opp. 46-47. Maryland thus added (without Congressional permission) new requirements to expand Congress's program. Opp. 26. That is a textbook preemption problem.

Similarly, the State's efforts to distinguish *Arizona* backfire. Opp. 35-36. As the State observes, *Arizona* concerned the field of immigration, over which the federal government wields broad power. 567 U.S. at 394. But if anything, the federal government's power over *its own programs* is even more defined. Unlike immigration, the 340B Program would not exist as a canvas for state regulation absent federal legislation.

---

[4] Thus, the State's reliance on the "presumption against preemption" is misplaced. Opp. 23-29. A State does not act within its historic police power—and is not entitled to the presumption—when it regulates a category of conduct created by federal law. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001).

Regardless, this Court and others have applied *Arizona*'s principles beyond immigration.  *See, e.g.*, *Am. Petroleum Inst. v. Cooper*, 718 F.3d 347, 354-56, 359 (4th Cir. 2013) (energy); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (emissions); *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 238-39 (5th Cir. 2012) (fraudulent calls).

**II.**   Instead of grappling with that problem, the State points to Congress's "silence" about contract-pharmacy requirements, asserting states can regulate in "the area of 340B drug delivery."  Opp. 12, 19, 31, 37-38, 44.  That reflects a misunderstanding of the 340B Program.

Although 340B may not reference "delivery" to contract pharmacies, it speaks to the issue in several ways.  First, it makes clear manufacturers have no responsibilities vis-à-vis contract pharmacies.  Second, by imposing a bona fide offer requirement and dictating only the price term, Congress preserved manufacturers' flexibility to set other reasonable terms, including those concerning delivery.  *Novartis*, 102 F.4th at 463-64.  Third, it provided HHS and federal courts with a tool to assess exactly what delivery-related, reasonable conditions are appropriate.  *Id.* at 460-64.  Congress did not leave a space for states to

impose their own preferred requirements. *Teltech*, 702 F.3d at 238-39.

Start with common ground. The State concedes (as it must) that the 340B Program does not obligate manufacturers to honor covered entities' delivery demands or other non-price terms. Opp. 37-38; *see Sanofi*, 58 F.4th at 702-07*; Novartis*, 102 F.4th at 460-64. And the State does not suggest Congress's choice to omit them was somehow an oversight. *See* Opp. 38, 51-52; *Sanofi*, 58 F.4th at 704 (concluding Congress acted "intentionally" by omitting contract-pharmacy obligations). The State errs, however, by construing Congress's purported "silence" as an open door.

As the *Astra* Court explained, the 340B Program makes participation a prerequisite for manufacturers' participation in other federal healthcare programs—so what 340B *does not* require is just as important as what it *does* require. *See Novartis*, 102 F.4th at 460. In other words, the 340B Program is an ostensibly voluntary scheme where manufacturers agree to a specific set of obligations. By adding an extra obligation, H.B. 1056 changes the terms of Congress's deal. Congress did not silently invite states to append requirements to its Program.

The State's other arguments also fail. For instance, the State contends the 340B Program is not sufficiently "comprehensive" or "pervasive" for preemption purposes because it specifies the "price" term for 340B offers without saying anything about other terms, like delivery, payment methods, dispute resolution, and limitation of liability. Opp. 31, 39. The State is incorrect that the 340B statute reaches none of those items: it regulates payment methods, *see* 42 U.S.C. §256b(a)(1) (providing for a "rebate" or "discount"), dispute resolution, *id.* §256b(d)(3), and "delivery"—at least in the sense that the State uses the term—by addressing what price must be extended to which entities, *id.* §256b(a)(1), (a)(4). And even if the State were correct that the statute does not reach these terms, that simply means Congress intentionally decided not to impose them as a condition of participating manufacturers' eligibility for Medicaid and Medicare Part B.

Next, the State turns to Section 340B's statutory title. Opp. 40. Per the State, Congress's inclusion of the term "Limitation on Prices of Drugs" in the title "confirms" 340B narrowly regulates price. *Id.* But the statute undeniably reaches many issues other than just price, although drug pricing is the defining characteristic of H.B. 1056.

17

**III.**     H.B. 1056's enforcement provisions—which authorize Maryland officials to police 340B participation through civil and criminal penalties in Maryland tribunals—present their own field-preemption problem.     Congress vested the federal government with exclusive authority to "oversee compliance with the 340B Program." *Astra*, 563 U.S. at 117.  After all, Congress desired "centralized enforcement in the government" and hoped to administer 340B "harmoniously and on a uniform, nationwide basis." *Id.* at 119-20.  That decision is impossible to reconcile with allowing every state to add 340B requirements and enforce them in state tribunals.

Maryland gives it a shot anyway.  It urges this Court to "narrow[ly]" consign *Astra*—a unanimous Supreme Court decision that is barely a decade old—to its specific facts.  Opp. 34-35.  The State claims Section 340B vests federal agencies with exclusive enforcement jurisdiction over only a certain *segment* of 340B disputes—those involving "pricing, overcharges, refunds, and diversion"—whereas Maryland wields power over *other* 340B disputes.  Opp. 32-33.

That is wrong:  HHS has extended the federal dispute resolution process to any "claims that a manufacturer has limited the covered

18

entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1); *see also* 89 Fed. Reg. 28643, 28649 (Apr. 19, 2024).[5]    That plainly encompasses what Maryland's law purports to do:  H.B. 1056 "prevent[s] 340B drug manufacturers from taking actions 'to limit or restrict the acquisition or delivery of a 340B drug,'" Opp. 13, thereby "eliminating a roadblock to the completion of drug sales to covered entities at federally mandated discounted prices," *id.* at 54.  The distinction Maryland seeks to draw does not exist.

Finally, the State's argument disregards the significant overlap between H.B. 1056 and 340B that Maryland built into its law.  If there is no federal duty to "offer" the 340B price (for example, if the prescription written does not fall within 340B's bounds), H.B. 1056's requirements are not triggered.  Md. Code, Health Occ. §12-6C-09.1(d); Md. Code, Com. Law §13-411.    The State provides no explanation of how a state

---

[5] Covered entities have also asserted that the federal process addresses these issues.  *See* JA139-153; Petition ¶1, *Open Door Cmty. Health Ctrs. v. AstraZeneca Pharms., LP*, ADR ID: 210112-1 (Jan. 13, 2021), *available at* https://strategichealthcare.net/wp-content/uploads/2021/01/340B-Petition.pdf.

decisionmaker could skip that first step. *But cf.* Hr'g Tr. at 74:19-77:13, ECF No. 56, *PhRMA v. Morrisey*, No. 2:24-cv-00271 (S.D. W. Va. Sept. 16, 2024) (West Virginia acknowledging adjudications of West Virginia's 340B law would require answering federal questions and acknowledging federal process should be used for those).

It is inevitable that manufacturers will raise federal defenses in state proceedings and inevitable that Maryland will have to adjudicate them. That will infringe on the federal agency's ability to render uniform nationwide decisions. *Astra*, 563 U.S. at 119-20. H.B. 1056's enforcement scheme, like its substantive contract-pharmacy obligation, improperly intrudes on a federally preempted field.

## B. H.B. 1056 Conflicts With The Federal 340B Program.

H.B. 1056 is also conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. First, it fundamentally alters the bargain Congress struck in 340B. *See Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 704-06. Second, H.B. 1056 conflicts with 340B's centralized enforcement scheme, by wresting adjudicatory authority over 340B away from HHS and barring manufacturers from

collecting the very information (claims data) that is needed for manufacturers to use the federal scheme.

The State's arguments to the contrary do not ameliorate those conflicts.

### 1. H.B. 1056 Upends The Bargain Congress Struck in 340B.

Maryland frustrates Congress's judgment by altering the terms of the federal offer and requiring manufacturers to provide 340B-priced drugs in circumstances Congress did not require.

340B is a federal incentive program, whereby Congress mandated that one private party provide a benefit to another private party to participate in other federal programs. Congress told manufacturers when, and under what conditions, they were required to provide the 340B ceiling price. *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 704-05. Manufacturers are required only to make a "bona fide" offer, which can include reasonable conditions such as one contract pharmacy and claims data policies. *Novartis*, 102 F.4th at 462-64. If a covered entity, or a contract pharmacy purporting to act on its behalf, does not accept an offer with those terms, there is no qualifying "purchase" under 42 U.S.C. §256b(a)(1) and no 340B price obligation.

H.B. 1056 upends all of that. It forces manufacturers to provide the 340B price even where a covered entity has not assented to the terms of a manufacturer's federal offer. The *only* way H.B. 1056 can mandate that manufacturers provide the 340B price is by running afoul of 340B's limitation that the federal pricing only applies where there is a qualifying "purchase." In doing so, it forces manufacturers to provide many more 340B-priced drugs than Congress required, skewing 340B's balance.

The State does not dispute that H.B. 1056 imposes a substantial extra burden on manufacturers. But in the State's view, that burden is "not relevant" because "protecting manufacturers" was not Congress's objective. Opp. 53. The State argues H.B. 1056 *fosters* 340B's purpose because it "increase[s] the volume of covered entities' purchases of 340B drugs" and provides "covered entities with additional funds." Opp. 45-48.

That essentially makes Appellants' point—Maryland is displeased with the bargain Congress struck and wants to rewrite 340B according to its own preferences. But 340B's text demonstrates that Congress struck a careful balance between *multiple* competing interests. Congress wanted to ensure certain healthcare providers could obtain below-market

22

prices on drugs. At the same time, it *needed* to incentivize drug manufacturers to participate in the ostensibly voluntary Program. Congress thus defined the Program's scope and obligations broadly enough to meet its goals of benefitting particular providers but narrowly enough to prevent overburdened manufacturers from withdrawing from the Program altogether. *Morrisey*, 2024 WL 5147643, at *6 (holding 340B has "twin federal purposes" of providing discounts to covered entities *and* protecting manufacturers). That limited scope is "no less a part" of Congress's "purpose" than its substantive end goal of drug price reductions. *Rapanos v. United States*, 547 U.S. 715, 752 (2006). Maryland obstructs Congress's purpose by skewing that balance and emphasizing only one of 340B's ends to the exclusion of the other.

*PhRMA v. Walsh*, 538 U.S. 644 (2003) is not to the contrary. The State misleadingly cites *Walsh* for the proposition that a state law's "impact on manufacturers" is "not relevant" to preemption when it helps produce Medicaid savings. Opp. 53. But *Walsh* concerned a completely different scheme. And more importantly, the State neglects to mention (or signal) only three justices signed onto that portion of *Walsh*. *See* 538 U.S. at 668 (Stevens, J., joined by Souter and Ginsburg, J.J.). Moreover,

23

in *this* context, the federal government itself has urged courts to reject "a one-sided characterization of the purpose of the 340B Program," that "impl[ies] that it exists for [covered entities] to maximize [their] revenues and dispense drugs to as many individuals as possible." Cross-MSJ at 27, *Genesis Health Care Inc. v. Becerra*, No. 4:19-cv-01531 (D.S.C. July 28, 2023), ECF No. 101.

Even if the State's cabined vision of Congress's purpose were correct, it ignores that "no legislation pursues its purposes at all costs," and "wider distribution is not necessarily better" in this regime. *Novartis*, 102 F.4th at 462; *Novartis Pharms. Corp. v. Espinosa*, 2021 WL 5161783, at *7 (D.D.C. Nov. 5, 2021) (explaining limitations on covered entities and inclusion of anti-fraud provisions indicate "that Congress did not intend Section 340B's purpose to be pursued at all costs").

The State also mischaracterizes H.B. 1056's usefulness. For example, it deems H.B. 1056 critical for homebound patients hoping to access 340B drugs because *other Maryland laws* prevent doctors from dispensing mail-order prescriptions. Opp. 47. That is a problem of Maryland's own making—not a justification for H.B. 1056. The State also wrongly implies Appellants will deprive a covered entity of 340B

24

drugs if that covered entity lacks an in-house pharmacy. *See* Opp. 25-26, 46; *id.* at 68. To be clear, the manufacturer policies at issue do *not* prevent such covered entities from directing delivery to one local contract pharmacy of their choice. *E.g.*, JA193.

### 2. H.B. 1056 Clashes With The Federal 340B Enforcement Scheme.

H.B. 1056 also interferes with Congress's desire for a single, unified 340B enforcement scheme. By setting up its own enforcement scheme that would address complex, federal issues and impose penalties not contemplated by Congress, H.B. 1056 conflicts with the federal enforcement mechanism. H.B. 1056 also conflicts with the intended exclusive federal enforcement scheme by barring manufacturers from collecting the very data that they require to access the federal regime.

#### a. The State's Own Admissions Confirm That It Is Wresting Exclusive Enforcement Authority From The Federal Government.

Conflict preemption is glaring here because Maryland adjudicators must decide a multitude of questions of federal 340B law. The State admits its judges must determine in each case whether, for example, a "covered entity" purchased the drug, and whether the drug is eligible for 340B pricing. Opp. 56. Although this should be the end of the inquiry,

the State reasons that the federal government "can presumably provide" Maryland with access to a real-time, continually updating list of the evolving medications eligible for 340B.  *Id.*  The State provides no basis to believe this is remotely realistic.  But the very fact that Maryland cannot enforce its own law without the federal government's help *underscores* the preemption problem.

Maryland adjudicators must decide even trickier questions, too— namely, whether a covered entity is even eligible to receive 340B pricing. If, for example, a covered entity engages in "diversion" or other 340B violations, it is no longer eligible to benefit from 340B.  *See* 42 U.S.C. §256b(a)(5).  Manufacturers would, of course, raise that issue as a defense where applicable.  The resolution of these federal questions raises the same concerns identified in *Astra*, destroying Congress's intended uniformity and creating a "substantial" "risk of conflicting adjudications." 563 U.S. at 120.

The State agrees only the federal government wields authority over such issues and argues manufacturers must separately use the federal dispute-resolution process to resolve diversion or other concerns.  Opp. 41-42, 49-50.  That makes little practical sense.  A manufacturer who

26

believes a covered entity is abusing 340B would find itself litigating on two separate fronts: Until the federal agency finally resolves these issues, the manufacturer would need to repeatedly subject itself to Maryland's criminal and civil sanctions, or agree to honor burdensome (and illegal) demands.

As the West Virginia court concluded, such overlapping enforcement regimes obstruct Congress's aims. The result is a hodgepodge of state and federal adjudicators deciding the same purely federal questions in inconsistent ways. And that "risk of conflicting results cuts against Congress's vision of 'centralized enforcement' that *Astra* found as necessary to execute the 340B Program." *Morrisey*, 2024 WL 5147643, at *11.

> b.    The State Has No Answer For Its Impediment To Use Of The Federal Regime.

While the State repeatedly references the federal enforcement regime as a panacea for the problems H.B. 1056 creates, H.B. 1056 simultaneously erects a roadblock to its use, creating further conflict. Claims data policies are key for manufacturers to determine if Congress's limits on 340B are being adhered to by covered entities and as a tool to collect the information necessary to utilize the federal enforcement

system.  H.B. 1056's bar on the collection of that information stands as an "obstacle to achieving the federal objective of preventing fraud in the 340B Program." *Morrisey*, 2024 WL 5147643, at *7.

The State has no substantive answer on that front.  Instead, it says only that H.B. 1056 "could not be construed to deny a manufacturer any information it is entitled to under federal law." Opp. 56.  That studiously avoids taking a position on whether claims data policies are prohibited where manufacturers essentially require the information to access the federal enforcement regime, but federal law does not affirmatively mandate its production.  But barring the collection of claims data unless federal law requires that it be shared *still* creates a conflict.  *Morrisey,* 2024 WL 5147643, at *5-7, *11 n.7 (holding this type of carve-out does not "do enough to overcome the obstacle [state law] erects to achieving the federal purposes of the 340B Program").  Manufacturers require clarity on this important issue.  Given the State's failure to provide any substantive argument on preemption, this Court should consider the argument waived and hold that the claims data restriction is preempted.

Finally, Maryland appears to concede H.B. 1056 does not cover claims data policies.  To be clear, covered entity acceptance of such

28

policies is a *precondition to receiving 340B pricing.* J.A. 128-29. If a covered entity does not agree to provide claims data, the order is not accepted and there is no 340B pricing for the purchase. H.B. 1056 explicitly prohibits a manufacturer from directly or indirectly interfering with acquisition or delivery of a 340B priced drug to a pharmacy. Md. Code, Health Occ. §12-6C-09.1(c)(1). If the State is conceding its statute does not apply based on a requirement that H.B. 1056 must be construed not to conflict with federal law, it must also be conceding that any effort to enforce H.B. 1056 as to claims data conditions would be preempted. *Morrisey*, 2024 WL 5147643, at *5-7, *11 n.7.

In sum, federal law preempts H.B. 1056.

## II. ABBVIE'S TAKINGS CLAIM IS LIKELY TO SUCCEED ON THE MERITS.

The State's arguments on AbbVie's takings claim are flawed on multiple levels. First, H.B. 1056 *does* affect a physical taking in the plainest terms: it requires AbbVie to transfer its drugs to contract pharmacies at steeply discounted prices. Maryland's law does not merely regulate the mode of that transfer—it compels the transfer at a particular price. Second, the voluntary participation doctrine has no place in analyzing H.B. 1056 because the State cannot draft off of federal law to

29

immunize a forced transfer of physical property from takings scrutiny. Nothing about the 340B Program shows AbbVie signed up for H.B. 1056. And even if it did, the State offers nothing that AbbVie does not already have. Finally, the State fails to rebut AbbVie's arguments that H.B. 1056 constitutes a regulatory taking.

### A.     H.B. 1056 Effects A Physical Taking.

To avoid the physical transfer that H.B. 1056 compels, the State argues that (i) Maryland itself does not take title to the drugs regulated under H.B. 1056, (ii) the federal 340B program is what actually dispossesses AbbVie of its drugs, and (iii) H.B. 1056 does not technically compel direct sales of drugs to contract pharmacies. Each argument fails.

The State insists that H.B. 1056 does not affect a taking because it does not authorize Maryland to "purchase" or "acquire title to" drugs manufactured by AbbVie. Opp. 58. That does not matter. The government forcing one private party to give its property to another private party is just as much a taking as the government keeping that same property for itself. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49 (2021). In fact, it is worse: No compensation can validate a

government-forced property transfer for private gain. *Kelo v. City of New London*, 545 U.S. 469, 477 (2005).

The State also says the federal 340B program is what "causes AbbVie to be dispossessed of its drugs," not H.B. 1056. Opp. 59. The State says H.B. 1056 does not "dictate the price" of drugs but only requires manufacturers to comply with certain delivery instructions. Opp. 58. As already explained, that's a distinction without a difference. Section 340B only requires AbbVie to "offer" its drugs for purchase at the discounted price, subject to AbbVie's own reasonable conditions—not under *any* conditions covered entities or contract pharmacies demand. *See Sanofi*, 58 F.4th at 707; *Novartis*, 102 F.4th at 464. H.B. 1056 destroys AbbVie's right to insist on those conditions, and compels AbbVie to transfer drugs to unlimited contract pharmacies at the 340B price when it otherwise would not.

The State's contention, then, that H.B. 1056 "does not compel direct, confiscatory sales to private pharmacies" is a red herring. Opp. 59-60. The realities of the 340B program and plain text of H.B. 1056 show that the Maryland law does more than merely regulate the "delivery" of AbbVie's drugs: It forces AbbVie to give up drugs that it

would otherwise withhold pursuant to its contract pharmacy policies, which are entirely lawful under 340B. *See Novartis*, 102 F.4th at 464. In that way, H.B. 1056 plainly "compel[s] drug manufacturers to transfer 340B drugs to a private party." Opp. 59-60. Such a blatant forced transfer of private party, by which the "government has physically taken property for itself or someone else—by whatever means," is the "clearest sort of taking." *Cedar Point*, 594 U.S. at 147-49.

### B.  H.B. 1056 Is Not Voluntary.

The State also argues that AbbVie's "voluntary participation in the 340B program" bars any takings claim challenging H.B. 1056. But voluntarily participating in the 340B program does not equal voluntarily participating in H.B. 1056.

None of the State's cases proves its point. Most involve takings challenges to *federal* conditions imposed as a part of *federal* programs. *See Baker Cnty. Med. Servs., Inc. v. U.S. Atty. Gen.*, 763 F.3d 1274, 1277-78 (11th Cir. 2014) (federal Medicare provider challenging requirements of federal Emergency Medical Treatment and Active Labor Act (EMTALA)); *Burditt v. HHS*, 934 F.2d 1362, 1376 (5th Cir. 1991) (same); *Eli Lilly & Co. v. HHS*, 2021 WL 5039566 (S.D. Ind. Oct. 29, 2021) (drug

manufacturer challenging federal enforcement of 340B provisions); *Sanofi-Aventis U.S., LLC v. HHS*, 570 F. Supp. 3d 129, 207-10 (D.N.J. 2021) (same); *Garelick v. Sullivan*, 987 F.2d 913, 916-17 (2d Cir. 1993) (anesthesiologists challenging federal price regulations under Medicare Part B); *Whitney v. Heckler*, 780 F.2d 963, 968-72 (11th Cir. 1986) (same); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 875-76 (7th Cir. 1983) (per curiam) (hospitals challenging federal agency enforcement of federal Medicare regulations). These cases do nothing to suggest that voluntary participation in a *federal* regime insulates an additional, onerous set of state conditions from challenge.

Another of the State's cases involves a takings challenge to *state* conditions imposed as part of a *state* program. *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984). That similarly says nothing about whether state conditions become voluntary because of ostensible participation in a federal program.

A final case involves a takings challenge to both *state and federal* conditions imposed as part of a joint *state and federal* program (Medicaid) in which plaintiffs voluntarily participated. *Pharmacist Pol. Action*

33

*Comm. of Md. (PHARMPAC) v. Harris*, 502 F. Supp. 1235 (D. Md. 1980). But the court in that case held that because "participation in the [Medicaid] program is entirely voluntary"—in essence, by choosing to fill orders from eligible patients—the pharmacists could not challenge the program's price regulations as a taking. *Id.* at 1243. Critical was the fact that Medicaid is a "cooperative federal-state venture," *id.*, such that participation in the federal program and participation in the state program are the same. But that holding only harms the State's argument: The State cannot argue that H.B. 1065 simply fills a "delivery" gap left by federal law, and at the same time argue that H.B. 1056 is so inextricably linked to Section 340B that voluntary participation in 340B renders H.B. 1056 voluntary as well.

In support of its voluntary participation argument, the State also cites *Virginia Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633 (E.D. Va. 2023). But that case proves AbbVie's point. It involved a challenge to both state and federal EMTALA regulations brought by hospitals participating in Medicare. Because the plaintiff hospitals were "opting into receiving" Medicare benefits, the court held that they could not pursue a takings claim against the *federal* government to challenge

the financial implications from complying with EMTALA. As to the additional state requirements imposed by Virginia on top of those federal requirements, the court suggested the analysis was different. Though the court ultimately concluded Virginia was immune from suit for reasons not applicable here, Maryland again ignores the key distinction: voluntary participation in a *federal* program and compelled participation in supplemental *state* regulation are not the same thing. By participating in a federal program and voluntarily subjecting themselves to resulting federal regulation, regulated entities do not also consent to any other related regulation by state governments (separate sovereigns) and thus abandon their property rights once and for all. That cannot be the law.

The other factors Maryland ignores further underscore why the State's understanding of the voluntary participation doctrine is wrong: AbbVie cannot have volunteered for Maryland's regime unless it receives some "valuable [g]overnment benefit" from the State. *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015); *Minnesota Ass'n of Health Care Facilities*, 742 F.2d at 446. The State can point to *no* such benefit bestowed independently by Maryland apart from those benefits already bestowed by the federal government through Medicare and Medicaid. As

35

such, any voluntary benefit by H.B. 1056 is "illusory" and cannot bar a takings claim. *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023).[6]

## C. *Penn Central* Does Not Apply, But H.B. 1056 Fails If It Does.

The regulatory takings doctrine does not apply for all of the reasons described above and in AbbVie's opening brief. *See* Br. 63-66, 80. H.B. 1056 effects a physical taking of private property for private purposes; it does not merely affect AbbVie's *use* of its property. When "possession and control" of physical property changes hands—as it does here—the law effects a physical taking, not a regulatory taking. *Horne*, 576 U.S. at 360-62.

Even if *Penn Central* does apply, its factors cut in AbbVie's favor, and the State has no adequate response.

To start, the State does not dispute H.B. 1056's economic impact on AbbVie will be severe. Opp. 67; JA178. Instead, the State claims that "diminution in the value of property" alone is "insufficient to demonstrate

---

[6] The State does not respond to AbbVie's arguments on public use, and thus has waived any argument on this point. *Stokes v. Stirling*, 64 F.4th 131, 137 (4th Cir. 2023).

a taking." Opp. 66. But H.B. 1056 does much more than merely reduce the value of AbbVie's drugs—it compels their transfer to another private party. *See U.S. Fid. & Guar. Co. v. McKeithen*, 226 F.3d 412, 416-17 (5th Cir. 2000).

As for H.B. 1056's interference with AbbVie's investment-backed expectations, the State argues it would be "unrealistic for AbbVie to assume it would be free from regulation," given Maryland's history of health and safety regulation. Opp. 67-68. While regulated industries may expect some regulatory shifts over time, "that does not mean that all regulatory changes are reasonably foreseeable or that regulated businesses can have no reasonable investment-backed expectations whatsoever." *Cienega Gardens v. United States*, 331 F.3d 1319, 1350 (Fed. Cir. 2003) (emphases omitted). And AbbVie could not have foreseen that Maryland would force it to transfer its drugs to unlimited contract pharmacies for mere pennies: AbbVie had a policy of limiting transfer of 340B drugs to contract pharmacies, JA193-194, and that policy was consistent with HRSA's longtime guidance on contract pharmacies, which recommended only one contract pharmacy per covered entity. 61 Fed. Reg. 43549, 43550-43555 (Aug. 23, 1996). Federal courts have also

upheld such policies as consistent with Section 340B. *Sanofi*, 58 F.4th at 706; *Novartis*, 102 F.4th at 460-64.

Finally, the State points to the supposed "myriad public interests" underlying the governmental action here. But AbbVie has shown that H.B. 1056 benefits commercial pharmacies, *not* needy patients. *See* JA123; JA128-129; JA429; JA433; JA446; JA490-493; JA520; JA537; JA544-546; JA684; JA692-693; JA896-897. And either way, the *character* of H.B. 1056's interference with AbbVie's property rights is significant: it errs more toward a permanent invasion, since AbbVie is dispossessed entirely of its drugs. *Cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35 (1982).

## III. PHRMA AND NOVARTIS ARE LIKELY TO SUCCEED ON THEIR CLAIMS THAT H.B. 1056 VIOLATES THE EXTRATERRITORIALITY PRINCIPLES IN THE UNITED STATES CONSTITUTION.

Maryland also cannot escape H.B. 1056's unlawful extraterritoriality. Binding precedent dictates that Maryland may not "compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland." *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 672 (4th Cir. 2018) (citing *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)) (*AAM*). And Maryland cannot evade this precedent here,

where the undisputed record shows that the transactions H.B. 1056 regulates occur beyond the State.  Opp. 71-73.

Further, far from refuting a dormant Commerce Clause violation, Maryland's brief actually *confirms* that H.B. 1056 is intended to "advantage in-state firms" by giving them unique contractual privileges. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370 (2023).  This type of economic " 'protectionism' " is anathema to "the 'very core' of [the] dormant Commerce Clause"—and forms a separate basis to enjoin the law.  *Id.* at 369.

## A.    H.B. 1056 Impermissibly Regulates Conduct Outside Maryland.

As a starting point, Maryland appears to misunderstand what makes a law impermissibly "extraterritorial[]" for purposes of the Commerce Clause.  *AAM*, 887 F.3d at 668.  Its brief attempts to defend H.B. 1056 on the ground that the law "seeks only to regulate conduct that *impacts* Maryland 340B covered entities" and does not "attempt to regulate conduct without a nexus to Maryland."  Opp. 72-73 (emphasis added).  But that is not the standard.

1.    The extraterritoriality doctrine rests on the fundamental idea—affirmed in the Supreme Court's recent cases—that States lack

39

"inherent . . . authority" to "directly control[ ] commerce occurring wholly outside" their borders. *Healy*, 491 U.S. at 336; *see also Pork Producers*, 598 U.S. at 375, 376 n.1 (noting the "territorial limits of state authority under the Constitution's horizontal separation of powers"). Under this principle, the existence of a local nexus cannot "validate the law if it regulates the out-of-state transactions." *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986); *see Edgar v. MITE Corp.*, 457 U.S. 624, 642–643 (1982) (Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State"). So, when the Court analyzed Maine regulating sales of pharmaceuticals in *Walsh*, it did not ask only if the law benefitted Maine residents. 538 U.S. at 669. Rather, the Court concluded that the law was permissible because it did "*not* regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect." *Id.* (emphasis added).

Drawing on this caselaw, this Court in *AAM* explicitly *rejected* the very "nexus" theory Maryland now advocates. *AAM*, 887 F.3d at 671. Reviewing the State's earlier effort to prohibit manufacturers "from

40

charging an 'unconscionable' price" for their drugs, the Court held that the State had impermissibly sought to regulate "'upstream' sales [that] would occur almost exclusively outside Maryland." *Id.* at 671, 673. As the Court emphasized, "[e]ven if the Act did require a nexus to an actual sale in Maryland, it is nonetheless invalid because it still controls the price of transactions that occur wholly outside the state." *Id.* at 671. Regardless of "[a]ny legitimate effects the Act may have [had] in Maryland," the State may not instruct "manufacturers and wholesale distributors as to" such transactions. *Id.* at 672.

Yet that is exactly what H.B. 1056 seeks to accomplish. By its plain terms, H.B. 1056 demands that manufacturers not "deny, restrict . . . or otherwise limit the acquisition of a 340B drug"—*i.e.* one that manufacturers offer at "reduced prices"—by pharmacies that serve Maryland 340B entities. Md. Code, Health Occ. §12-6C-09.1(c)(1), (a)(1)(4)(i). Thus, the law necessarily dictates what kinds of "prices" manufacturers must make available to pharmacies that contract with covered entities (because, as explained above, pharmacies already receive the same drugs at commercial prices). And because manufacturers sell their drugs—and provide any associated price reductions—through

41

national wholesalers and distributors located outside Maryland, H.B. 1056 by necessity dictates the terms of offers and transactions that take place beyond the State. JA038 (¶ 29), JA051 (¶ 66); JA106 (¶ 104); JA403 (¶ 110).

All this is fatal to the statute. Unlike the law in *Walsh*, H.B. 1056 is not regulating the actual "price for drugs offered to" Maryland residents. 538 U.S. at 649. The record shows that pharmacies generally identify 340B-eligible patients only *after* dispensing the drug (at full price). JA765-767.

Nor is Maryland creating an indirect effect on "extraterritorial behavior" by regulating a local market. *Pork Producers*, 598 U.S. at 374; *see also AAM*, 887 F.3d at 672-73 (distinguishing between "'upstream pricing impact of a state regulation'" and laws that "specify the price at which goods may be sold beyond Maryland's borders"). Rather, by dictating how a drug must be sold before it ever arrives at a local pharmacy, Maryland has reached outside its borders to directly control "upstream pricing and sale of prescription drugs" outside the State. *AAM*, 887 F.3d at 671. Maryland may not do so. *Id.*

42

2.     Maryland does not engage with any of these issues.  Opp. 71-72.  Although it insists that H.B. 1056 should be presumed not "to reach conduct beyond Maryland's border," the simple fact is that given the nature of pharmaceutical supply chains, it *does* reach that conduct.  Further Maryland does not even assert the law is inapplicable to out-of-state *pharmacies*.  Its brief simply ignores the uncontested reality that both the contractual arrangements and sales—which together result in 340B pricing being made available to pharmacies—take place between out-of-state actors.  *Id.* at 72.  But this reality defeats the District Court's view that Maryland did not "set requirements for the terms of out-of-state sales."  JA892.

Further—and just as telling—Maryland ignores the patchwork problem resulting from other States' "analogous restriction[s]."  *AAM*, 887 F.3d at 673.  Following Maryland's logic, Virginia could impose all sorts of requirements—including by mandating that manufacturers deliver drugs to Virginia before anywhere else.  Plainly, multiple priority regimes of this type would be impossible for manufacturers to simultaneously accommodate.  Yet nothing in Maryland's brief suggests a rule under which such a regime would be legally wanting.  And that is

a sure sign that Maryland is on the wrong path. The Commerce Clause "protects against inconsistent legislation" by prohibiting "the projection of one state regulatory regime into the jurisdiction of another State." *Healy,* 491 U.S. at 336–37.

### B.   H.B. 1056 Is Discriminatory.

Maryland's efforts to defend H.B. 1056 also highlight a second problem. Eager to paint H.B. 1056 as not extraterritorial, Maryland insists that the law seeks to "deter[ ]" conduct that is "detriment[al] [to] [Maryland] covered entities." Opp. 73. But this too is impermissible.

As Appellants previously detailed, the Commerce Clause does not allow States to privilege economic interests of in-state 340B entities and their business partners by mandating that those entities receive preferential contract terms compared to their out-of-state counterparts. Br. 92-93. This prohibition against economic "protectionism" that "'hoard[s]' commerce 'for the benefit of' in-state" businesses and affiliates lies at the "very core" of dormant Commerce Clause jurisprudence. *Pork Producers*, 598 U.S. at 372–73 (citation omitted). Applied appropriately, this principle serves to preserve "a national market free from local legislation that discriminates in favor of local interests," the way H.B.

1056 seeks to do. *C & A Carbone, Inc. v. Town of Clarkstown*, *N.Y.*, 511 U.S. 383, 393 (1994).

Maryland once again ignores the larger principle—along with the supporting details. *See* Opp. 74. Its brief appears to embrace, rather than deny, the protectionist purpose of H.B. 1056. *Id.* Indeed, Maryland makes no effort to rebut the "discriminatory effect" that results. And its brief does not even attempt suggest that H.B. 1056 has been sufficiently tailored in this regard. *See Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019) (law must be "narrowly tailored to advanc[e] a legitimate local purpose" (internal quotations omitted)).

Instead, Maryland defends H.B. 1056's protectionism by claiming that it does not discriminate between in-state and out-of-state *manufacturers*. Opp. 72. But neither did the statute in *Brown-Forman*, which "regulate[d] all distillers of intoxicating liquors"—in-state and out-of-state ones—"evenhandedly." 476 U.S. at 579. Yet the Court found the law impermissible, explaining that "[e]conomic protectionism is not limited to attempts to convey advantages on local merchants" but also includes attempts "to give local consumers an advantage over consumers in other States." *Id.* at 580. So too here. As Appellants detailed, H.B.

45

1056 seeks to advantage in-state hospitals and their contract pharmacy partners at the expense of out-of-state firms.  Br. 92-93, 95.

### C.    H.B. 1056 Excessively Burdens Interstate Commerce.

Maryland's failure to rebut the showing that H.B. 1056 "directly regulates or discriminates against interstate commerce" means there is no need for "further inquiry." *Brown-Forman*, 476 U.S. at 579 (citations omitted); *see also Star Sci. Inc. v. Beales*, 278 F.3d 339, 355 (4th Cir. 2002) (same).  No further balancing under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), can save the statute.

Notably, Maryland seems to agree.  The State's response pointedly refuses to do any meaningful balancing.  *See* Opp. 75.  It discounts the burden H.B. 1056 imposes on interstate commerce based on its categorical (and incorrect) assertion that the law does not regulate extra-territorially or "discriminat[e]."  *Id.*  But, as the State admits, this defense is coterminous with its other arguments—and thus fails for all the same reasons.  *Id.*

The State also is wrong as a matter of law to claim that the costs manufacturers would incur to comply with H.B. 1056 are not cognizable. *See, e.g.*, *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d

46

560, 572 (4th Cir. 2005) ("significant economic burdens" relevant to the *Pike* analysis); *Pork Producers*, 598 U.S. at 398 (noting that "*Pike* found both compliance costs and consequential market harms cognizable" (Roberts, C.J., dissenting in part)). Those costs are substantial here, and made worse by the veritable web of "similar, but not identical" new laws across numerous States that Maryland acknowledges. *See* Opp. 76-77 (citing new laws in Arkansas, Kansas, Louisiana, Minnesota, Mississippi, and West Virginia).

Against these real costs, the State posits the tautology that H.B. 1056 benefits "Maryland 340B" entities' "use of contract pharmacies" against "interfere[nce]." *Id.* at 76. This formulation is revealing. Framed in this way, the State's interest has nothing at all to do with the "public health and welfare" it purports to invoke—not even the expansive kind recognized by two justices in *Pork Producers*. 598 U.S. at 382 (articulating potential "moral and health interests") (Gorsuch, J.). Rather, the State effectively concedes the basic reality that Appellants detailed in their brief: H.B. 1056 seeks to financially benefit Maryland entities and their business partners, not "uninsured and underinsured Maryland patients." Br. 95-96. The costs and benefits thus appear both

47

monetizable and not "incommensurable." *Pork Producers*, 598 U.S. at 382 (Gorsuch, J.). And Maryland offers no argument for why weighing them favors the State.

*     *     *

Maryland's brief itself makes clear that H.B. 1056 both regulates the price of drugs beyond Maryland and endeavors to set up a preferential market for Maryland entities. The dormant Commerce Clause allows none of that. Maryland "exceed[ed] the inherent limits of" its authority when it enacted the law. *Healy*, 491 U.S. at 336.

## IV. APPELLANTS HAVE SATISFIED THE REMAINING INJUNCTION FACTORS.

The other injunction factors—irreparable harm, balance of the equities, and public interest—all weigh in Appellants' favor. Opp. 97-101. The State presents no compelling arguments to the contrary.

***First***, the State warns that enjoining H.B. 1056 would have "catastrophic results." Opp. 78. That warning is misplaced: Enjoining H.B. 1056 would simply rewind the status quo back to manufacturers' contract-pharmacy policies, which would *not*, as the State contends, "adversely affect the availability of health care and affordable medications" for patients of covered entities. *Id.* In fact, AbbVie's current

48

policy continues to offer *unlimited* 340B drugs to covered entities at or below the ceiling price.  JA193-194.  Enjoining H.B. 1056 will change none of that.

**Second,** the State focuses on the supposed harm to covered entities that would result from enjoining H.B. 1056, accusing Appellants of seeking to "severely limit covered entities' ability to benefit from the 340B program."  Opp. 78-79.  But the benefits received by covered entities are only worthwhile if they pass those benefits on to patients.  Based on the voluminous evidence submitted by Appellants, the answer is plain—on balance, H.B. 1056 *harms* more than helps at-risk patients because the reduced drug pricing it claims to be protecting is rarely passed on to patients.  JA537, JA545.  Instead, H.B. 1056 serves to enrich commercial pharmacies at manufacturers' expense.  *See, e.g.*, JA684; JA692-693; JA429; JA544-546.

**Third,** the State complains that any harm inflicted on Appellants is "purely speculative."  Opp. 80.  Not so.  To begin, the deprivation of Appellants' constitutional rights and injury to Appellants' property interests inflicted by an unconstitutional law inflicts direct and concrete harm.  *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th

49

330, 346 (4th Cir. 2021) (en banc). Even the mere "prospect of an unconstitutional enforcement" action under an unlawful regulation "supplies the necessary irreparable injury." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (citation omitted). The State apparently would rather have Appellants subject themselves to enforcement actions in Maryland before they could test its constitutionality and enjoin its enforcement, but that is a "risk [Appellants] ought not to be required to take." *Ex parte Young*, 209 U.S. 123, 165 (1908). Even apart from the inherent injury inflicted by enforcement of an unconstitutional law, Appellants have documented the significant financial harms (in the *millions*) that will inevitably result from H.B. 1056. Br. 99; JA768; JA178. And because any award of damages from a future lawsuit would be either nonexistent or insufficient to remedy the harm, any damage inflicted by H.B. 1056 is irreparable.[7]

---

[7] As pointed out in their opening brief, Appellants would be unable to recover damages from Maryland even if H.B. 1056 was later found to be unconstitutional. The State agreed such an action in federal court would be foreclosed by sovereign immunity but declined to say whether Appellants could bring a claim for damages in Maryland state court. Opp. 80 n.25. Unless they waive it, "States retain immunity from private suit in their own courts." *Alden v. Maine*, 527 U.S. 706, 754 (1999).

## CONCLUSION

The district court's order denying a preliminary injunction should be reversed.

---

Maryland has waived its sovereign immunity for tort actions brought in Maryland courts, and this waiver extends to "state constitutional torts." *Lee v. Cline*, 384 Md. 245, 265-66 (2004). But even assuming the waiver extends to a statutory challenge based on constitutional issues, Appellants' recovery would be limited to $400,000 per claimant. Md. Code, State Gov't §12-104(a)(2)(i).

Dated: March 28, 2025

Ashley C. Parrish
John D. Shakow
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Suite 900
Washington, D.C. 20006
(202) 626-2627
aparrish@kslaw.com
jshakow@kslaw.com

Nicole Bronnimann
KING & SPALDING LLP
1100 Louisiana, Suite 4100
Houston, TX 77002
(713) 276-7402
nbronnimann@kslaw.com

Respectfully submitted,

*/s/ Matthew S. Owen, P.C.*
Matthew S. Owen, P.C.
Meredith M. Pohl
Lucas H. Funk
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com

Timothy Maloney
JOSEPH GREENWALD LAAKE
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(240) 553-1206
tmaloney@jgllaw.com

*Counsel for Plaintiffs – Appellants AbbVie, Inc.; Allergan, Inc.; Durata
Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.;
Pharmacyclics LLC; Allergan Sales, LLC*

*/s/ Catherine E. Stetson*
Catherine E. Stetson
Susan M. Cook
Marlan Golden
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com
susan.cook@hoganlovells.com

*Counsel for Plaintiff – Appellant*
*Novartis Pharmaceuticals Corporation*

*/s/ Philip J. Perry*
Philip J. Perry
Andrew D. Prins
Abid R. Qureshi
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.
(202) 637-2200
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

*Counsel for Plaintiff – Appellant*
*Pharmaceutical Research and Manufacturers of America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fourth Circuit Rule 32(b), as modified by this Court's Order Granting Motion to Exceed Length Limitations For Reply Brief (ECF 46), because it contains 9,728 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century font 14-point type face.

*/s/ Matthew S. Owen, P.C.*
Matthew S. Owen, P.C.

## CERTIFICATE OF SERVICE

This is to certify that the foregoing brief has been served via the Court's CM/ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on March 28, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

/s/ Matthew S. Owen, P.C.
Matthew S. Owen, P.C.