**No. 24-1939 (L)**

# United States Court of Appeals
# for the Fourth Circuit

ABBVIE, INC., (a Delaware corporation); ALLERGAN, INC., (a Delaware corporation); DURATA THERAPEUTICS, INC., (a Delaware corporation); ABBVIE PRODUCTS LLC, (a Georgia limited liability company); APTALIS PHARMA US, INC., (a Delaware corporation); PHARMACYCLICS LLC, (a Delaware limited liability company); ALLERGAN SALES, LLC, (a Delaware limited liability company),

*Plaintiffs - Appellants*,

and

NOVARTIS PHARMACEUTICALS CORPORATION; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA; ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiffs,*

v.

ANTHONY G. BROWN, in his official capacity as Attorney General of the State of Maryland; KRISTOPHER RUSINKO, in his official capacity as Board President of the Maryland Board of Pharmacy; DAPHANIE ROBINSON, in her official capacity as a member of the Maryland Board of Pharmacy; ADETORO ORIAIFO, in his official capacity as a member of the Maryland Board of Pharmacy; KRISTEN FINK, in her official capacity as a member of the Maryland Board of Pharmacy; KAREN SLAGLE, in her official capacity as a member of the Maryland Board of Pharmacy; BRENDA OLIVER, in her official capacity as a member of the Maryland Board of Pharmacy; KARLA EVANS, in her official capacity as a member of the Maryland Board of Pharmacy; JAVIER VAZQUEZ, in his official capacity as a member of the Maryland Board of Pharmacy; AKESH PATEL, in his official capacity as a member of the Maryland Board of Pharmacy; KEVIN MORGAN, in his official capacity as a member of the Maryland Board of Pharmacy; JENNIFER HARDESTY, in her official capacity as a member of the Maryland Board of Pharmacy; PEGGY GLASCOE

GEIGHER, in her official capacity as a member of the Maryland Board of Pharmacy; NEIL LEIKACH, in his official capacity as a member of the Maryland Board of Pharmacy; MARYLAND BOARD OF PHARMACY/PRESIDENT,

*Defendants - Appellees.*

**No. 24-1949**

NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiff - Appellant,*

and

ABBVIE, INC., (a Delaware corporation); ALLERGAN, INC., (a Delaware corporation); DURATA THERAPEUTICS, INC., (a Delaware corporation); ABBVIE PRODUCTS LLC, (a Georgia limited liability company); APTALIS PHARMA US, INC., (a Delaware corporation); PHARMACYCLICS LLC, (a Delaware limited liability company); ALLERGAN SALES, LLC, (a Delaware limited liability company); PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA; ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiffs,*

v.

ANTHONY G. BROWN, in his official capacity as Attorney General of the State of Maryland; KRISTOPHER RUSINKO, in his official capacity as Board President of the Maryland Board of Pharmacy; DAPHANIE ROBINSON, in her official capacity as a member of the Maryland Board of Pharmacy; ADETORO ORIAIFO, in his official capacity as a member of the Maryland Board of Pharmacy; KRISTEN FINK, in her official capacity as a member of the Maryland Board of Pharmacy; KAREN SLAGLE, in her official capacity as a member of the Maryland Board of Pharmacy; BRENDA OLIVER, in her official capacity as a member of the Maryland Board of Pharmacy; KARLA EVANS, in her official capacity as a member of the Maryland Board of Pharmacy; JAVIER VAZQUEZ, in his official capacity as a member of the Maryland Board of Pharmacy; AKESH PATEL, in his official capacity as a member of the Maryland Board of Pharmacy; KEVIN MORGAN, in his official capacity as a member of the Maryland Board

of Pharmacy; JENNIFER HARDESTY, in her official capacity as a member of the Maryland Board of Pharmacy; PEGGY GLASCOE GEIGHER, in her official capacity as a member of the Maryland Board of Pharmacy; NEIL LEIKACH, in his official capacity as a member of the Maryland Board of Pharmacy; MARYLAND BOARD OF PHARMACY/PRESIDENT,

*Defendants - Appellees.*

**No. 24-1978**

---

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff - Appellant,*

and

ABBVIE, INC., (a Delaware corporation); ALLERGAN, INC., (a Delaware corporation); DURATA THERAPEUTICS, INC., (a Delaware corporation); ABBVIE PRODUCTS LLC, (a Georgia limited liability company); APTALIS PHARMA US, INC., (a Delaware corporation); PHARMACYCLICS LLC, (a Delaware limited liability company); ALLERGAN SALES, LLC, (a Delaware limited liability company); NOVARTIS PHARMACEUTICALS CORPORATION; ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiffs,*

v.

ANTHONY G. BROWN, in his official capacity as Attorney General of the State of Maryland; KRISTOPHER RUSINKO, in his official capacity as Board President of the Maryland Board of Pharmacy; DAPHANIE ROBINSON, in her official capacity as a member of the Maryland Board of Pharmacy; ADETORO ORIAIFO, in his official capacity as a member of the Maryland Board of Pharmacy; KRISTEN FINK, in her official capacity as a member of the Maryland Board of Pharmacy; KAREN SLAGLE, in her official capacity as a member of the Maryland Board of Pharmacy; BRENDA OLIVER, in her official capacity as a member of the Maryland Board of Pharmacy; KARLA EVANS, in her official capacity as a member of the Maryland Board of Pharmacy; JAVIER VAZQUEZ, in his official capacity as a member of the Maryland Board of Pharmacy; AKESH PATEL, in his official

capacity as a member of the Maryland Board of Pharmacy; KEVIN MORGAN, in his official capacity as a member of the Maryland Board of Pharmacy; JENNIFER HARDESTY, in her official capacity as a member of the Maryland Board of Pharmacy; PEGGY GLASCOE GEIGHER, in her official capacity as a member of the Maryland Board of Pharmacy; NEIL LEIKACH, in his official capacity as a member of the Maryland Board of Pharmacy; MARYLAND BOARD OF PHARMACY/PRESIDENT,

*Defendants - Appellees.*

---

On Appeal from the United States District Court
for the District of Maryland,
No. 1:24-cv-01557-MJM
Judge Matthew J. Maddox

---

**APPELLANTS' SUPPLEMENTAL BRIEF**

---

MEREDITH M. POHL
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.,
Suite 900,
Washington, D.C. 20006
(202) 737-0500
mpohl@kslaw.com

MATTHEW S. OWEN, P.C.
RUSSELL BALIKIAN
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8616
mowen@gibsondunn.com
rbalikian@gibsondunn.com

*Counsel for Plaintiffs – Appellants AbbVie, Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.; Pharmacyclics LLC; Allergan Sales, LLC*

ERIN E. MURPHY
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com

*Counsel for Plaintiff – Appellant*
*Pharmaceutical Research and Manufacturers of America*

JESSICA L. ELLSWORTH
SUSAN M. COOK
HOGAN LOVELLS
CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hlc.com
susan.cook@hlc.com

*Counsel for Plaintiff – Appellant*
*Novartis Pharmaceuticals Corporation*

July 31, 2026

# TABLE OF CONTENTS

Page

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **5**

**ARGUMENT** .......... **11**

**I. H.B. 1056 VIOLATES THE SUPREMACY CLAUSE.** .......... **11**

**A. The Supremacy Clause Forecloses Maryland's Effort To Target The Federal 340B Program For Unique Regulations.** .......... **11**

**B. H.B. 1056 Is Field-Preempted.** .......... **17**

**C. H.B. 1056 Is Obstacle-Preempted.** .......... **26**

**1. H.B. 1056 Frustrates Manufacturers' ADR Access.** .......... **27**

**2. H.B. 1056 Supplants ADR And Disrupts 340B's Nationwide Uniformity.** .......... **28**

**II. H.B. 1056 VIOLATES THE TAKINGS CLAUSE** .......... **31**

**CONCLUSION** .......... **36**

# TABLE OF AUHORITIES

Page(s)

## Cases


*AbbVie Inc. v. Brown*,
809 F.Supp.3d 1341 (D. Utah 2025) .................................................. 33

*AbbVie Inc. v. Drummond*,
808 F.Supp.3d 1266 (W.D. Okla. 2025) ........................ 8, 19, 30, 32, 34

*AbbVie, Inc. v. Brown*,
2026 WL 1005576 (4th Cir. Apr. 14, 2026) .................................... 9, 11

*AbbVie, Inc. v. Murrill*,
180 F.4th 747 (5th Cir. 2026) ........................................................... 35

*Anderson v. Sara Lee Corp.*,
508 F.3d 181 (4th Cir. 2007) ............................................................. 31

*Arizona v. Bowsher*,
935 F.2d 332 (D.C. Cir. 1991) ........................................................... 19

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................................... 28

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) .................................................. 2, 3, 5, 27, 28, 31

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) ............................................................. 12

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ............................................................... 12, 15, 21

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ............................................................... 15, 17, 31

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ........................................................................... 35

*Chamber of Com. of the U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ........................................................... 26

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ........................................................... 15

*City of Burbank v. Lockheed Air Terminal*,
411 U.S. 624 (1973) ........................................................................... 20

*City of Charleston, S.C. v. A Fisherman's Best, Inc.*,
310 F.3d 155 (4th Cir. 2002) ............................................................. 28

*Columbia Venture, LLC v. Dewberry & Davis, LLC*,
604 F.3d 824 (4th Cir. 2010) .......... 21

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) .......... 12

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) .......... 23

*Dawson v. Steager*,
586 U.S. 171 (2019) .......... 16

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003) .......... 11, 15, 22

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) .......... 18

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) .......... 26

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .......... 15, 17

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) .......... 32, 33

*Johnson v. Maryland*,
254 U.S. 51 (1920) .......... 15

*Landor v. La. Dep't of Corr.*,
146 S.Ct. 1931 (2026) .......... 12, 13, 20, 23, 25, 33

*Lawrence County v. Lead-Deadwood School District No. 40-1*,
469 U.S. 256 (1985) .......... 22

*Maine Forest Prods. Council v. Cormier*,
51 F.4th 1 (1st Cir. 2022) .......... 26

*Mayo v. United States*,
319 U.S. 441 (1943) .......... 12

*McCulloch v. Maryland*,
17 U.S. 316 (1819) .......... 3, 11

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) .......... 12

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) .......... 1, 2, 7, 8, 18, 24, 25, 26, 32

*OPM v. Richmond*,
496 U.S. 414 (1990) .......... 19

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 13

*PhRMA v. McCuskey*,
171 F.4th 675 (4th Cir.), *reh'g en banc granted*, 176 F.4th 830 (4th Cir. 2026)
.......... 3, 9, 11, 14, 16, 17, 18, 20, 23, 25, 26, 28

*PhRMA v. Walsh*,
538 U.S. 644 (2003) .......... 14

*PPL EnergyPlus, LLC v. Nazarian*,
753 F.3d 467 (4th Cir. 2014), *aff'd sub nom.*, *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016) .......... 20, 28

*Rust v. Sullivan*,
500 U.S. 173 (1991) .......... 19

*Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*,
58 F.4th 696 (3d Cir. 2023) .......... 8, 25, 26, 32

*Shao v. Link Cargo (Taiwan) Ltd.*,
986 F.2d 700 (4th Cir. 1993) .......... 28

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) .......... 15

*United States v. Locke*,
529 U.S. 89 (2000) .......... 16

*United States v. Washington*,
596 U.S. 832 (2022) .......... 3, 11

*Valancourt Books, LLC v. Garland*,
82 F.4th 1222 (D.C. Cir. 2023) .......... 33

*Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*,
539 F.3d 1159 (9th Cir. 2008) .......... 26

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 29

**Statutes**

42 U.S.C. §256b .......... 9, 17

42 U.S.C. §256b(a)(1) .......... 5, 10, 17, 18

42 U.S.C. §256b(a)(5)(A) .......... 5, 30

42 U.S.C. §256b(a)(5)(B) .......... 5, 30

42 U.S.C. §256b(d)(2)(A) .......... 5

42 U.S.C. §256b(d)(2)(B)(iii) .......... 5
42 U.S.C. §256b(d)(3) .......... 6
42 U.S.C. §256b(d)(3)(A) .......... 29
42 U.S.C. §256b(d)(3)(B)(iv) .......... 27
Md. Code, Health Occ. §12-6C-09.1(a)(1)-(2) .......... 16
Md. Code, Health Occ. §12-6C-09.1(a)(2) .......... 9, 18
Md. Code, Health Occ. §12-6C-09.1(a)(4) .......... 9, 16, 18, 30
Md. Code, Health Occ. §12-6C-09.1(a)(4)(i)(2) .......... 10
Md. Code, Health Occ. §12-6C-09.1(a)(4)(ii) .......... 10, 36
Md. Code, Health Occ. §12-6C-09.1(a)(5) .......... 9, 10
Md. Code, Health Occ. §12-6C-09.1(c)(1) .......... 6, 10, 16, 17, 24, 30, 32
Md. Code, Health Occ. §12-6C-09.1(d) .......... 10

**Regulations**

42 C.F.R. §§10.20-.25 .......... 6
42 C.F.R. §10.21(a)(1) .......... 6, 29, 30
42 C.F.R. §10.21(a)(2) .......... 6
61 Fed. Reg. 65,406 (Dec. 12, 1996) .......... 6
61 Fed. Reg. 65,409 (Dec. 12, 1996) .......... 6, 27
82 Fed. Reg. 1,210 (Jan. 5, 2017) .......... 5
82 Fed. Reg. 1,215 (Jan. 5, 2017) .......... 5

**Other Authorities**

Ryan Long et al., *Cui Bono? Misaligned Incentives in the 340B Program* 3 (USC Schaeffer Ctr. for Health Pol'y & Econ., White Paper Series, 2025), https://tinyurl.com/2zf6y5sc .......... 7

U.S. Dep't of Health & Hum. Servs., Health Res. & Servs. Admin., *340B ADR Decision Summaries*, https://tinyurl.com/yybjmha3 .......... 9, 29

## INTRODUCTION

This case is about forbidden state intrusion into a program created by federal law and exclusively overseen by the federal government. Congress created the 340B Drug Pricing Program to provide reduced-priced medicines to certain nonprofit healthcare providers called "covered entities." Because Congress cannot force private parties to give their products to other private parties at bargain-bin prices, Congress used its spending power to make a deal with pharmaceutical manufacturers: The federal government spends federal dollars reimbursing their drugs under Medicaid and Medicare Part B; manufacturers offer to sell drugs to covered entities at heavily reduced prices—sometimes pennies per pill.

As with any deal, Congress carefully defined manufacturers' obligations under that bargain. Critically, Congress "preserve[d]—rather than abrogate[d]—the ability of" manufacturers to attach reasonable conditions on covered entities' ability to acquire drugs at 340B prices. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024). And unlike "cooperative federalism" programs between states and the federal government, 340B is purely federal: Congress assigned HHS

exclusive power to administer and enforce it, and gave states no role in defining or enforcing manufacturers' obligations under it.

Nevertheless, some states have enacted laws that do nothing more than expressly alter manufacturers' 340B obligations and circumvent HHS's exclusive enforcement power. Maryland's H.B. 1056 is one such effort. H.B. 1056 prohibits manufacturers from attaching to their 340B offers the very same conditions that Congress "preserve[d]" manufacturers' "ability" to impose. *Novartis*, 102 F.4th at 460. If a manufacturer exercises its federal right to attach such conditions to its federal 340B offers, state officials can punish manufacturers with civil penalties, injunctions, and criminal sanctions. That means state law requires manufacturers to sell their drugs at 340B prices even in circumstances where federal law authorizes them to decline a sale, and creates a parallel enforcement regime to police conduct that Congress placed in HHS's exclusive bailiwick. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119-20 (2011).

Because none of that is consistent with the Supremacy Clause, this Court should reverse the district court's preliminary injunction holding that H.B. 1056 is not preempted. There are several paths to doing so.

The *en banc* Court can reaffirm the longstanding principle, dating back to *McCulloch v. Maryland*, 17 U.S. 316 (1819), that the Constitution forecloses state laws exclusively targeting federal creations for regulation or singling out "for less favorable treatment" those who partner with the federal government. *United States v. Washington*, 596 U.S. 832, 838-39 (2022) (quotation omitted). The *en banc* Court can, as the *McCuskey* majority correctly did with West Virginia's similar law, find H.B. 1056 field-preempted, as H.B. 1056 "targets only manufacturers that participate in the 340B program" for additional requirements, even though "Congress has ousted States" from the field of "340B program requirements." *PhRMA v. McCuskey*, 171 F.4th 675, 691-92 (4th Cir.), *reh'g en banc granted*, 176 F.4th 830 (4th Cir. 2026). Or the *en banc* Court can find H.B. 1056 conflict-preempted because it "interferes operationally with multiple aspects of the 340B program," *id.* at 693, by outlawing conduct federal law purposely permits and supplanting 340B's "unitary administrative and enforcement scheme," *Astra*, 563 U.S. at 120.

Under any of these principles, H.B. 1056 violates the Supremacy Clause. The United States agrees. As it explains in its amicus brief, H.B. 1056 is unconstitutional because it "requires manufacturers who

participate in the 340B Program (and only those manufacturers) to bear additional burdens imposed not by Congress but by Maryland." U.S.Br.1-2.

H.B. 1056 violates the Takings Clause too. States may not compel physical transfers of property for private use. Yet that is exactly what Maryland has tried to do. H.B. 1056 forces manufacturers to sell their property, at confiscatory prices, solely for the benefit of state-favored hospitals and pharmacies, under circumstances where federal law would allow manufacturers to decline the sale. Every time H.B. 1056 forces a manufacturer to make a sale it would otherwise decline, the manufacturer suffers a physical taking of its property. Manufacturers do not receive just compensation. Nor are H.B. 1056's takings put to a public use. H.B. 1056 does not lower patients' drug costs or expand patients' access to medications. The Takings Clause does not condone that kind of private-to-private wealth transfer. Indeed, that is why Congress crafted 340B as a spending-power bargain.

Regardless of which legal doctrine this Court prefers, the answer is the same. Maryland cannot undo the bargain that Congress created by

imposing state-law conditions on participation in the federal 340B Program. The *en banc* Court should affirm.

## BACKGROUND

For pharmaceutical manufacturers, access to Medicaid and Medicare Part B comes with strings attached. One such string is participation in the 340B Program.

Under the 340B Program, manufacturers execute a contract with the federal government known as a Pharmaceutical Pricing Agreement, or "PPA." The PPA obligates a manufacturer to "offer" drugs to covered entities "at or below the applicable ceiling price," which can go as low as a penny. 42 U.S.C. §256b(a)(1); 82 Fed. Reg. 1,210, 1,215 (Jan. 5, 2017). Covered entities, for their part, cannot transfer 340B-purchased drugs to anyone but their patients; that is unlawful "diversion." 42 U.S.C. §256b(d)(2)(A); *id.* §256b(a)(5)(B). Covered entities must also ensure that Medicaid rebates are not based on any drug unit bought at the 340B price; those are forbidden "duplicate discounts." *Id.* §256b(a)(5)(A), (d)(2)(B)(iii).

Congress vested HHS with exclusive authority to administer the 340B Program. *Astra*, 563 U.S. at 113. HHS created an administrative

dispute resolution ("ADR") process for 340B disputes. 42 U.S.C. §256b(d)(3); 42 C.F.R. §§10.20-.25. ADR is the exclusive forum for claims "that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1). It is also the only forum for manufacturers' diversion and duplicate-discount claims against covered entities. *Id.* §10.21(a)(2). Before bringing ADR claims, however, a manufacturer must audit the covered entity—which in turn requires that the manufacturer first establish "reasonable cause" to suspect 340B violations. 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). In practice, manufacturers usually cannot meet that standard without prescription-level "claims data" from 340B orders. *E.g.*, JA779-81, JA197, JA131-32, JA102-03.[1]

---

[1] Maryland's law does not appear to prevent manufacturers from requiring claims data as a condition of a 340B sale. But the state has studiously avoided taking a position as to whether H.B. 1056's language that "a 340B manufacturer may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug," Md. Code, Health Occ. §12-6C-09.1(c)(1), bans claims-data requirements. *See* Appellees' Br.56-57; Appellants' Reply Br.27-29. If it does, it is preempted. *See infra* pp. 26-30; *see also* No. 25-1054, Appellees' Suppl. Br.26-29.

Despite Congress's careful calibration of the 340B Program, covered entities have partnered with for-profit pharmacies to turn it into a massive arbitrage scheme. They buy, often at penny prices; re-sell to pharmacy customers at the price; and pocket the "spread." Thus, the more 340B-priced units a covered entity can buy, the more a covered entity can profit. *See* JA86-90; Ryan Long et al., *Cui Bono? Misaligned Incentives in the 340B Program* 3 (USC Schaeffer Ctr. for Health Pol'y & Econ., White Paper Series, 2025), https://tinyurl.com/2zf6y5sc. To increase the number of 340B transactions, covered entities retroactively claim 340B discounts on drugs previously dispensed by for-profit pharmacies like CVS and Walgreens. Covered entities work with pharmacies and "third-party administrators" to find instances where a pharmacy sold drugs to a customer that shares a name with a covered entity's patient. JA86-90. The covered entity and pharmacy retroactively deem the dispensed drugs 340B-eligible and divvy the spread between the 340B price and the market price the patient (and/or insurer) paid at the time of sale. *Novartis*, 102 F.4th at 457-58; JA86-90. The covered entity then places a new 340B-priced "replenishment" order

and transfers it to the pharmacy, where it will be sold at full price in a future transaction. JA86-90.

The federal government has long observed that these "contract-pharmacy" arrangements increase the risk of diversion and duplicate discounting. *E.g.*, JA693-94. And federal law allows manufacturers to impose reasonable limits on such arrangements to try to reduce that risk. Those reasonable limits include recognizing only one contract pharmacy per covered entity and requiring covered entities to provide certain data for contract-pharmacy dispensed drugs for which 340B pricing is claimed. *Novartis*, 102 F.4th at 463-64; *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 701, 704-06 (3d Cir. 2023).

Many manufacturers (including AbbVie, Novartis, and many PhRMA members) have individually implemented such policies. *E.g.*, JA39, JA173-74, JA193-97. These policies are conditions on a manufacturer's *offer* of 340B pricing and thus operate pre-sale: If a covered entity refuses to comply with a manufacturer's terms, the manufacturer will not sell to that covered entity at the 340B price. *See* JA178, JA193; *AbbVie Inc. v. Drummond*, 808 F.Supp.3d 1266, 1271-73 (W.D. Okla. 2025). Importantly, the policies at issue here do not

eliminate covered entities' access to 340B pricing. Manufacturers continue to offer the 340B price for drugs purchased through an in-house pharmacy or through the single recognized contract pharmacy. *See, e.g.*, Appellees' Br.19-21. Nor do these policies increase patients' costs or decrease their access to any drug. Again, covered entities are claiming 340B pricing based on past transactions—so the drugs are available regardless of these policies and the patient has already paid at the pharmacy counter. Manufacturers' policies have been upheld as permissible under federal law not only by the Third and D.C. Circuits but also in ADR challenges brought by covered entities. *See* U.S. Dep't of Health & Hum. Servs., Health Res. & Servs. Admin., *340B ADR Decision Summaries*, https://tinyurl.com/yybjmha3.

"Dissatisfied with the scale of drug discounts required by Congress in the 340B program," *McCuskey*, 171 F.4th at 682, Maryland enacted H.B. 1056, which "imposes obligations on drug manufacturers solely by virtue of their participation in the federal 340B program," *AbbVie, Inc. v. Brown*, 2026 WL 1005576, at *1 (4th Cir. Apr. 14, 2026). Maryland's law is expressly predicated on "42 U.S.C. §256b," the federal 340B statute. *See* Md. Code, Health Occ. §12-6C-09.1(a)(2), (4)-(5). And it parasitically

applies only to "340B manufacturer[s]," defined as drug manufacturers who have "signed a pharmaceutical pricing agreement under 42 U.S.C. §256b(a)(1)." *Id.* §12-6C-09.1(a)(5).

Under H.B. 1056, manufacturers cannot "deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity." Md. Code, Health Occ. §12-6C-09.1(c)(1). That provision applies only to "340B drug[s]"—drugs that have "been subject to an offer for reduced prices by a 340B manufacturer" under the federal 340B Program, including drugs "that would have been purchased but for" manufacturers' contract-pharmacy offer restrictions. *Id.* §12-6C-09.1(a)(4)(i)(2), (ii). H.B. 1056 thus applies only to manufacturers' participation in the 340B Program, prohibiting manufacturers from having a one-contract-pharmacy or claims-data policy and requiring manufacturers to sell at the 340B price when the federal 340B Program itself does not. And to enforce its extra 340B requirements, Maryland empowered state officials to sue in state court and punish manufacturers

with civil penalties, injunctive relief, and even criminal sanctions. *See id.* §12-6C-09.1(d).

AbbVie, Novartis, and PhRMA challenged H.B. 1056 on several constitutional grounds. The district court denied preliminary injunctive relief. A panel of this Court vacated the preliminary-injunction denial "[i]n light of this Court's decision in" *McCuskey*. *Brown*, 2026 WL 1005576, at *1; *see McCuskey*, 171 F.4th 675.

## ARGUMENT

### I. H.B. 1056 VIOLATES THE SUPREMACY CLAUSE.

#### A. The Supremacy Clause Forecloses Maryland's Effort To Target The Federal 340B Program For Unique Regulations.

More than two centuries ago, the Supreme Court made clear that the Supremacy Clause deprives states of any power "to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [national] government." *McCulloch*, 17 U.S. at 436. Ever since, the Court has consistently invalidated state action that violates that hierarchy. And it has treated with particular disapprobation state laws that single out for special regulation not just "the Federal Government" itself, but "those with whom it deals." *Washington*, 596 U.S. at 838.

That principle applies with full force to state laws that target inherently federal relationships. *See, e.g.*, *Forest Park II v. Hadley*, 336 F.3d 724, 730-34 (8th Cir. 2003); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325-27 (3d Cir. 2025). After all, when a state "regulates … the effective terms of [a] federal contract," "mandat[ing] the ways in which [parties] rende[r] services" for which "the federal government" has contracted, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014), it is ultimately regulating the federal government itself. But, again, "the activities of the Federal Government [must be] free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Simply put, because federal contractual relationships are "governed exclusively by federal law," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988), states cannot add or alter the obligations the federal government has imposed.

Such is the case here, as manufacturers that have agreed to carry out federal ends by entering into federal contractual relationships via PPAs with HHS fit this mold perfectly. JA182-91. Indeed, the 340B Program's nature as a spending-power bargain makes the constitutional problem with H.B. 1056 particularly acute. The Spending Clause does "not 'endow Congress with [any] power to regulate conduct.'" *Landor v.*

*La. Dep't of Corrs.*, 146 S.Ct. 1931, 1940 (2026) (alteration in original) (quoting *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 370-71 (2025)). As a result, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

"The legitimacy of" such laws "thus rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* So, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*; *see also Landor*, 146 S.Ct. at 1941. Regardless of whether the recipient of federal funds is a state or a private party, if Congress wants federal-funds recipients to be subject to obligations or prohibitions *because of their spending-power relationship with the federal government*, then it must "clearly and unambiguously alert" them of that intention. *Landor*, 146 S.Ct. at 1941.

Participants in federal spending-power programs thus cannot be subjected to state-law restrictions on conduct that occurs entirely within the confines of the program unless Congress put them on clear notice that

states may impose such restrictions.[2] But H.B. 1056 does nothing other than regulate the terms of participation in a federal program—and in ways that make program participation more onerous than Congress saw fit to demand. "Maryland's law requires manufacturers who participate in the 340B Program—and only those manufacturers—to bear additional burdens imposed not by Congress but by Maryland." U.S.Br.1-2. But "a State cannot intercede in the execution of the laws Congress enacts." U.S.Br.12; *accord McCuskey*, 171 F.4th at 688 (drawing on principles of both intergovernmental immunity and traditional preemption as reinforcing that "federal interests edge out state interests when federal and state law 'clash'"). H.B. 1056's exclusive focus on the 340B Program is thus sufficient to establish its unconstitutionality, as the United States has explained in its amicus brief.

Of course, that does not mean that participants in a federal spending-power program are immune from state regulation. They

[2] Sometimes Congress does so. In "cooperative federalism" programs, for instance, Congress typically gives states an explicit role in regulating and administering the program. *See, e.g.*, *PhRMA v. Walsh*, 538 U.S. 644 (2003) (Medicaid). But unless Congress explicitly assigns states that role in a federal spending program, the Supremacy Clause forbids them from claiming it.

typically must comply with generally applicable and neutrally applied state laws (unless Congress preempts them), because compliance with those laws is not conditioned on participation in a federal program. *See Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920). That kind of *indirect* regulation as a "consequence of a broad, neutrally applicable [state-law] rule" is sometimes an unavoidable incident of our federal system. *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). But state laws that "specifically target" federal-program participants' federal-program participation, *id.*—and thus *directly* "interfere with the implementation of a federal program by a federal agency," *Forest Park II*, 336 F.3d at 732—are impermissible.

That is true regardless of label. Nondiscrimination and direct-regulation principles are commonly articulated in both intergovernmental-immunity cases and preemption cases. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *Boyle*, 487 U.S. at 504-08; *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 639 (6th Cir. 2025); *Forest Park II*, 336 F.3d at 730-32. Indeed, the Supreme Court has long drawn "on principles of intergovernmental immunity" when conducting preemption

analyses in cases involving state regulation of intrinsically federal areas. *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022) (collecting cases). And as the United States explains, intergovernmental immunity protects *all* "those who deal with the federal government" from being targeted because of their federal relationship. *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (quotation omitted). Appellants thus agree with the United States that the intergovernmental-immunity doctrine applies here and resolves this case. *See* U.S.Br.18-20. Likewise, Appellants agree that the panel correctly concluded in its *McCuskey* opinion that the principles underlying intergovernmental immunity yield the same result under field- and conflict-preemption analyses. *See* 171 F.4th at 688-89.

At the very least, the fact that H.B. 1056 does nothing other than regulate participation in a federal program forecloses any argument that the presumption against preemption applies. "No artificial presumption" applies when states legislate "in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). The federal presence in determining manufacturers' 340B obligations is beyond significant, which even H.B. 1056 recognizes by expressly incorporating those federal-law obligations. Md. Code, Health

Occ. §12-6C-09.1(a)(1)-(2), (a)(4), (c)(1). As the panel majority explained, the terms of relationships between manufacturers and covered entities are "inherently federal in character" because they "originate[] from, [are] governed by, and terminate[] according to federal law." *McCuskey*, 171 F.4th at 689 (quoting *Buckman*, 531 U.S. at 347). While that alone suffices to render H.B. 1056 unconstitutional, it at a minimum means that Maryland must rebut a presumption of unconstitutionality. *See Geo Grp., Inc.*, 50 F.4th at 761-62.

**B. H.B. 1056 Is Field-Preempted.**

**1.** It is beyond dispute that H.B. 1056 expressly and exclusively regulates the federal 340B Program. If Congress repealed 340B tomorrow, H.B. 1056 would become a nullity. Under H.B. 1056, "*a 340B manufacturer* may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a *340B drug* by, or delivery of a *340B drug* to, a pharmacy that is under contract with or otherwise authorized by a covered entity to receive *340B drugs* on behalf of the covered entity[.]" Md. Code, Health Occ. §12-6C-09.1(c)(1) (emphases added). A "340B drug" is "a covered outpatient drug under 42 U.S.C. §256B" that "[h]as been subject to an offer for reduced prices by a

340B manufacturer under 42 U.S.C. §256b(a)(1)," and "[i]s purchased by a covered entity" or "would have been purchased but for" a manufacturer's contract-pharmacy policy limitations. *Id.* §12-6C-09.1(a)(4). And Maryland's law gives "covered entity" "the meaning stated in" the federal 340B statute. *Id.* §12-6C-09.1(a)(2).

The sole field in which H.B. 1056 operates, then, is the field of "340B program requirements." *McCuskey*, 171 F.4th at 691. All H.B. 1056 does is change manufacturers' 340B obligations. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992) (defining the field by examining the "impact" of state law "on the federal scheme"). Congress's condition for accessing Medicaid and Medicare Part B is that a manufacturer must "offer each covered entity covered outpatient drugs for purchase at or below the [340B] price," 42 U.S.C. §256b(a)(1), subject to reasonable limitations, *Novartis*, 102 F.4th at 462-63. H.B. 1056, however, says manufacturers must make a different offer to covered entities—one without the reasonable limitations federal law permits. As the state acknowledges, H.B. 1056 requires manufacturers to "complet[e] … drug sales" that "would not have occurred but for" manufacturers' contract-pharmacy policies. Appellees' Br.54-55. By overriding the

limited 340B obligations manufacturers accepted when they agreed to join Congress's program, H.B. 1056 intrudes upon this federal field. But states cannot "take over a federal program just because they think they can do it better." *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991).

As the panel majority correctly explained in *McCuskey*, the 340B Program's spending-power origins reinforce that conclusion. Again, a spending-power bargain works like a contract. Fashioning the terms of that contract is purely a matter of federal law. State efforts to rewrite that bargain not only force Congress's counterparties to take on obligations to which they never agreed, *see supra* pp. 13-17, but hurt the federal government itself. Generally, such efforts strip Congress of its power (and duty) to "define the limits" of federal spending programs, *Rust v. Sullivan*, 500 U.S. 173, 194 (1991), and to "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good," *OPM v. Richmond*, 496 U.S. 414, 428 (1990). And in the 340B context specifically, laws like H.B. 1056 disincentivize manufacturers from participating in Medicaid and Medicare by increasing the "price of admission" to those healthcare programs. *Drummond*, 808 F.Supp.3d at 1277. But, as the United States

explains, "[o]nly the federal government can determine the extent to which it will tolerate the risk of manufacturer withdrawal" from Medicaid and Medicare. U.S.Br.21-22.

Taking into account that critical context is not applying a "more stringent" standard. *Contra McCuskey*, 171 F.4th at 701 (Benjamin, J., dissenting). Rather, doing so is simply applying ordinary, longstanding preemption principles. After all, "[p]reemption of all varieties is ultimately a question of congressional intent." *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014), *aff'd sub nom.*, *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016). To discern that intent, courts must evaluate all "the peculiarities and special features of the federal regulatory scheme." *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 638 (1973). The spending-power bargain is a critical feature of the 340B scheme because it reveals the constraints Congress was under when it set out to incentivize private parties' voluntary participation. And a court cannot reasonably conclude that Congress intended to silently empower states to upset 340B's incentive structure when settled spending-power doctrine requires Congress to make such intentions clear and unambiguous. *See Landor*, 146 S.Ct. at 1940-41.

That analysis fits neatly within this Court's preemption precedents. In *Columbia Venture, LLC v. Dewberry & Davis, LLC*, for instance, the Court held preempted state-law claims against federal contractors that would have made it costlier and more difficult for the government to administer a federal program through private parties. 604 F.3d 824, 831-32 (4th Cir. 2010) (citing *Boyle*, 487 U.S. at 507-08). Because Congress chose to subject those private parties to only a limited federal appeals process, the extra liability those state-law claims sought to impose would have destroyed Congress's "careful balancing of [competing] interests" in designing the federal program. *Id.* at 831. Analyzing the federal 340B statute with a view toward its spending-power origins is no different. Doing so underscores that Congress made a series of policy choices concerning what burdens to impose on manufacturers and what benefits to offer covered entities, and that H.B. 1056 consciously rebalances this incentive structure to the federal government's detriment. *See* U.S.Br.20-23.

Both the Supreme Court and other courts have used similar reasoning to hold state laws preempted. For instance, the panel majority correctly relied on *Lawrence County v. Lead-Deadwood School District*

*No. 40-1*, where South Dakota tried to impose additional conditions on the use of funds that Congress gave to a local government for "any governmental purpose." 469 U.S. 256, 258-59 (1985). By adding terms to Congress's exercise of its spending power, the state ran afoul of "the freedom and flexibility" Congress intentionally preserved for the recipients of federal dollars. *Id.* at 263-64. And in *Forest Park II*, the Eighth Circuit rejected Minnesota's effort to restrict the ability of private housing developers who agreed to participate in a federal program to subsidize low-income housing to exit the program on Congress's terms. 336 F.3d at 728-30. Like H.B. 1056, that law interfered with the "incentive" Congress used to attract developers in the first place by imposing "additional requirements on federal program participants [and] restrict[ing] the exercise of the participants' federally granted rights."[3] *Id.* at 733-34.

[3] After holding that the Supremacy Clause itself displaced the challenged state law, the court "also" held that "the federal statutes and regulatory scheme" at issue there "impliedly preempt the state statutes because the state statutes conflict with the federal law." *Forest Park II*, 336 F.3d at 731-33.

Thus, once Congress has calibrated the costs and benefits needed to attract and sustain participation in a wholly federal program, states cannot second-guess its judgment.

**2.** The district court's reasoning did not account for any of this. The district court decided that because, in its view, the federal 340B statute is "silent as to the matter of delivery," Congress left the door open for state legislation. JA884; *see also McCuskey*, 171 F.4th at 706 (Benjamin, J., dissenting) (similar). That reasoning is both irrelevant and wrong.

At the outset, even assuming that the 340B statute is "silent" on "delivery," that would not mean that states are free to impose their own "delivery" conditions. In the spending-power context, states do not have the power to impose their own conditions on program participation unless Congress clearly informs participants that states may do so. If "statutory silence" left a gap in the program that could later be filled by any state, "funding recipients" would never have "the requisite clear notice" of their obligations. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 220, 226 (2022) (quotation omitted). "And if someone has not agreed to be bound" by a condition in a spending power statute, "he cannot be." *Landor*, 146 S.Ct. at 1944.

That said, H.B. 1056 does not regulate delivery. H.B. 1056 is not about getting drugs where they need to go; AbbVie, Novartis, and PhRMA's members already deliver the same drugs to the same pharmacies all throughout Maryland. *See, e.g.*, JA122, JA764 ("AbbVie will deliver its drugs to any pharmacy, anywhere."). What H.B. 1056 controls is the price of those same units: It does this by prohibiting manufacturers from exercising their authority under federal law to "restrict" contract pharmacies' "acquisition of a 340B drug," Md. Code, Health Occ. §12-6C-09.1(c)(1), defined as a drug offered for "reduced prices" under the 340B program, *id.* §12-6C-09.1(a)(4)(i). Thus, when covered entities demand retroactive discounts on an unlimited number of contract pharmacy purchases of drugs that have already been dispensed, H.B. 1056 forbids manufacturers from refusing to let them "acqui[re]" the drugs on those terms. The practical consequence is a change in the *price* of a drug that was already delivered and dispensed.

Regardless, federal law is not "silent" in the way the district court believed. To ensure that manufacturers would participate in 340B, Congress "preserve[d] … the ability of sellers to impose" some conditions on their offers to sell drugs to covered entities at 340B prices. *Novartis*,

102 F.4th at 460. That the statutory (and contractual) text does not enumerate every permissible condition is not silence—it is a "preserv[ation]" of discretion, bounded by the requirement that a manufacturer's offer remain bona fide. *Id.* at 460-64; *see Sanofi*, 58 F.4th at 704-07. That is a substantive federal-law standard: A contract-pharmacy policy so restrictive or burdensome as to negate a manufacturer's obligation to extend a bona fide offer of 340B pricing would violate the federal statute. *Novartis*, 102 F.4th at 462-64; *Sanofi*, 58 F.4th at 704, 707. If a manufacturer crosses that line, a federal ADR panel (not a state court) resolves the issue by applying federal (not state) law. *See McCuskey*, 171 F.4th at 693-94 ("HHS maintains the power to enforce *bona fide* offers to covered entities.").

Thus, even if "silence" could help the state, it does not exist here, as federal law provides both the substantive standard of conduct (make a bona fide offer) and the mechanism through which HHS is enforcing that standard (ADR). And again, silence cannot help the state because in the spending power context, Congress's choice to expressly require some conditions and not others matters. *Landor*, 146 S.Ct. at 1941.

### C. H.B. 1056 Is Obstacle-Preempted.

H.B. 1056 is also obstacle-preempted because it "interferes operationally with multiple aspects of the 340B program." *McCuskey*, 171 F.4th at 693-694.

H.B. 1056 impermissibly curtails manufacturers' federal rights to impose reasonable conditions on 340B offers. Federal law undisputably allows manufacturers to limit the number of contract-pharmacy arrangements they will recognize and to require covered entities to submit claims data as a condition of receiving 340B pricing. *Novartis*, 102 F.4th at 463-64; *Sanofi*, 58 F.4th at 701, 703-06. It is also undisputed that H.B. 1056 outlaws at least some of the same policies Congress allows manufacturers to implement. Maryland cannot alter "the federally-approved operation" of a federal program. *Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1167 (9th Cir. 2008); *see also e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 865 (2000); *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022); *Chamber of Com. of the U.S. v. Edmondson*, 594 F.3d 742, 769 (10th Cir. 2010).

By creating a parallel state forum to resolve 340B disputes, H.B. 1056 undermines Congress's goal of uniform, nationwide 340B

administration, in violation of the Supremacy Clause. *See Astra*, 563 U.S. at 120.

### 1. H.B. 1056 Frustrates Manufacturers' ADR Access.

The federal 340B statute expressly contemplates that manufacturers will bring potential violations to HHS's attention through ADR. *See* 42 U.S.C. §256b(d)(3)(B)(iv). And Congress designed a sequential process for doing so. First, a manufacturer identifies potential 340B violations. Then, the manufacturer audits the covered entity. Next, the manufacturer brings a claim in ADR. To initiate an audit, a manufacturer must provide "documentation" to HHS establishing "reasonable cause" to believe that a covered entity has engaged in diversion or duplicate discounting. 61 Fed. Reg. at 65,409. HHS requires specificity: A manufacturer must produce a detailed audit plan that "set[s] forth a clear description of why [the manufacturer] has reasonable cause" and that identifies "sufficient facts and evidence in support of the belief." *Id.* at 65,410. To the extent H.B. 1056 bans manufacturers' claims-data conditions, *see supra* n.1, that ban would severely hamper manufacturers' ability to obtain the substantive information necessary to identify potential 340B violations, initiate audits, and bring ADR claims.

*See McCuskey*, 171 F.4th at 695 (holding that West Virginia's H.B. 1056 analog "frustrates the operation of the audit mechanism and thus the enforcement of §340B"). It would also hurt HHS, as it would deprive the agency of manufacturers' identification of potential program abuse.

**2. H.B. 1056 Supplants ADR And Disrupts 340B's Nationwide Uniformity.**

When Congress intends federal law to operate the same way nationwide, state law must yield. *See Arizona v. United States*, 567 U.S. 387, 401-02 (2012) (emphasizing the "comprehensive and unified" nature of federal alien-registration requirements in finding a supplementary state law invalid); *see also, e.g.*, *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 705 (4th Cir. 1993); *City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155, 177 (4th Cir. 2002); *PPL EnergyPlus*, 753 F.3d at 477. The Supreme Court concluded in *Astra* that Congress designed the 340B Program to operate as a single, nationally uniform program. 563 U.S. at 113, 121-22. And to ensure that uniformity, Congress decided that the 340B Program would have a sole federal agency decisionmaker and enforcer. *Id.*

H.B. 1056 disrupts Congress's pursuit of uniformity by empowering Maryland officials and state courts to decide the circumstances under

which a 340B-participating manufacturer must sell its drugs at the 340B price. The federal 340B statute obligates "the Secretary" of HHS to "promulgate regulations to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for drugs purchased under [340B]." 42 U.S.C. §256b(d)(3)(A). Those regulations have "the force of law"—and thus "pre-empt" state law. *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). And, crucially, they reflect HHS's view that the exclusive jurisdiction of the federal ADR tribunal to encompass claims that "a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1).

Yet Maryland wants its own state courts to decide those exact questions—even as HRSA is currently resolving them in ADR claims brought by covered entities. *See 340B ADR Decision Summaries*, https://tinyurl.com/yybjmha3. In an H.B. 1056 enforcement action, the question will not be whether the manufacturer delivered drugs to a contract pharmacy; manufacturers are more than willing to do so—if pharmacies pay non-340B prices. *See, e.g.*, JA122, JA764; *Drummond*, 808 F.Supp.3d at 1277. The question will be whether a manufacturer

"restrict[ed]" a covered entity's ability to obtain 340B pricing for those drugs. *See* Md. Code, Health Occ. §12-6C-09.1(a)(4), (c)(1). Maryland simply cannot (and has never tried to) explain how an ADR claim under 42 C.F.R. §10.21(a)(1) would differ ***in substance*** from a state-court suit brought under H.B. 1056. That is because there would be no difference. The only difference is the ***result***: The same conduct that is lawful under federal law (such that manufacturers prevail in ADR , *see* No. 24-1949, Dkt.75-1 to 3) would expose manufacturers to penalties and punishment in Maryland's courts.

Additional examples of conflict abound. If a manufacturer were sued for violating H.B. 1056, that state-court suit would inevitably require answering a number of federal questions, including whether: the drugs for which 340B pricing is sought are actually going to patients of covered entities; the covered entity and/or contract pharmacy is engaged in duplicate discounting, *see* 42 U.S.C. §256b(a)(5)(A); the contract pharmacy that dispenses the 340B-priced drugs could lawfully receive them, *see id.* §256b(a)(5)(B); and any violations under federal law disqualify the covered entity from participating in 340B, *see Astra*, 563 U.S. at 120. Indeed, the State admitted on appeal that H.B. 1056 creates

federal-law questions that overlap with those in the federal program. Appellees' Br.56. This overlap between federal and state law "inevitably conflict[s] with" HHS's exclusive "responsibility to police" the same subject matter "consistently with [its] judgment and objectives." *Buckman*, 531 U.S. at 350; *see also, e.g.*, *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007) (state claims that "merely duplicate[]" federal claims subject to an exclusive "enforcement scheme … are precluded under a theory of obstacle preemption").

Just as in *Astra*, "the risk of conflicting adjudications" threatens Congress's vision for a uniform federal program. *See* 563 U.S. at 120. If Maryland (and every other state in the Union) can revamp the program's obligations, then the program will soon cease to be either federal or uniform. This Court should not permit that sort of 50-state-free-for-all approach, which would make it impossible for HHS "to administer both Medicaid and §340B harmoniously and on a uniform, nationwide basis." *Id.*

## II. H.B. 1056 VIOLATES THE TAKINGS CLAUSE.

AbbVie's Takings Clause claim provides an independent basis to reverse. The Takings Clause prohibits governments from forcing

property to be transferred from its owner to another without just compensation. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015). H.B. 1056 does just that. AbbVie's contract-pharmacy policy is a set of federally lawful conditions attached to AbbVie's pre-sale 340B offer. So when covered entities do not accept AbbVie's offer conditions, they reject AbbVie's 340B offer and AbbVie thus has no federal obligation to complete 340B-priced sales. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 704. Maryland creates new state-law obligations in that void: offer the 340B price unconditionally and complete more 340B-priced sales.

Although AbbVie is not required to make—and would not make—340B-priced sales to covered entities that reject AbbVie's offer under the federal 340B Program, Maryland's law nonetheless compels AbbVie to allow covered entities to "acqui[re]" its drugs at the 340B price. Md. Code, Health Occ. §12-6C-09.1(c)(1). Absent H.B. 1056, AbbVie simply would not sell in those circumstances and would retain title to its property. *See* JA173-74, JA178, JA202; *Drummond*, 808 F.Supp.3d at 1279-80; *AbbVie Inc. v. Brown*, 809 F.Supp.3d 1341, 1360-62 (D. Utah 2025). Because H.B. 1056 forces AbbVie to complete 340B-priced sales that federal law does not demand, it destroys AbbVie's ability to "control

[the] disposition" of its drugs and thus takes AbbVie's property. *Horne*, 576 U.S. at 364.

To avoid that conclusion, states like Maryland (and the Fifth Circuit in *Murrill*) typically resort to a handful of arguments, none of which persuades.

***First***, Maryland is wrong that its ***state-law*** taking is rendered "voluntary" by AbbVie's participation in the ***federal*** 340B Program. No. 24-1939, Dkt.36 at 60-65. Congress's spending power includes the power only to impose conditions that Congress "clearly and unambiguously" identifies. *Landor*, 146 S.Ct. at 1941. Congress clearly laid out the terms of participation—*i.e.*, make a bona fide offer of discounted pricing to covered entities—and did not obligate manufacturers to comply with Maryland's (or any other state's) tack-on regulations.

Maryland's confiscations of AbbVie's property must therefore be accompanied by a new, state-provided benefit. *See Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023). Otherwise, Maryland could force Medicare-participating hospitals to provide free treatment, grocery stores that accept SNAP benefits to give away food, and private universities that administer Pell Grants to provide extra

scholarships. But Maryland "isn't giving the drug manufacturers anything they don't already have (i.e., access to the federal market) as compensation for forcing them to make discounted sales." *Drummond*, 808 F.Supp.3d at 1279. Put simply, AbbVie never accepted a "carrot" from Maryland that would justify H.B. 1056's "stick."

Maryland invokes another iteration of the "voluntary participation" argument by asserting that the state law compels no more discounted sales than the federal 340B Program already requires. No. 24-1939, Dkt.36 at 64. But again, manufacturers' policies are permitted by federal law, so unconditional 340B-priced sales are not required by the federal program. Indeed, compelling unlimited, unconditional 340B-priced sales that federal law does not already require was Maryland's impetus for enacting H.B. 1056. *See id.* at 11 (manufacturers' policies lead to "[s]ubstantial declines in 340B revenues"). Any argument that such sales were already part of the ***federal*** program is just a disagreement with the D.C. and Third Circuits' interpretations of the federal 340B statute in *Novartis* and *Sanofi*.

***Second***, other states (including West Virginia in the related appeal) argue that states can avoid the Takings Clause by phrasing their

takings as "negative obligation[s] of non-interference." *AbbVie, Inc. v. Murrill*, 180 F.4th 747, 763 (5th Cir. 2026) (quotation omitted). But that is equally untenable. The Supreme Court squarely rejected the substance of that negative-obligation argument in *Cedar Point Nursery v. Hassid* by invalidating a negatively phrased law that punished "[***i***]***nterference*** with organizers' right of access" to private property. 594 U.S. 139, 144 (2021) (emphasis added).

***Third***, Maryland cannot rely on the common (yet self-defeating) proposition employed by others that laws like H.B. 1056 apply only ***after*** a 340B sale is completed. *See Murrill*, 180 F.4th at 763. For one, such an interpretation would rob Maryland's law of any effect; manufacturers like AbbVie could simply continue to enforce their pre-sale offer conditions and refuse to sell 340B-priced drugs to covered entities that decline their offer terms. For another, Maryland's law goes out of its way to clarify that it governs "drug[s] that ***would have been purchased*** but for" manufacturers' offer conditions. Md. Code, Health Occ. §12-6C-09.1(a)(4)(ii) (emphasis added).

Maryland simply cannot navigate the tension between its preemption and takings arguments. When it comes to preemption,

Maryland argues that it employed its traditional police powers to regulate a topic—340B delivery—that is purportedly beyond the 340B Program's contours. *See* No. 24-1939, Dkt.36 at 36-37. Yet, when it comes to takings, Maryland knits 340B and H.B. 1056 together. *Id.* at 63-64. The state cannot have it both ways. If Congress did not regulate 340B sale terms regarding delivery (as Maryland supposes on preemption), then participation in the 340B Program cannot manifest as consent to Maryland's purported delivery restrictions (as Maryland requires on takings). By the same token, if H.B. 1056 really is just an attempt to impose conditions on the 340B Program itself (as it plainly is), then H.B. 1056 impermissibly intrudes on that federal program. Maryland cannot resolve this tension at the very core of its defenses, and that failure dooms H.B. 1056.

## CONCLUSION

This Court should be reverse.

Dated: July 31, 2026

Respectfully submitted,

*/s/ Matthew S. Owen*
Matthew S. Owen, P.C.
Russell Balikian
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8616
mowen@gibsondunn.com
rbalikian@gibsondunn.com

Meredith M. Pohl
King & Spalding LLP
1700 Pennsylvania Avenue N.W.,
Suite 900,
Washington, D.C. 20006
(202) 737-0500
mpohl@kslaw.com

*Counsel for Plaintiffs – Appellants AbbVie, Inc.; Allergan, Inc.; Durata Therapeutics, Inc.; AbbVie Products LLC; Aptalis Pharma US, Inc.; Pharmacyclics LLC; Allergan Sales, LLC*

*/s/ Erin E. Murphy*
Erin E. Murphy
Matthew D. Rowen
Clement & Murphy, PLLC
706 Duke Street,
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com

*Counsel for Plaintiff – Appellant*
*Pharmaceutical Research and Manufacturers of America*

*/S/ JESSICA L. ELLSWORTH*
JESSICA L. ELLSWORTH
SUSAN M. COOK
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hlc.com
susan.cook@hlc.com

*Counsel for Plaintiff – Appellant*
*Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation imposed by this Court's order inviting supplemental briefing (ECF 112), because it contains 6,847 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century font 14-point type face.

*/s/ Matthew S. Owen*
Matthew S. Owen

## CERTIFICATE OF SERVICE

The foregoing brief has been served via the Court's CM/ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on July 31, 2026, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ Matthew S. Owen*
Matthew S. Owen